*Received and Filed*
*07-3531*
*02/07/08*
*Marcia M. Waldron,*
*Clerk*

# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

## Case No. 07-3531

**PEDRO LOZANO; HUMBERTO HERNANDEZ; ROSA LECHUGA; JOHN DOE 1; JOHN DOE 2; JOHN DOE 3, A MINOR, BY HIS PERENTS; JANE DOE 1; JANE DOE 2; JANE DOE 3; JOHN DOE 4, A MINOR, BY HIS PARENTS; BRENDA LEE MIELES; CASA DOMINICANA OF HAZLETON, INC.; HAZLETON HISPANIC BUSINESS ASSOCIATION; PENNSYLVANIA STATEWIDE LATINO COALITION; JANE DOE 5; JOHN DOE 7; JOSE LUIS LECHUGA**

*Appellees*

v.

## CITY OF HAZLETON

*Appellant*

_____

## BRIEF OF APPELLANT, CITY OF HAZLETON
_____

APPEAL FROM FINAL DECISION AND JUDGMENT OF THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF PENNSYLVANIA AT DOCKET NO. 3:06-cv-01586  AND ANTECEDENT ORDERS ENTERED ON DECEMBER 15, 2006 and MARCH 9, 2007

_____

**Kris W. Kobach, Esquire**
**Professor of Law**
**Univ. of Missouri (Kansas City)**
**5100 Rockhill Road**
**Kansas City, MO  64110-2499**
**(913) 638-5567**

**Harry G. Mahoney, Esquire**
**Carla P. Maresca, Esquire**
**Andrew B. Adair, Esquire**
**Deasey Mahoney & Valentini, Ltd.**
**1601 Market Street**
**Suite 3400**
**Philadelphia, PA 19103-2978**
**(215) 587-9400**

# **TABLE OF CONTENTS**

Page

TABLE OF CONTENTS ..................................................................ii

TABLE OF AUTHORITIES ..........................................................vii

STATEMENT OF SUBJECT MATTER JURISDICTION
AND APPELLATE JURISDICTION.................................................. 1

STATEMENT OF ISSUES ............................................................. 2

STATEMENT OF THE CASE......................................................... 3

STATEMENT OF THE FACTS....................................................... 5

STATEMENT OF RELATED CASES ............................................. 9

STANDARD OF REVIEW ............................................................ 10

SUMMARY OF ARGUMENT ................................................ …………………………11

ARGUMENT………………………………………………………………. 14

I.      THE DISTRICT COURT ERRED IN HOLDING THAT
        THE APPELLEES POSSESS STANDING…………………………14

        A.  THE CONSTITUTIONAL AND PRUDENTIAL
            REQUIREMENTS OF STANDING…………………………………..14

        B.  ALL APPELLEES LACK PRUDENTIAL STANDING
            TO BRING AN INA PREEMPTION CHALLENGE…………………15

        C.  ILLEGAL ALIENS LACK PRUDENTIAL STANDING TO
            CHALLENGE A LOCAL LAW THAT IMPEDES THEIR
            ADMITTED AND CONTINUING VIOLATION OF
            FEDERAL LAW…………………………………………………………..17

D.  JOHN DOE 3, JOHN DOE 7, AND JANE DOE 5 LACK STANDING…………………………………………………………19

E.  JOHN DOE 1 LACKS STANDING…………………………………...21

F.  LANDLORDS LOZANO AND ESPINAL LACK STANDING………22

G.  THE HAZLETON HISPANIC BUSINESS ASSOCIATION AND LOZANO LACK STANDING AS BUSINESS OWNERS…………...25

H.  THE PENNSYLVANIA STATEWIDE LATINO COALITION LACKS STANDING………………………………………………..28

I.  CASA LACKS STANDING…………………………………………...30

II.  THE DISTRICT COURT ERRED IN ALLOWING THE DOES TO SUE ANONYMOUSLY…………………………………32

III.  THE DISTRICT COURT ITSELF VIOLATED 8 U.S.C. §§ 1373(A) AND 1644 BY RESTRICTING THE CITY'S COMMUNICATION WITH THE FEDERAL GOVERNMENT…………34

IV.  THE DISTRICT COURT ERRED IN HOLDING THAT THE IIRA IS PREEMPTED BY FEDERAL IMMIGRATION LAW…………36

A.  THE DISTRICT COURT FAILED TO APPLY THE PRESUMPTION AGAINST PREEMPTION ………………………...36

B.  THE DISTRICT COURT ERRED IN FINDING THE IIRA EMPLOYMENT PROVISIONS TO BE EXPRESSLY PREEMPTION……………………………………………………39

1.  THE DISTRICT COURT DISREGARDED THE PLAIN MEANING OF FEDERAL LAW WHEN HOLDING THE IIRA EMPLOYMENT PROVISIONS TO BE EXPRESSLY PREEMPTED……………………………………………………39

    2. THE DISTRICT COURT ERRED BY MISREADING A
       COMMITTEE REPORT TO OVERRIDE THE PLAIN
       MEANING OF A FEDERAL STATUTE…………………………42

    3. A COMMITTEE REPORT CANNOT TRUMP THE
       TEXT OF A STATUTE IN ANY CASE………………………..46

    4. THE DISTRICT COURT ERRED IN ASSERTING THAT
       THE IIRA PRIVATE RIGHT OF ACTION IS NOT
       PERMITTED BY 8 U.S.C. 1324A(H)(2)………………………..47

C. THE DISTRICT COURT ERRED IN FINDING THE IIRA
   EMPLOYMENT PROVISIONS TO BE PREEMPTED THROUGH
   FIELD PREEMPTION…………………………………………………52

D. THE DISTRICT COURT ERRED IN FINDING THE IIRA TO BE
   PREEMPTED THROUGH CONFLICT PREEMPTION……………..55

    1. THE DISTRICT COURT ERRONEOUSLY DISREGARDED
       THE DOCTRINE OF CONCURRENT ENFORCEMENT, TO
       WHICH THE IIRA ADHERES…………………………………56

    2. THE IIRA IS CONSISTENT WITH THE CONGRESSIONAL
       OBJECTIVE OF MAXIMIZING STATE AND LOCAL
       ASSISTANCE IN IMMIGRATION ENFORCEMENT………...60

    3. THE DISTRICT COURT ERRED BY INVENTING A
       THEORY OF "EXCESSIVE ENFORCEMENT"………………65

    4. THE DISTRICT COURT ERRED BY ASSUMING
       PREEMPTION OCCURS WHEREVER SLIGHT
       VARIATIONS IN FEDERAL AND LOCAL STATUTES
       EXIST …………………………………………………………...66

    5. THE DISTRICT COURT ERRED IN ITS
       IDENTIFICATION OF SUPPOSED DIFFERENCES
       BETWEEN THE IIRA AND FEDERAL LAW……………………..69

V.     THE DISTRICT COURT ERRED IN FINDING A FACIAL
       DUE PROCESS VIOLATION………………………………………..76

       A.  THE DISTRICT COURT FAILED TO APPLY THE *SALERNO*
           STANDARD………………………………………………..76

       B.  THE EMPLOYMENT PROVISIONS OF THE IIRA PROVIDE
           DUE PROCESS……………………………………………..78

       C.  THE HARBORING PROVISIONS OF THE IIRA PROVIDE
           DUE PROCESS……………………………………………..82

VI.    THE DISTRICT COURT ERRED IN HOLDING THAT THE IIRA
       VIOLATES 42 U.S.C. § 1981……………………………………..83

       A.  ILLEGAL ALIENS ARE NOT "PERSONS" COVERED
           BY § 1981…………………………………………………83

       B.  § 1981 IS LIMITED TO INSTANCES OF RACIAL
           DISCRIMINATION…………………………………………84

       C.  MORE RECENT FEDERAL STATUTES PROHIBIT THE
           DISTRICT COURT'S INTERPRETATION OF § 1981………………85

VII.   THE DISTRICT COURT ERRED IN HOLDING THAT THE IIRA
       VIOLATES 42 U.S.C. § 1981………………………………………...86

VIII.  THE DISTRICT COURT ERRED IN HOLDING THAT THE
       ORDINANCES EXCEED THE POLICE POWERS OF THE CITY……..90

CONCLUSION ................................................................. 92

CERTIFICATES OF BAR MEMBERSHIP ........................................ 93

CERTIFICATE OF COMPLIANCE……………………...……………………97

CERTIFICATE OF SERVICE……………………………………………………98

ADDENDUM…………………………………………………………………………..99

# TABLE OF AUTHORITIES

**Federal Cases**                                                      **Page**

*Affordable Hous. Found., Inc. v. Silva*, 469 F.3d 219, 240-41 (2d. Cir. 2006). . . 54

*AFGE v. Styles*, 123 Fed. Appx. 51, 52 (3d. Cir. 2004) . . . . . . . . . . . . . . . . . . . 24

*Alexander v. Sandoval*, 532 U.S. 275, 294 (2001) . . . . . . . . . . . . . . . . . . . . . . . 50

*Anderson v. Conboy*, 156 F.3d 167, 171 (2d Cir. 1998) . . . . . . . . . . . . . . . . 84, 85

*Anjelino v. The New York Times Company*, 200 F.3d 73, 98 (3d Cir. 1999) . . . . 84

*Armstrong v. Toler*, 24 U.S. 258, 278. (1826) . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002) . . . . . . . . . . . . . . . . . . 42

*Becker v. IRS (In re Becker)*, 407 F.3d 89 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . 66

*Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992) . . . . . . . . . . . . . 36, 38

*Connecticut National Bank v. Germain*, 503 U.S. 249, 254 (1992) . . . . . . . . . . 42

*De Canas v. Bica*, 424 U.S. 351 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Doe v. Bell Atl. Business Sys. Servs.*, 162 F.R.D. 418, 420 (D. Mass. 1995) . . . . 33

*Doe v. Frank*, 951 F.2d 320 (11th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Doe v. Rostker*, 89 F.R.D. 158, 162 (D. Cal. 1981) . . . . . . . . . . . . . . . . . . . . . . . 34

*Doe v. Stegall*, 653 F.2d 180 (5th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Doe v. Tupac Shakur*, 164 F.R.D. 359, 362 (D.N.Y. 1996) . . . . . . . . . . . . . . . . . 33

*Duncan v. Walker*, 533 U.S. 167, 174 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Duquesne Light Co. v. United States EPA*, 166 F.3d 609, 613 (3d Cir. 1999) . . . 25

*Elk Grove Unified School Dist. v. Newdow*, 542 U.S. 1, 12 (2004) . . . . . . . . . . 15

*Frederick L. v. Dep't of Pub. Welfare*, 422 F.3d 151, 155 (3rd Cir. 2005) . . . . . . 10

*Gade v. Nat. Solid Wastes Man. Ass'n*, 505 U.S. 88, 111-12 (1992) . . . . . 37, 38, 39

*Garcia v. United States*, 469 U.S. 70, 75 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Geier v. Amer. Honda Motor Co.*, Inc., 529 U.S. 861, 899 (2000) . . . . . . . . . . . . 60

*Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 607-608 (1982) . . . . . . . 32

*Goldstein v. California*, 412 U.S. 546, 554 (1973) . . . . . . . . . . . . . . . . . . . . . . . . 68

*Gonzales v. Peoria*, 722 F.2d 468, 474 (9th Cir. 1983) . . . . . . . . . . . . . . . 57, 58, 71

*Graham v. Richardson*, 403 U.S. 365, 378 (1971) . . . . . . . . . . . . . . . . . . . . . . . . 84

*Harris v. City of Philadelphia*, 47 F.3d 1333, 1338 (3d Cir. 1994) . . . . . . . . . . . 78

*Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977) . . . . 28

*In re Elmendorf*, 345 B.R. 486 (Bankr. D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . . . 66

*INS v. Legalization Assistance Project of the L.A. County Fed'n of Labor*,
510 U.S. 1301 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Jane Doe 1 v. Merten*, 219 F.R.D. 387, 395 (E.D. Va. 2004) . . . . . . . . . . . . . . . . 36

*Jenkins v. Immigration and Naturalization Services*,
108 F.3d 195, 197 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

*Loranzo v. City of Hazelton*, 496 F. Supp. 2d 477 (M.D. Pa. 2007) . . . 26, 30,48,85

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) . . . . . . . . . . . *passim*

*Lynch v. Cannatella*, 810 F.2d 1363, 1367 (5th Cir. 1987) . . . . . . . . . . . . . . . . . 57

*Lyons v. City of Los Angeles*, 461 U.S. 95,105-106 (1983) . . . . . . . . . . . . . . . . . 24

*Magic Restaurants, Inc. v. Bowie Produce Co. (In re Magic Restaurants, Inc.)*, 205 F.3d 108, 114 (3d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Marsh v. United States*, 29 F.2d 172, 174 (2d Cir. 1928) . . . . . . . . . . . . . . . . . . 57

*Mathews v. Eldridge*, 424 U.S. 319, 333 (U.S. 1976) . . . . . . . . . . . . . . . . . . . . . . 78

*Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Merrill Lynch, Pierce, Fenner & Smith v. Ware*, 414 U.S. 117, 127 (1973) . . . . 67

*Mich. Canners & Freezers Ass'n, Inc. v. Agric. Mktg. & Bargaining Bd.*, 467 U.S. 461, 469 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

*New York Tel. Co. v. New York State Dep't of Labor*, 440 U.S. 519, 540 (1979) . 36

*Plyler v. Doe*, 457 U.S. 202 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947) . . . . . . . . . . . . . . . . . 36

*Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (U.S. 1997) . . . . . . . . . . . . . . . . . . 42

*Runyon v. McCrary*, 427 U.S. 160, 167 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

*Saint Francis College v. Al-Khazraji*, 481 U.S. 604, 613 (1987) . . . . . . . . . . . . . 84

*Selective Service System v. Minnesota Public Interest Research Group*, 468 U.S. 841 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 256 (1984) . . . . . . . . . . . . . . . . . . 68

*Southern Methodist Univ. Ass'n of Women Law Students v. Wynne & Jaffe*, 599 F.2d 707, 713 (5th Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Sprietsma v. Mercury Marine*, 537 U.S. 51, 62-63 (2002) . . . . . . . . . . . . . . . . . . 46

*Storino v. Borough of Point Pleasant Beach,*
322 F.3d 293, 300 (3d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .15, 17, 18, 19

*Takahashi v. Fish and Game Commission,* 334 U.S. 410, 418-19 (1948) . . . . . . . 83

*Toll v. Moreno,* 458 U.S. 1 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Total TV v. Palmer Communications, Inc.,* 69 F.3d 298, 304 (9th Cir. 1995) . . . . 68

*Trollinger v. Tyson Foods,* 370 F.3d 602, 611 (6th Cir. 2004) . . . . . . . . . . . . . . 88

*Tull v. United States,* 481 U.S. 412, 427 (1987) . . . . . . . . . . . . . . . . . . . . . . . . 50

*U.S. v. Edmonds,* 80 F.3d 810, 819 (3d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . 78

*U.S. v. Salerno,* 481 U.S. 739 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .12, 77

*United States v. Aguilar,* 883 F.2d 662, 669-670 (9th Cir., 1989) . . . . . . . . . . . .59

*United States v. Gonzales,* 520 U.S. 1, 6 (1997) . . . . . . . . . . . . . . . . . . . . . . . . 43

*United States v. Rubio-Gonzales,* 674 F.2d 1067, 1073 (5th Cir. 1982) . . . . . . . . 59

*United States v. Varkonyi,* 645 F.2d 453, 459 (5th Cir. 1981) . . . . . . . . . . . . . . .60

*Valley Forge Christian College v. Americans United for Separation of Church and States,* 454 U.S. 464, 474-75 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Vallies v. Sky Bank,* 432 F.3d 493, 495 (3d Cir. 2006) . . . . . . . . . . . . . . . . . . . .42

*Whitmore v. Arkansas,* 495 U.S. 149, 155 (1990) . . . . . . . . . . . . . . . . . . . . . . . 24

## State Cases

*Arizona Farmworkers Union v. Phoenix Vegetable Distributors,*
747 P.2d 574, 581 (Az. Ct. App. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

*Commonwealth v. Harmar Coal Company*, 306 A.2d 308, 317 (Pa. 1973) . . . . . 90

*Correa v. Waymouth Farms, Inc.*, 664 N.W.2d 324, 329 (Minn. 2003) . . . . . . . . 55

*Jie v. Liang Tai Knitwear Co.*, 107 Cal. Rptr. 2d 682, 690 (Cal. Ct. App. 2001) . 50

*Knox v. Bd. of Directors of Susquenita School Dist.*,
888 A.2d 640, 647 (Pa. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

*New Kensington*, 55 A.2d 392, 395 (Pa. 1947) . . . . . . . . . . . . . . . . . . . . . . . . . 87

*Safeharbor Employer Servs. I, Inc. v. Cinto Velazquez*,
860 So. 2d 984, 986 (Fl. Ct. App. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*Wood v. State*, 891 So.2d 398, 406 (Ala. Crim. App. 2004) . . . . . . . . . . . . . . . . 51

**Federal Statutes**

110 Stat. § 2105 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

18 U.S.C. § 1961(1)(F) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

1986 U.S.C.C.A.N. § 5649 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

28 U.S.C. § 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. §1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

42 U.S.C. § 1395dd . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

42 U.S.C. § 1981 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 13, 83

8 U.S.C § 1373 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

8 U.S.C. § 1324(a)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59, 99

8 U.S.C. § 1324(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

8 U.S.C. § 1324a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

8 U.S.C. § 1324a(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

8 U.S.C. § 1324a(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

8 U.S.C. § 1324a(a)(1)-(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

8 U.S.C. § 1324a(a)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

8 U.S.C. § 1324a(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

8 U.S.C. § 1324a(a)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

8 U.S.C. § 1324a(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

8 U.S.C. § 1324a(e)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

8 U.S.C. § 1324a(h)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

8 U.S.C. § 1357(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

8 U.S.C. § 1357(g)(10) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

8 U.S.C. § 1373 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 35, 62, 100

8 U.S.C. § 1373 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

8 U.S.C. § 1373(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

8 U.S.C. § 1373(b)(1)-(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

8 U.S.C. § 1373(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 63

8 U.S.C. § 1621(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

8 U.S.C. § 1644 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 101

8 U.S.C. § 1101 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

8 U.S.C. § 1324a(h)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

8 U.S.C. § 1324a(h)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40, 43, 47, 50

8 U.S.C. §§ 1373(a)                                                                34

H.R. Rep. 99-682(I) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Internal Revenue Service Code § 42 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126

P.L. 104-208 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63, 81, 82, 105

Pub. L. No. 104-193 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

## State Statutes

53 P.S. § 37403(16) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86, 102

53 P.S. § 37403(60) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86, 87, 102

68 P.S. § 250.501 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

O.C.G.A. § 48-7-21.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

## Federal Rules

53 C.J.S. Licenses § 55 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Fed .R. Civ. Pro. 10(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

## **State Rules**

procedure of 62 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .71

## **Federal Regulations**

8 C.F.R. § 274a.1(h) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

## STATEMENT OF SUBJECT MATTER JURISDICTION
## AND APPELLATE JURISDICTION

The court below had jurisdiction over Plaintiffs' Complaint pursuant to 28 U.S.C. §§1331 and 1343(a)(3-4).

This Court has jurisdiction over the appeal pursuant to 28 U.S.C. §1291.

# STATEMENT OF ISSUES

1.  Did the District Court err in deciding that the Appellees have standing?

2.  Did the District Court err in allowing the Doe Plaintiffs to sue anonymously and conceal personal information during discovery?

3.  Did the District Court err in prohibiting the Appellant from communicating with the U.S. Bureau of Immigration and Customs Enforcement (ICE), in violation of 8 U.S.C §§ 1373 and 1644.

4.  Did the District Court err in holding that the ordinances are preempted, both expressly and impliedly?

5.  Did the District Court err in holding that the IIRA violates Appellees' procedural due process rights?

6.  Did the District Court err in holding that the housing provisions of the ordinances violate 42 U.S.C. § 1981?

7.  Did the District Court err in holding that the private right of action contained within the IIRA is invalid under Pennsylvania Commonwealth law?

8.  Did the District Court err in holding that the ordinances exceed the City's police powers?

## STATEMENT OF THE CASE

On July 13, 2006, the City of Hazleton enacted Ordinance 2006-10, the "Illegal Immigration Relief Act Ordinance."  On August 15, 2006, the City enacted Ordinance 2006-13, the "Rental Registration Ordinance."  On September 21, 2006, Hazelton enacted Ordinance 2006-18, the "Illegal Immigration Relief Act Ordinance" ("IIRA") and 2006-19, the "Official English Ordinance" to replace Ordinance 2006-10.

On October 30, 2006, Appellees filed an amended complaint and a motion for a preliminary injunction seeking to enjoin Appellants from enforcing the ordinances.  On October 31, 2006, the District Court granted Appellees' request for a Temporary Restraining Order, which was extended by stipulation until the final order.  Appellees' challenge is a facial one.  The IIRA has never been enforced.

On December 28, 2006, in an effort to clarify various aspects of Ordinance 2006-18, Hazleton enacted Ordinance 2006-40, the "Illegal Immigration Relief Act Implementation Amendment," which adds a final section to the IIRA.

On December 28, 2006, Hazleton also enacted Ordinance 2006-35, to reinstate the old rental property registration system for owners of rental property that existed prior to Ordinance 2006-13, while the legality of Ordinance 2006-13 is adjudicated.

On March 21, 2007, Hazleton enacted Ordinance 2007-6, which eliminated

the following language from §§ 4.B.2 and 5.B.2 of Ordinance 2006-18: "solely and primarily". It also added the word "knowingly" to §4.A of Ordinance 2006-18.

On January 12, 2007, Plaintiffs filed a Second Amended Complaint seeking a permanent injunction of the IIRA and the Rental Registration Ordinance. The Court held a bench trial on March 12-22, 2007.

On July 26, 2007, the District Court issued an opinion and on August 7, 2007, the District Court issued a final order granting a permanent injunction.

**STATEMENT OF THE FACTS**

## I.  Factual Background

Hazleton, Pennsylvania, is a Third Class City that experienced a rapid increase in population during 2001-06, from approximately 23,000 to 30,000-33,000 residents, due in part to an unusually high influx of illegal aliens.  Trans. vol. VII, pp. 169-73, Appx. A2291-93.  The population increase was not accompanied by any additional income tax revenues, because many new arrivals worked "off the books."  This overloaded the City's budget.  Appx. A1647, A1399-1400, A2290-91.  The school district experienced a dramatic increase in costs.  Appx. A1682.  The City experienced numerous drug trafficking crimes involving illegal aliens, Appx. A2187, illegal-alien-dominated street gangs moved into Hazleton, Appx. A2490-93, and illegal aliens committed several murders, Appx. A1382-83, A1674.  In July of 2006, the Mayor and City Council decided to exercise their authority, consistent with federal law, to take limited steps to discourage the employment and harboring of illegal aliens.

## II.  Rental Registration Ordinance

Ordinance 2006-13, the "Rental Registration Ordinance" was enacted to address increasing problems with absentee landlords and overcrowded apartments. It requires any landlord to obtain a permit prior to allowing occupancy of a

5

dwelling unit.  It also requires any tenant to provide basic identity and contact information to the City in order to obtain an occupancy permit.  The City does not attempt to verify or confirm any information received from tenants under the ordinance.  All occupancy permits are issued to all applicants, regardless of the information or documents presented.  Trans. vol. 5, p. 119, Appx. A1852.  The City merely collects information that may be used later for code enforcement purposes, security purposes, or for the purpose of investigating a complaint under the IIRA.

### III.  <u>IIRA Ordinance</u>

Ordinance 2006-18, as amended by Ordinances 2006-40 and 2007-6, (collectively "IIRA") renders it unlawful for any business entity to employ unauthorized aliens, as that term is defined by federal law.  The IIRA applies federal definitions and standards of work authorization.   The IIRA does not permit any Hazleton official to determine independently whether a person is authorized to work in the United States.  Rather, the city relies entirely upon the federal government's verification of any person's authorization to work, through the E-Verify program (formerly "Basic Pilot Program").

The IIRA also renders it unlawful to harbor an illegal alien by knowingly providing rental accommodations to an illegal alien.  The IIRA applies federal

definitions of unlawful presence in the United States. The IIRA does not permit any Hazleton official to determine independently whether a person is an alien unlawfully present in the United States. Rather, the City relies entirely upon the federal government's verification of any alien's legal status, according to the terms of 8 U.S.C. § 1373(c), which requires the federal government to verify the legal status of any alien whenever a state or local unit of government requests such verification, pursuant to state or local law. The City will use the Systematic Alien Verification for Entitlements (SAVE) internet-based system, to obtain such verifications from the federal government, unless the federal government directs the City to utilize another method of verification. The IIRA, in describing the legal status of aliens, exclusively uses terms and classifications found in the Federal Immigration and Nationality Act (INA), 8 U.S.C. §§ 1101, *et seq.* Hazleton has not in any way attempted to define who should or should not be admitted into the country.

Ordinance 2006-40 clarifies that the IIRA applies only prospectively and concerns only those employment contracts and lease contracts that are entered into after the Ordinance becomes effective. Ordinance 2006-40 defines what actions constitute a correction of a violation under the IIRA, and allows an employer or landlord to toll enforcement by seeking reverification of an alien's status from the federal government. It also clarifies that the Magisterial District Court of Hazleton

is an available venue in which an employer, employee, landlord, or tenant may challenge the enforcement of the IIRA, at any point in the enforcement process.

**All references to the "IIRA" are to Ordinance 2006-18, as amended by Ordinances 2006-40 and 2007-6. The final text of the amended IIRA is in the Addendum to this brief.**

## STATEMENT OF RELATED CASES

*Scottsdale Ins. Co. v. City of Hazleton*, M.D. Pa. Case No. 07-cv-01704.

Declaratory judgment action pending.

## STANDARD OF REVIEW

The standard of review for a district court's conclusions of law is de novo.

Its factual conclusions are reviewed for clear error. *Frederick L. v. Dep't of Pub. Welfare*, 422 F.3d 151, 155 (3rd Cir. 2005).

## SUMMARY OF ARGUMENT

Due to word-limit constraints, this summary and some sections that follow are extremely brief. Appellants will supplement those sections in the Reply Brief.

## I. Standing

Appellees fail to meet the constitutional requirements of standing. Many fail to present a legal cognizable injury; others fail to establish causation because they rely upon the independent actions of third parties. In addition, there are two prudential restrictions on standing that apply, one preventing parties outside of the zone of interest of the INA from asserting preemption claims under that Act, and another barring illegal aliens from using federal courts to facilitate their admitted and continuing violations of federal law.

## II. Anonymity

The District Court erred by granting permission to adult illegal aliens to sue anonymously and conceal their identity from Appellant. This seriously prejudiced Appellant's ability to assess their standing and the nature of any injuries asserted.

**III.  Restricting the City's communication under 8 U.S.C. § 1373 and 1644**

Federal statute unequivocally bars federal courts from restricting communication between a city and ICE.  The Court ignored this statutory bar.

**IV.  Preemption**

The Court erroneously found express preemption of the IIRA by concluding that a federal statute that expressly *permits* cities to sanction the employers of unauthorized aliens "through licensing and similar laws," 8 U.S.C. § 1324a(h)(2), somehow prohibits those same laws.  The Court also erred by finding implied field preemption.  In so doing, the Court improperly and unilaterally disregarded the controlling Supreme Court precedent of *De Canas v. Bica*, 424 U.S. 351 (1976).  Finally, the District Court erred by finding implied conflict preemption.  The Court ignored the doctrine of concurrent enforcement, which allows states and cities to prohibit conduct that is already prohibited under federal law, and substituted its own theory of "excessive enforcement."

**V.  Due process**

The Court erred by failing to apply the controlling standard of *U.S. v. Salerno,* 481 U.S. 739 (1987).  Under that standard, a facial due process challenge must demonstrate that no conceivable set of facts exists under which due process

would occur.  The Court also erred in failing to recognize that the numerous hearings required by the IIRA afford due process.

## VI.  42 U.S.C. § 1981

The Court erroneously applied § 1981 to illegal aliens and failed to recognize that its expansive interpretation of § 1981 conflicts with more recent federal law.

## VII.  Private causes of action under Pennsylvania Commonwealth law

The Court erroneously used state common law to limit a city's authority, when Pennsylvania law only permits such limitations to arise from *statutory* law.

## VIII.  Police powers

The Court failed to conduct a normal police powers analysis.  Such an analysis establishes that the ordinances are within the City's police powers.

**ARGUMENT**

## I.  THE DISTRICT COURT ERRED IN HOLDING THAT THE APPELLEES POSSESS STANDING

The District Court determined that all of the Appellees except for Jose and Rosa Lechuga possess standing to sue.  This determination was erroneous, for the reasons explained below.

### A.  The Constitutional and Prudential Requirements of Standing

The case or controversy requirement of Article III, which is the irreducible constitutional minimum of standing, contains three elements:

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest[,] which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical[.]'"  Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court."  Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)(internal citations omitted).

The Supreme Court has delineated three of the prudential requirements of standing as:  (1) a plaintiff "cannot rest his claim to relief on the legal rights or interests of third parties;" (2) courts must not adjudicate "generalized grievances;"

14

and (3) a plaintiffs' complaint must fall within "the zone of interests to be protected … by the statute." *Valley Forge Christian College v. Americans United for Separation of Church and States*, 454 U.S. 464, 474-75 (1982)(*citing Warth v. Seldin*, 422 U.S. 490, 499-500).  The Supreme Court "has also recognized that such self-imposed limits might need to be imposed in unique cases, therefore, the Court has declined to 'exhaustively defin[e] the prudential dimensions of the standing doctrine.'" *National Coalition of Latino Clergy, Inc. v. Henry*, Case No. 07-CV-613-JHP (N.D.Okla., Dec. 14, 2007), slip op. at 13 (hereinafter "*NCLC*")(*quoting Elk Grove Unified School Dist. v. Newdow*, 542 U.S. 1, 12 (2004)).

The party invoking federal jurisdiction bears the burden of establishing standing.  *Lujan*, 504 U.S. at 561.  Moreover, plaintiffs must establish "proper jurisdictional bases for each and every claim—particularly when courts are called upon to review a state or local legislative enactment."  *Storino v. Borough of Point Pleasant Beach*, 322 F.3d 293, 300 (3d Cir. 2003).  If an Article III court finds that plaintiffs lack standing to bring federal claims, the court cannot exercise supplemental jurisdiction over any state law claims in the same complaint.  *Id.* at 299-300.

## B. All Appellees Lack Prudential Standing to Bring an INA Preemption Challenge

Firstly, and perhaps most importantly, all of the Appellees lack prudential standing to challenge the Ordinances as being inconsistent with the INA. None of Plaintiffs are within the zone of interest protected by federal immigration law— which is, by definition, designed to exclude certain aliens and punish those who employ or harbor such aliens unlawfully. Justice O'Connor stated this explicitly with respect to the landlords and employers of illegal aliens:

> The fact that the INS regulation may affect the way an organization allocates its resources—*or, for that matter, the way an employer who currently employs illegal aliens or a landlord who currently rents to illegal aliens allocates its resources*—does not give standing to an entity which is not within the zone of interests the statute meant to protect.

*INS v. Legalization Assistance Project of the L.A. County Fed'n of Labor*, 510 U.S. 1301 (1993)(opinion by O'Connor, J.). Justice O'Connor stated such entities outside the zone of interests protected by the INA did not have standing to challenge administrative regulations as being inconsistent with the Act. Plainly, employers who employee unauthorized aliens and landlords who harbor illegal aliens are not entities that the INA was meant to protect. *Id.* Therefore, they have no standing to raise a preemption challenge that is based on the INA. *Id.*

The same is true of an alien unlawfully present in the United States. By definition, the INA is not designed to protect those who violate the immigration

laws of the United States.  He is outside the zone of interest and therefore has no

standing to raise an INA preemption claim.  Consequently, Appellees cannot

establish that their interests are "within the zone of interests intended to be

protected by the statute, rule or constitutional provision on which the claim is

based."  *Storino*, 322 F.3d at 300.


### C.  Illegal Aliens Lack Prudential Standing to Challenge a Local Law That Impedes Their Admitted and Continuing Violation of Federal Law

All of the Doe Appellees are either aliens who concede that they are

unlawfully present in the United States or aliens who believe that they face

deportation (which implies the same thing).  Because the District Court

erroneously prevented the City from inquiring into the Does' immigration statuses,

there remains some uncertainty as to how each of the Does came to be unlawfully

present in the United States.  Regardless, as illegal aliens, they lack prudential

standing to challenge the ordinances.  While they certainly would possess standing

to challenge the federal immigration laws that establish their unlawful presence in

the United States, they do not challenge those laws in any respect.

The Northern District of Oklahoma recently held that illegal aliens lacked

standing to challenge a state law that was very similar to Hazleton's IIRA.  *NCLC*,

slip op. at 2.  Like the IIRA, the state law prohibited the harboring of illegal aliens,

required governmental agencies to verify the work authorization of employees, required public contractors to verify the work authorization of employees, and created a private right of action allowing a U.S. citizen discharged from his job to sue his employer if the employer had an unauthorized alien on the payroll at the time. *Id.* There, as here, the illegal alien plaintiffs did not challenge the federal immigration laws that rendered them unlawfully present in the United States. Instead, they challenged the state law that would make it more difficult for them to obtain housing and employment, in light of their status as illegal aliens. The Court held that it "must prudentially decline to recognize standing on the part of these plaintiffs." *Id.*, slip op. at 15.

In articulating its holding that illegal aliens lack standing to bring such a challenge, the Court stated:

> An illegal alien, in willful violation of federal immigration law, is without standing to challenge the constitutionality of a state law, when compliance with federal law would absolve the illegal alien's constitutional dilemma—particularly when the challenged state law was enacted to discourage violation of the federal immigration law.

*Id.*, slip op. at 17. The Court based its holding on two premises. First, even if the Court were to agree with the illegal alien plaintiffs and strike down the state law, they still would remain in legal jeopardy if they continued to reside or work in the United States. Therefore, the Court could not truly offer them a remedy. "For these Plaintiffs, the remedy for their alleged injuries is simple: *act in accordance*

18

*with federal law.*" *Id.* (emphasis in original). Second, the Court recognized that a plaintiff with unclean hands lacks standing:

> This equitable maxim—that 'he who comes into equity must come with clean hands'—is a judicial closing of the courthouse doors to those tainted with inequitableness or bad faith related to the matter in which they now seek relief. *Id.*

*Id.*, slip op. at 15. The same principles apply in the case at bar.

The Northern District of Oklahoma emphasized that a federal court must never place itself in the position of facilitating the violation of federal laws: "These illegal alien Plaintiffs seek nothing more than to use this Court as a vehicle for their continued unlawful presence in this country." *Id.*, slip op. at 16. For the same reasons, this Court too must prudentially decline to take jurisdiction with respect to the Doe Appellees.

### D. John Doe 3, John Doe 7, and Jane Doe 5 Lack Standing

John Does 3 and 7 and Jane 5 acknowledge that they are illegal aliens or that they fear being removed from the United States by the federal government. 496 F.Supp. 2d at 497; Dep. of John Doe 7, pp. 31-32, Appx. A944. Consequently, these Appellees lack standing for the prudential reason described above. They also lack constitutional standing. The District Court held that they possessed standing because they feared that they might be evicted at some point in the future. 496

F.Supp. 2d 497.  There are three flaws in the Court's reasoning.

First, the Does have not established a concrete and imminent injury-in-fact. Despite the Court's assertion without reference to the record, none of them have been evicted or have received any threat or warning that they might be evicted in the future.  Appx. A858-953.  Their articulated fears are simply "conjectural or hypothetical" and therefore cannot satisfy the requirements of standing.  *Lujan*, 504 U.S. at 560-61.

John Doe 3 conceded in his deposition that *he has not been injured in any way because of the ordinances.*  Appx. A902.  His landlord has never asked him to provide proof of his immigration status.  Appx. A886-87  Indeed, he does *not* believe that he will evicted if Hazleton's ordinance goes into effect because "the owner of the house doesn't care much about [the ordinance]." Appx. A888.  Jane Doe No. 5's landlord has not evicted her, threatened to evict her, or otherwise attempted at contacting her regarding the ordinance.  Appx. A917.  John Doe No. 7's landlord has not evicted him, threatened to evict him, or asked for proof of his immigration status.  Appx. A944.  The alleged injury-in-fact faced by these Doe Plaintiffs is pure conjecture.

Second, they fail to meet the causation requirement of standing.  The Supreme Court has made clear that an injury for standing purposes may not be "'the result [of] the independent action of some third party not before the court.'"

20

*Lujan*, 504 U.S. at 560-61 (quoting *Simon* v. *Eastern Ky. Welfare Rights Organization*, 426 U.S. 26, 41-42 (1976)).  Any eviction that might hypothetically occur in the future under the IIRA would only occur if third parties took independent actions.  Either the landlords would have to unilaterally evict the Does; or residents of Hazleton would have to learn of the Does' illegal status and file a valid complaint against their landlords, sufficient to trigger the enforcement process under IIRA § 5.B.  Neither the landlords, nor such hypothetical complainants were before the Court.

Third, this Court lacks the power to grant a remedy that takes the Doe plaintiffs out of legal jeopardy.  They will still be in violation of federal law and subject to removal.  Merely eliminating the local law that they are violating does nothing to cure their violations of federal law.  "[T]he proper remedy for the injuries alleged by the … Plaintiffs—all of whom are in willing violation of federal immigration law—is not judicial intervention, rather, it is simple compliance with federal immigration law."  *NCLC*, slip op. at 15.

### E.  John Doe 1 Lacks Standing

Because of the anonymity and protective order that the District Court granted on behalf of the Doe Plaintiffs, John Doe 1's status is somewhat unclear.  The District Court inferred that John Doe 1 thought he could be removed from the

United States. See 496 F.Supp. 2d at 496-97. However, a fair reading of the transcript of the deposition yields a different conclusion. John Doe 1 was apparently merely stating that the U.S. government has the *general authority* to remove *any* alien from the United States. Dep. of John Doe 1, p. 26, Appx. A810. More importantly, John Doe 1 stated that the U.S. Government approved his application for lawful permanent residency that he filed more than five years ago. Appx. A808-09. He also stated that he possesses a document that constitutes an "approval from immigration" and suffices to establish his lawful presence in the United States. Appx. A839-40.

Since John Doe 1 states that he is a lawful permanent resident of the United States, the operation of the ordinances cannot injure him in any way. Therefore, he has no injury-in-fact. If on the other hand, he is actually unlawfully present in the United States, as the Court speculates, then he still lacks standing for the same reasons applicable to the other Does.

### F. Landlords Lozano and Espinal Lack Standing

Pedro Lozano is a landlord who has owned a duplex in the City of Hazleton since April 2005. He leases two rental units "sporadically" to tenants. Trans. vol. 1, pp. 165-66, Appx. A1107-08. Lozano claims that he has not been able to find steady tenants since some tenants departed in May or June of 2006. However, he

*has* been able to rent the unit "irregularly" since the enactment of the ordinances. Appx. A1115-A1116. During the trial in March, 2007, one of the units *was* occupied; and the other was vacant after his daughter had recently moved out of the unit. Appx. A1119. Moreover, Lozano admitted that the units were *not occupied* for most of the eight month period that predated the enactment of the ordinances. Appx. A1119-22. Thus, Lozano had the same mixed success renting the units before and after the IIRA's enactment. Further dispelling his claim that the IIRA might be partially to blame for his failure to continuously rent his duplex was the fact that he was also having difficulties renting his apartments *outside* the City limits of Hazleton—apartments that were in no way subject to the IIRA, Appx. A1128.

Lozano did not know the immigration status of any prospective tenant, Appx. A1124, or the immigration status of any past tenant. Appx. A252. He produced no evidence to support a claim that the reason any tenants moved from his property were because of the ordinances. He also conceded that he does not know why any prospective tenants did not rent his property. Appx. A1123-25. Thus, he was not able to show any causal connection between the enactment of the ordinances and the intermittent vacancies on his properties. Similarly, landlord Rudolfo Espinal conceded that he did not inform potential tenants about the ordinances and that he had no idea why they declined to rent his properties from

him. Appx. A1233-34. Thus, the causation of their injuries is entirely speculative. Speculation cannot establish an Article III injury for standing purposes. *Lyons v. City of Los Angeles*, 461 U.S. 95,105-106 (1983). "The litigant must clearly and specifically set forth facts sufficient to satisfy these Art. III standing requirements," and may not rely on speculation and conjecture to do so. *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990).

There is a second reason that the landlord Appellees fail to meet the injury-in-fact requirement of standing. To possess standing, a plaintiff must prove a "legally cognizable injury-in-fact." *AFGE v. Styles*, 123 Fed. Appx. 51, 52 (3d. Cir. 2004); *Defenders of Wildlife*, 504 U.S. at 563. The landlords' asserted "injury" is the loss of rental income from hypothetical illegal alien tenants. Such an injury is not legally cognizable. The income that they might theoretically lose is income that is *dependent upon a continuing violation of federal immigration laws*. An illegal alien cannot occupy a rental unit in Hazleton without remaining unlawfully present in the United States. Just as a drug dealer has no legally-cognizable interest in income derived from violations of federal drug laws, a landlord has no legally-cognizable interest in income derived from continuing violations of federal immigration laws. "[W]here the contract grows immediately out of, and is connected with, an illegal or immoral act, a Court of justice will not lend its aid to enforce it." *Armstrong v. Toler*, 24 U.S. 258, 278. (1826).

Finally Lozano and Espinal fail to meet the causation requirement of standing. As explained above, the injury may not be the result the independent action of a third party not before the court. *Lujan*, 504 U.S. at 560-61. In this case, the injury is "manifestly the product of the independent action of a third party." *Duquesne Light Co. v. United States EPA*, 166 F.3d 609, 613 (3d Cir. 1999). The conjectural injury is the result of the decision of hypothetical tenants not to rent apartments from Appellees. Such tenants are third parties not before the court.

### G. The Hazleton Hispanic Business Association and Lozano Lack Standing as Business Owners

Because the District Court held that the business-owner Lechugas lacked standing, the only remaining Appellees who could possibly assert any claims regarding the employment provisions of the IIRA are the Hazleton Hispanic Business Association ("HHBA") and Lozano. Neither possesses standing.

The District Court correctly declined to recognize HHBA's asserted loss of membership as a basis for its standing. 496 F.Supp. 2d at 492-93. The Court also correctly declined to recognize loss of a business's ability to sell to, or hire, illegal aliens as an injury-in-fact for standing purposes. *Id.* at 494.

Rather, the Court erroneously held that the businesses' standing could be based simply "in the operation and requirements of the ordinances." 496 F.Supp.

2d 494.  The only individual member of HHBA who was specifically identified as suffering this cost-of-compliance injury was its president, Rudy Espinal.  *Id*. at 493.  Similarly, Lozano's standing as an employer was also based on the fact that, if he ever decided to employ someone in the future, he would have "to comply with the employer requirements of the IIRA, adding a burden of time and expense to his operations."  *Id*. at 489.  In sum, the Court based the employers' standing solely on the slender reed of cost-of-compliance.

The cost of compliance with an ordinance is a generalized burden that is insufficient to constitute the "particularized" injury necessary to satisfy the injury-in-fact requirement.  *Lujan*, 504 U.S. at 560.  "Plaintiffs' assertion that compliance with the Ordinance places a burden upon them sufficient to constitute an injury is inadequate."  *Gray*, slip op. at 37.  The District Court offered no case law in support of its notion that the generalized obligation to comply with the statute is sufficient to constitute an injury-in-fact.

More importantly, even if the general cost of compliance could be construed as a particularized injury under standing analysis, *the employer-Appellees did not demonstrate, and the District Court did not explain, how the cost of compliance would be any greater under the IIRA than that which already existed under federal law.*  Since 1986, all employers in the United States have been forced to examine documentation of employees according to 8 U.S.C. § 1324a(b), and take any other

26

steps necessary to avoid knowingly hiring, recruiting, or referring for a fee an unauthorized alien, as proscribed by 8 U.S.C. § 1324a(a). Hazleton's IIRA added nothing new to the process of hiring an employee in Hazleton. It merely added a local consequence (suspension of business licenses) to those who refuse to conform their conduct to what was already required by federal law. The District Court did not explain how the IIRA added any additional cost to the compliance that was already necessary under federal law. This flaw in the District Court's reasoning is a fatal one.

The only scenario under which a business in Hazleton might have to do anything beyond what was already required by federal law, is the scenario that would occur *after* enforcement occurred. Only then would a Hazleton have to business provide any information to the City. IIRA § 4.B. The District of Arizona, in reviewing a similar law prohibiting the employment of unauthorized aliens, held that a business must show an imminent threat of enforcement in order to have standing. There, as here, no such threat exists because none of the businesses claimed that they employed unauthorized aliens. "There is no justiciable case or controversy against these Defendants. Plaintiffs do not intentionally or knowingly employ any unauthorized aliens, and they have no plans to. They bear no imminent threat of enforcement." *Arizona Contractors Assoc., Inc. v. Napolitano*, Case No. CV07-1355-PHX-NVW and CV07-1684-PHX-NVW (D. Ariz. Dec. 7,

2007), slip op. at 2. The Court in the case at bar erred by failing to require Appellee business owners to demonstrate a threat of enforcement. Without the threat of enforcement, the IIRA created no obligation greater than that already required by federal law. Consequently, because the business owner appellees cannot establish standing, there are no Appellees in this case that have standing to challenge the employment provisions of the IIRA.

### H. The Pennsylvania Statewide Latino Coalition Lacks Standing

An association has standing to sue on behalf of its members only when: (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organizations' purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977). The Pennsylvania Statewide Latino Coalition ("PSLC") fails to meet the first requirement. Jose Molina, who is not a Hazleton resident, is the regional director of the PSLC. Trans. vol. II, pp. 18, 21-22, Appx. A1148, A1151. Molina was able to substantiate the membership of only four Hazleton residents, on behalf of whom the PSLC brought the lawsuit: Dr. Agapito Lopez, Anna Arias, Jose Lechuga and Rosa Lechuga. Appx. A1181-83. None of these individuals possesses standing. With respect to the Lechugas, the District

Court correctly held that the Lechugas lacked standing to sue in their own right. 496 F.Supp. 2d at 491. Dr. Lopez is a U.S. citizen, Appx. A1038, who retired from the practice of ophthalmology and does not own a business. Appx. A1019. He is not a landlord. See Appx. A1016-19. Therefore he has no plausible basis to claim that any of the provisions of the ordinances could injure him. Anna Arias is a resident of Hazleton who, evidently owns a rental unit. Appx. A1189. The District Court did not seek, and Appellees have not provided, any information about Arias's rental unit—whether she is actively renting it, whether it is even within the city limits of Hazleton, and whether it is in any way affected by the IIRA.

At the prompting of counsel during redirect examination, Molina was asked to think of any other PSLC members who might live in Hazleton and own a business. He mentioned a "Rubio family," which he said owned a gift shop, a barber shop, and other businesses. Appx. A1189. The District Court incorrectly interpreted this as a reference to three different business owners. 496 F.Supp. 2d at 496. Worse, the District Court then stated simplistically that if they were business owners, they would have to comply with the ordinances, and they would therefore have standing. *Id.* That is of course incorrect. The employment provisions of the IIRA only affect businesses in their capacity *as employers*. If the owner of a business has no employees, he cannot be affected by the IIRA. No evidence was

presented at trial regarding whether the Rubios have employees. Therefore, since the PSLC failed to establish that any individual PSLC member has standing to bring suit, the PSLC itself does not possess standing. *NCLC*, slip op. at 7.

## I. Casa Lacks Standing

Casa Dominicana de Hazleton ("Casa") is an organization that provides assistance to the Latino community in Hazleton. 496 F.Supp. 2d at 494. Some 20-23 of Casa's approximately 50 Hazleton members are believed to be illegal aliens. *Id*. No evidence was presented at trial regarding whether these 20-23 individuals were tenants in rented apartments, or whether they were employed by Hazleton businesses, or who they were. Nevertheless, the Court held that they possessed standing because "[m]embers of the organization are both tenants and employees in Hazleton, and would be required to comply with the terms of the ordinances." *Id*. at 495. There are several problems with this unsupported finding of the District Court.

First, assuming that Casa had established that these unspecified aliens were tenants, the terms of the ordinances do not impose any direct penalties on tenants. Although the Appellees claimed that the presentation of basic identity information to the City under the Rental Registration Ordinance would violate privacy rights, the District Court *dismissed* the privacy claim on the merits. 496 F.Supp. 2d 545.

Appellees have not cross appealed that holding. The only way that the IIRA might affect a tenant is indirectly, if a complaint were filed against the tenant's landlord, and then the City contact the federal government to determine the tenant's immigration status, and then the federal government determined that the tenant was an illegal alien, and then the tenant were evicted. This "injury" relies on the actions of an independent third party not before the court—the complainant—and therefore the unnamed Casa tenants fail to meet the causation requirement of standing. *Lujan*, 504 U.S. at 560-61.

Second, the only direct effect that the Tenant Registration Ordinance has on the tenants is that it requires them to obtain an occupancy permit. However, as noted above, the generalize cost of compliance with a statute not sufficient to establish injury-in-fact for the purposes of standing. *Gray*, slip op. at 37.

Third, the only injury faced by the unauthorized alien employees who may be members of Casa (assuming that they are employed by Hazleton companies— which was never established at trial) is the loss of employment. However, as noted above, this is not a "legally cognizable" injury-in-fact. *Defenders of Wildlife*, 504 U.S. at 563. An unauthorized alien has no legal right to employment in the United States. 8 U.S.C. § 1324a. An Article III court cannot recognize the inability to continue violating federal law as a "legally cognizable" injury-in-fact. Consequently, Casa also lacks standing.

## II.  The District Court Erred in Allowing the Does to Sue Anonymously

The District Court's decision to allow the Does to sue anonymously, and to prevent the Defendants from learning their identities or any information regarding their legal statuses, was erroneous in numerous respects.  The Court set aside the requirements of F.R.C.P. 10(a) and 17(a) without sufficient justification.  A plaintiff must first show that a substantial privacy right is at stake before a district court may override the constitutional presumption of openness in judicial proceedings.  *Agonal v. Day*, 1996 U.S. Dist. LEXIS 5089, 1-2 (M.D. Pa. 1996)(citing *Doe v. Frank*, 951 F.2d 320 (11th Cir. 1992)).  Any limitation on the public's right to openness in trials can be no greater than is necessary to serve a compelling governmental interest. *Globe Newspaper Co. v. Superior Court,* 457 U.S. 596, 607-608 (1982).

The District Court failed to identify the required substantial privacy interest, much less identify a compelling governmental interest.  The Court declared without analysis that immigration status was "personal information of the utmost intimacy" that warranted abandonment of the presumption of openness in judicial proceedings. 496 F.Supp. 2d at 508.  However, the Court flatly contradicted this conclusion when it later dismissed the Doe Appellees' privacy claims:  "[P]laintiffs have not adduced case law that would allow us to conclude that immigration

information is on its face private data. We will therefore dismiss the plaintiffs' privacy rights complaint." *Id*. at 545.

Unable to rely on a privacy interest to justify its grant of anonymity, the Court improperly concluded that three "fears" of potential adverse consequences constituted a substantial personal security threat to the Doe Appellees:  that disclosure might affect their jobs and accommodations, that disclosure might make them targets of anti-Latino sentiment, and that the City might disclose their names to federal immigration authorities." 496 F.Supp. 2d at 507.  None of these fears were adequately supported by the factual record at trial.

More importantly, they are not legally sufficient to justify anonymity. Economic harm and retaliation are not sufficient grounds for a grant of secrecy. *Doe v. Bell Atl. Business Sys. Servs*., 162 F.R.D. 418, 420 (D. Mass. 1995); *Southern Methodist Univ. Ass'n of Women Law Students v. Wynne & Jaffe*, 599 F.2d 707, 713 (5th Cir. 1979).  Such loss-of-employment fears are especially inapplicable regarding aliens who lack work authorization.  Similarly, neither public embarrassment nor fear of hostile public opinion are sufficient to overcome the strong presumption of openness in civil proceedings. *Doe v. Stegall*, 653 F.2d 180 (5th Cir. 1981); *Doe v. Tupac Shakur*, 164 F.R.D. 359, 362 (D.N.Y. 1996).

The third justification that the District Court offered is even less defensible. The District Court rested its decision on the Does' claimed "fear" that the City (or

the public) would reveal their identities and immigration statuses to federal authorities. By embracing this justification, the District Court undermined the enforcement of federal laws not at issue in the case. Other courts have rejected the same request for anonymity. *NCLC*, slip op. at 15-16; *Day v. Sebelius*, 227 F.R.D., at 679. Fears of adverse federal enforcement action have also been rejected in cases dealing with the military draft. *Doe v. Rostker*, 89 F.R.D. 158, 162 (D. Cal. 1981); *Selective Service System v. Minnesota Public Interest Research Group,* 468 U.S. 841 (1984).

The decision of the Court to conceal the Does' identity and status information from the City was highly prejudicial. Discovery of the Does' exact immigration statuses was essential to establishing two elements of the City's defense: the standing of the Does; and what injury, if any, that implementation of the ordinances would actually cause the Does.

## III. <u>The District Court Itself Violated 8 U.S.C. §§ 1373(a) and 1644 by Restricting the City's Communication with the Federal Government</u>

A District Court may impose confidentiality or protective orders in an exercise of discretion. However, under no circumstances may an Article III court violate the terms of federal law. On December 8, 2006, the District Court did exactly that, by ordering "that the parties enter into a confidentiality agreement

covering information obtained during discovery regarding the John and Jane Doe plaintiffs. The Court overrules the defendant's objection, which was based on 8 U.S.C. § 1373(a)." Order of Dec. 8, 2006, Appx. A211. See Confidentiality Order of January 26, 2007, Appx. A692-A707. In so doing, the District Court prevented the City from communicating with federal immigration authorities and violated the unequivocal terms of 8 U.S.C. § 1373(a) and (b):

> Notwithstanding any other provision of Federal, State, or local law, *a Federal*, State, or local *government entity or official may not prohibit, or in any way restrict*, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual.

8 U.S.C. §§ 1373(a)(emphasis added). Virtually the same statutory text is found at 8 U.S.C. § 1644. Plainly, the language of the statute does not allow a federal judge to force parties to enter into a confidentiality agreement that restricts communication between a local government entity and ICE. The District Court is a "federal government … entity," within the meaning of 8 U.S.C. § 1373(a). Moreover, the District Court was forbidden by 8 U.S.C. § 1373 from *restricting in any way* the City of Hazelton's communication with ICE regarding the immigration status of the Doe plaintiffs.

This statutory language is not ambiguous. There are no exceptions. The Court offered no explanation for its decision to disregard this federal statute. And

one federal court has confirmed that it restricts the orders of federal judges. *Jane Doe 1 v. Merten*, 219 F.R.D. 387, 395 (E.D. Va. 2004). In sum, the Court's orders were issued in error; and they continues to stand in defiance of federal law.

## IV.  The District Court Erred in Holding that the IIRA is Preempted by Federal Immigration Law

### A.  The District Court Failed to Apply the Presumption Against Preemption

The District Court's greatest error in its preemption analysis was its decision to unilaterally set aside the controlling Supreme Court precedent of *De Canas v. Bica*, 424 U.S. 351 (1976), as explained below. However, the District Court also erred from the outset by failing to apply the well-established presumption against preemption. "In *all* preemption cases…we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was a clear and manifest purpose of Congress." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485(1996)(*citing Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947))(emphasis added). *See also Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 516 (1992); *New York Tel. Co. v. New York State Dep't of Labor*, 440 U.S. 519, 540 (1979).

The Eastern District of Missouri recently upheld an ordinance that is nearly identical to Hazleton's IIRA against a similar preemption challenge. That Court

applied the traditional presumption against preemption and concluded that the presumption could only be set aside if the local ordinance actually attempted to regulate "'who should or should not be admitted into the country, and the conditions under which a legal entrant may remain.'" *Gray*, slip op. at 15 (*quoting De Canas*, 424 U.S. at 355). Because the ordinance did not do so, it could not be regarded as a regulation of immigration, according to the Supreme Court in *De Canas*. Therefore, the Court concluded, the "the Ordinance is a regulation on business licenses, an area historically occupied by the states. The rule articulated by the Supreme Court in *Medtronic, Inc*., is applicable, and the Court will apply a presumption against preemption." *Gray*, slip op. at 15. The same analysis applies in the case at bar.

Moreover, in addition to the presumption against preemption, the District Court all but disregarded the rule that a court must not find preemption absent clear and manifest congressional intent to preempt. "[W]e will not infer pre-emption of the States' historic police powers absent a clear statement of intent by Congress." *Gade v. National Solid Wastes Management Ass'n*, 505 U.S. 88, 111-12 (1992)(Kennedy, J., concurring)(citing *Rice v. Santa Fe Elevator Corp*., 331 U.S. at 230; *Jones v. Rath Packing Co*., 430 U.S. 519, 525 (1977); and *English v. General Electric Co*., 496 U.S. 72, 79 (1990)). Article III Courts are bound by an "obligation to infer pre-emption only where Congress' intent is clear and manifest"

37

*Cipollone*, 505 U.S. at 524 (Blackmun, J., dissenting).  In *De Canas*, the Supreme

Court reiterated this high standard:

> [F]ederal regulation… should not be deemed pre-emptive of state
> regulatory power in the absence of persuasive reasons—either that the
> nature of the regulated subject matter permits no other conclusion, or
> that Congress has *unmistakably* so ordained.

424 U.S. at 356 (*quoting Florida Lime & Avocado Growers v. Paul*, 373 U.S. 132,

142 (1963))(emphasis added).  Indeed, as Justice Rehnquist would remember with

regard to *De Canas*:  "The statute in *De Canas* discriminated against aliens, yet the

Court found no strong evidence that Congress intended to pre-empt it."  *Toll v.

Moreno*, 458 U.S. 1 (1982)(Rehnquist, J., concurring).  The District Court

mentioned this requirement in a footnote, 496 F.Supp. 2d at 518, n.41, but then

ignored it.

There are two broad categories of preemption—express preemption and

implied preemption.  *Gade*, 505 U.S. at 98 (1992)(plurality opinion).  Express

preemption occurs when federal statute expressly bars a state or local government

from passing a particular law.  Implied preemption in the immigration context is

governed by the controlling Supreme Court precedent of *De Canas*.  In that case,

the Court laid out a three-part test for determining whether a state or local

regulation affecting immigration is displaced through implied preemption.  A state

regulation is preempted (1) if it falls into the narrow category of a "regulation of

immigration," *id.* at 355, (2) if Congress expressed "the clear and manifest purpose" of completely occupying the field and displacing all state activity, *id.* at 357, or (3) if the state regulation conflicts with federal laws, such that it "stands as an obstacle to the accomplishment … of the full purposes and objectives of Congress." *Id.* at 363.

### B. The District Court Erred in Finding the IIRA Employment Provisions to be Expressly Preemption

#### 1. The District Court Disregarded the Plain Meaning of Federal Law when holding the IIRA Employment Provisions to be Expressly Preempted

In order to reach the conclusion that the IIRA's employment provisions were expressly preempted, the District Court had to ignore the plain language of federal law. In so doing, the District Court transformed a federal statute that expressly *allows* states and localities to impose sanctions on the employers of unauthorized aliens into a provision that *prohibits* such sanctions. In 1986, Congress enacted the Immigration Reform and Control Act (IRCA), which made the employment of unauthorized aliens a federal crime. In IRCA, Congress expressly preempted some state and local restrictions on the employment of unauthorized aliens, but expressly *permitted* others. The relevant provision, found at 8 U.S.C. § 1324a(h)(2), reads as follows:

> Preemption.  The provisions of this section preempt any State or local
> law imposing civil or criminal sanctions (*other than through licensing
> and similar laws*) upon those who employ, or recruit or refer for a fee
> for employment, unauthorized aliens.

8 U.S.C. § 1324a(h)(2)(emphasis added).  In this provision, Congress utilized its

power of express preemption to deny states and localities the authority to impose

criminal penalties or civil fines on the employment of unauthorized aliens.

However, Congress explicitly left open a window for state and local legislation on

the subject—in the form of "sanctions … through licensing and similar laws."  The

City drafted the IIRA carefully to fit precisely through the window of local action

created by Congress.  Section 4.B. of the IIRA provides for the suspension of the

business license of a business entity that knowingly employs unauthorized aliens—

a licensing restriction that is obviously permitted under 8 U.S.C. § 1324a(h)(2):

> The plain meaning of [8 U.S.C. § 1324a(h)(2)] clearly provides for
> state and local governments to pass licensing laws which touch on the
> subject of illegal immigration.  The statute at issue is such a licensing
> law, and therefore is not expressly preempted by the federal law.

*Gray*, slip op. at 21.

The language of 8 U.S.C. 1324a(h)(2) is neither ambiguous nor equivocal.

It plainly permits state and local governments to deny business licenses to

employers of unauthorized aliens.  However, in an Orwellian twist of language, the

District Court managed to come to exactly the opposite conclusions.  Judge

Munley disregarded the plain language of 8 U.S.C. § 1324a(h)(2) because, in his

opinion, "It would not make sense for Congress in limiting the state's authority to allow states and municipalities the opportunity provide the ultimate sanction, but no lesser penalty." 496 F.Supp. 2d at 519. In Judge Munley's view, the temporary suspension of a business license is the "ultimate sanction"—even greater than criminal imprisonment. *Id*. Certainly, reasonable minds may disagree as to which sanction is greater. However, one thing is certain. Congress decided which sanction to impose at the federal level and which sanctions to allow at the state level. An Article III judge has no authority to second-guess that policy decision, even if he is convinced that Congress's approach "would not make sense."

The Eastern District of Missouri rejected this precise argument: "whether or not the denial of a business permit is a greater or lesser sanction that fines and imprisonment is an irrelevant inquiry.... the question for the Court is solely whether the ordinance is a licensing or other similar law." *Gray*, slip op. at 18. In another case remarkably similar to this one, the District of Arizona also rejected Judge Munley's policy argument. In that case, the state of Arizona enacted a state statute that suspended the business licenses of employers who employ unauthorized aliens. "Plaintiffs complain that the licensing penalties in the Act are more severe than the penalties in the federal law. That argument ignores Congress' express approval of such state licensing penalties in 8 U.S.C. § 1324a(h)(2)." *Ariz. Contractors Ass'n, Inc. v. Napolitano*, Case Nos. CV07-1355-

PHX-NVW and CV07-1684-PHX-NVW, (D. Ariz., Dec. 21, 2007), slip op. at 19.

There is no ambiguity in Congress's reservation of "licensing" sanctions to states and local governments. In the absence of ambiguity, the plain language of a statute is decisive in any proper judicial interpretation. "It is well-settled that where unambiguous, the plain language of a statute or regulation controls." *Vallies v. Sky Bank*, 432 F.3d 493, 495 (3d Cir. 2006). "Our first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case. Our inquiry must cease if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.'" *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (U.S. 1997)(*quoting United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 240 (1989)). See also *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002); *Connecticut National Bank v. Germain*, 503 U.S. 249, 254 (1992). The fact that Judge Munley disagreed as a policy matter with Congress's decision to allow states and localities to impose licensing sanctions on the employers of unauthorized aliens did not constitute "ambiguity."

### 2. The District Court Erred by Misreading a Committee Report to Override the Plain Meaning of a Federal Statute

Undoubtedly, the District Court recognized that it was treading on thin ice

by disregarding the obvious meaning of 8 U.S.C. § 1324a(h)(2).  To bolster its position, the District Court attempted to find some support for its view in a stray sentence of a committee report.  In so doing, the District Court committed several errors.

First, the District Court violated the longstanding principle of statutory interpretation that when presented with a "straightforward statutory command, there is no reason to resort to legislative history."  *United States v. Gonzales*, 520 U.S. 1, 6 (1997); *Magic Restaurants, Inc. v. Bowie Produce Co.* (*In re Magic Restaurants, Inc.*), 205 F.3d 108, 114 (3d Cir. 2000).  "While we now turn to the legislative history as an additional tool of analysis, we do so with the recognition that *only the most extraordinary showing* of contrary intentions from those data would justify a limitation on the 'plain meaning' of the statutory language."  *Garcia v. United States*, 469 U.S. 70, 75 (1984)(emphasis added).  As is explained below, the Court's casual reading of three sentences of a committee report not only fails to meet the standard of "extraordinary showing," it fails to meet the standard of common English usage.

The statement in question comes from the House Judiciary Committee Report on IRCA, in which the preemption language of 8 U.S.C. 1324a(h)(2) was included:

The penalties contained in this legislation are intended to specifically

43

preempt any state or local laws providing civil fines and/or criminal sanctions on the hiring, recruitment or referral of undocumented aliens. *They are not intended to preempt or prevent lawful state or local processes concerning the suspension, revocation or refusal to reissue a license to any person who has been found to have violated the sanctions provisions in this legislation.* Further, the Committee does not intend to preempt licensing or "fitness to do business laws," such as state farm labor contractor laws or forestry laws, which specifically require such licensee or contractor to refrain from hiring, recruiting or referring undocumented aliens.

H.R. Rep. 99-682(I), 1986 U.S.C.C.A.N. 5649, 5662 (emphasis added).  It is from the italicized sentence that the District Court extracted its dubious conclusions.  It should be noted that this passage comes from only one of the four House Committees Reports on the bill, the most important of which was the conference report.  And the Senate had already passed the bill at the time.  As a result, the weight of this report must be discounted accordingly.  "The conference committee report said nothing about preemption…. Therefore, whatever the meaning of the House Judiciary Committee Report's comment, it was not before the Senate when it approved the bill."  *Ariz. Contractors Ass'n*, slip op. at 17.

In arguing that this Committee Report somehow changes the meaning of 8 U.S.C. § 1324a(h)(2), the District Court simply stated, without any explanation, "In the instant case, Hazleton suspends the business permit of those who violate its Ordinance, not those who violate IRCA.  Thus, the licensing exception to State and local pre-emption is not applicable."  496 F.Supp. 2d at 520.

The District Court's objection is nonsensical. The question, according to the committee report itself, is whether the "local process" suspends the license of a person who violates "the sanctions provisions in this legislation." The sanctions provisions in IRCA make it unlawful "to hire, or to recruit or refer for a fee, for employment in the United States an alien knowing the alien is an unauthorized alien," 8 U.S.C. § 1324a(a)(1)(A), or "to continue to employ the alien in the United States knowing the alien is (or has become) an unauthorized alien with respect to such employment." 8 U.S.C. § 1324a(a)(1)(B)(ii). Similarly, Hazleton's IIRA makes it unlawful "to knowingly recruit, hire for employment, or continue to employ, or to permit, dispatch, or instruct any person who is an unlawful worker to perform work in whole or part within the City." IIRA § 4.A. Unlawful worker is defined to include "an unauthorized alien as defined by United States Code Title 8, subsection 1324a(h)(3)." IIRA § 3.E. *In other words, a person who violates the IIRA is also in violation of IRCA.* The same conduct is proscribed.

The District of Arizona addressed the same issue and concluded, "Consistent with IRCA, the [state] Act authorizes suspension or revocation of business licenses for conduct that is also prohibited by IRCA…. The Act falls within the plain meaning of IRCA's safe harbor for 'licensing and similar laws.' That is enough to defeat this facial challenge." *Ariz. Contractors Ass'n*, slip. op. at 14. The mere fact that the phrasing of the state or local law differs slightly from the phrasing of

45

IRCA does not create preemption.  "A mere difference between state and federal law is not conflict."  *Id.*, slip op. at 13 (*citing Fla. Lime & Avacado Growers*, 373 U.S. at 141).

### 3.  A Committee Report Cannot Trump the Text of a Statute in Any Case

"[I]n order to overcome the plain meaning of the statute, the legislative history would have to provide an extraordinary showing of contrary intentions."  *Gray*, slip op. at 20.  As the Supreme Court has explained, when interpreting "an express pre-emption clause, our 'task of statutory construction must in the first instance focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent.'"  *Sprietsma v. Mercury Marine*, 537 U.S. 51, 62-63 (2002)(*quoting CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993)).  In *Sprietsma*, the Supreme Court was similarly urged to override the plain language of a federal statute by finding broader preemptive intent in a committee report.  Importantly, the Court held that such preemptive intent could not be based on a committee report:  "Nor is a clear and manifest intent to sweep away state common law established by an unembellished statement in a House Report…." 537 U.S. at 69-70.  A statement in a committee report is not enough to constitute the "clear and manifest" intent of Congress.  Only the text of a statute

can establish such intent.

An attempt to alter the scope of 8 U.S.C. §1324a(h)(2) by offering a strained interpretation of a committee report cannot stand, especially when "the wording of the statute is perfectly clear." *Gray*, slip op. at 20. "[S]uch an attempt to override the plain language of the statute would be precisely the kind of excess that the modern view of legislative history illegitimates. The Members or their staff must write amendments into the bill, not into the Report." *Ariz. Contractors Ass'n*, slip op. at 18.

### 4. The District Court Erred in Asserting that the IIRA Private Right of Action is not Permitted by 8 U.S.C. 1324a(h)(2)

Hazleton's IIRA also imposes a secondary consequence upon employers who hire unauthorized aliens: it creates a private right of action for unfairly discharged employees against employers who discharge them while employing unauthorized aliens. IIRA § 4.E(2). The District Court, *without any explanation or case support*, declared that this private right of action provision was a preempted sanction under 8 U.S.C. § 1324a(h)(2) and that it did not fit the "licensing and similar laws" category of permitted sanctions. The District Court's holding consisted of the following two sentences: "This sanction certainly falls within the express pre-emption clause. It does not involve licensing or anything

similar to licensing." 496 F.Supp. 2d 520. The Court offered no analysis whatsoever. The Court also neglected to apply the standard of requiring a "clear and manifest intent" to preempt on the part of Congress.

A careful statutory analysis of the wording of 8 U.S.C. § 1324a(h)(2) reveals that a private right of action like that in the IIRA is not a preempted civil or criminal "sanction." In the alternative, even if the private right of action were to be construed as a sanction, it may be regarded as a permissible "similar law" under 8 U.S.C. § 1324a(h)(2).

The errors in the District Court's reasoning began with the Court's initial assumption—that 8 U.S.C. § 1324a(h)(2) describes the entire universe of state and local laws discouraging the employment of unauthorized aliens. This is an erroneous assumption, which becomes evident upon a careful analysis of the words in the statute:

> Preemption. The provisions of this section preempt any State or local law imposing civil or criminal *sanctions* (other than through licensing and similar law*s*) upon those who employ, or recruit or refer for a fee for employment, unauthorized aliens.

8 U.S.C. § 1324a(h)(2)(emphasis added). The only laws that are preempted are those imposing civil and criminal "sanctions" at the state or local level. Sanctions "through licensing and similar laws" are treated as a subcategory of sanctions that are exempted from this preemption and are expressly authorized. However, the

statute says nothing about *other* actions that a state or municipality might take to discourage the employment of unauthorized aliens—actions that do not constitute "sanctions." The District of Arizona noted that there are unpreempted actions that a state or municipality might take, outside of imposing "sanctions." The Arizona Act, which requires businesses to participate in E-Verify falls outside of the "sanctions" category. *Ariz. Contractors Ass'n*, slip op. at 17. Another example is Georgia's statute that bars employers from deducting wages paid to unauthorized aliens from their taxable income. O.C.G.A. § 48-7-21.1. Neither of these statutes creates a "sanction" within the meaning of 8 U.S.C. § 1324a(h)(2). The same may be said of the IIRA's private right of action provision.

A private right of action does not rise to the level of a civil sanction (such as a fine) because a private right of action does not *guarantee* success at litigation, it does not stipulate any particular dollar amount that an employer might have to pay, and it does not guarantee that any action will be taken against the employer at all. Rather, it only becomes operative if an employee who has been wrongfully terminated chooses to exercise his private right of action. This element of plaintiff choice severs the connection between the ordinance and any eventual money damages awarded to an injured employee. The ordinance itself does not impose the sanction of a fine; rather, a plaintiff may seek damages if he chooses to do so. In contrast, a civil or criminal sanction is a fixed penalty that is triggered as soon as

49

a violation is proven.  Importantly, the California Court of Appeals examined 8 U.S.C. § 1324a(h)(2) and concluded that its "*sanctions are not the same as damages*; a statutory reference to sanctions does not equal a reference to damages." *Jie v. Liang Tai Knitwear Co.*, 107 Cal. Rptr. 2d 682, 690 (Cal. Ct. App. 2001)(emphasis added).

A "civil fine" has a consistent meaning in federal statutes, and that is the type of fine provided in 8 U.S.C. § 1324a(e)(4).  A civil fine is a specific monetary exaction for violating a statute.  Congress is aware of and respects the difference between civil fines and private rights of action.  For example, 42 U.S.C. § 1395dd(d) provides *both* civil fines and private rights of actions for violations of a statute regulating emergency medical care.  The difference, highlighted by 42 U.S.C. § 1395dd, is that civil fines are imposed for harms against the public, whereas private rights of action are imposed for harms against a person.  U.S. Supreme Court precedent supports this distinction.  Private rights of action are tied to harms inflicted upon an individual, not to harms against the public.  See *Alexander v. Sandoval*, 532 U.S. 275, 294 (2001); *Tull v. United States*, 481 U.S. 412, 427 (1987).  Thus, because a private right action cannot be correctly described as a civil "sanction" within the meaning of 8 U.S.C. 1324a(h)(2), it is not expressly preempted.

However, even if this Court were to determine that a private right of action

may be considered a "sanction" despite the case law cited above, the inquiry is not over.  The next question to be answered would be whether or not the IIRA private right of action fits within the exempted sanctions encompassed by the phrase "and similar laws."  In order to determine the meaning of the phrase "through licensing and similar laws," one must begin by defining a licensing law.  A license is "in the nature of a privilege or special privilege, entitling the licensee to do something that he would not be entitled to do without the license."  51 Am. Jur. 2d, Licenses and Permits §§ 1, 4 (2005).  Licensing statutes are typically administered by a licensing authority and are intended to assure the public that those providing certain services are qualified to do so.  53 C.J.S. Licenses § 55 (2005).  "Licensing statutes are an exercise of the police power, enacted for regulatory purposes, and designed to protect the public…."  *Wood v. State*, 891 So.2d 398, 406 (Ala. Crim. App. 2004).

Although the District Court treated the phrase "and similar laws" as if it were superfluous, a fundamental canon of statutory interpretation require that a statute be construed so as to give effect to all provisions.  "It is our duty to give effect, if possible, to every clause and word of a statute. We are thus reluctant to treat statutory terms as surplusage in any setting."  *Duncan v. Walker*, 533 U.S. 167, 174 (2001).  In order for "and similar laws" to not be superfluous, it must be understood to include laws that are *not* licensing laws.  If it only included licensing laws, it would be mere surplusage.

The IIRA private right of action provision is not a licensing law.  However, it bears enough similarities to licensing laws to be expressly exempted by the phrase "and similar laws" in  8 U.S.C. § 1324a(h)(2).  Like a licensing law, it is a law that makes it difficult for a business entity that knowingly employs unauthorized aliens to continue doing so.  Like a licensing law, it is an indirect incentive for business entities to hire only authorized aliens or U.S. citizens.  And like a licensing law, it is a penalty that applies only against the business entity itself, rather than against the particular individuals who engage in the unlawful hiring of unauthorized aliens.   In summary, the District Court's bare assertion that the IIRA private right of action constitutes a preempted civil sanction that stands outside the exempted "similar laws" category does not stand up to careful analysis.

## C.  The District Court Erred in Finding the IIRA Employment Provisions to be Preempted Through Field Preemption

In perhaps the most brazen section of its opinion, the District Court swept aside controlling Supreme Court precedent and became the first court in America to declare that IRCA constitutes field preemption.  In *De Canas*, the U.S. Supreme Court *sustained* against a preemption challenge a California law that imposed penalties on any employer who "knowingly employ[ed] an alien who is not entitled to lawful residence in the United States if such employment would have an adverse

effect on lawful resident workers." *Id*. at 352. The *De Canas* Court held that states and localities possessed wide leeway to "deal with aliens" without being preempted: "[T]he Court has never held that every state enactment which in any way deals with aliens is a regulation of immigration and thus per se pre-empted by this constitutional power, whether latent or exercised." *Id.* at 355.

Importantly, the *De Canas* Court considered and *rejected* the possibility that the regulation of immigration by the federal government might be so comprehensive that it leaves not room for state action. Field preemption had *not* occurred:

> Only a demonstration that complete ouster of state power—including state power to promulgate laws not in conflict with federal laws—was "the clear and manifest purpose of Congress" would justify that conclusion…. Respondents have not made that demonstration. They fail to point out, and an independent review does not reveal, any specific indication in either the wording or the legislative history of the INA that Congress intended to preclude even harmonious state regulation touching on aliens in general, or the employment of illegal aliens in particular.

*De Canas*, 424 U.S. at 357-358 (internal citations omitted). The Supreme Court's holding that field preemption has not occurred was unmistakable and unequivocal.

However, the District Court unilaterally declared that Congress's enactment of IRCA in 1986 constituted field preemption. Therefore, according to the District Court, the Supreme Court holding in *De Canas* is no longer binding precedent: "Since *De Canas*, however, Congress has passed IRCA. … [A] complete statutory

53

scheme has now been enacted that addresses the employment of unauthorized workers. Therefore, defendant's reliance on *De Canas* is misplaced." 496 F.Supp. 2d at 524.

The most obvious problem with the District Court's action is that an inferior federal court lacks the authority to set aside a binding precedent of the U.S. Supreme Court, based on the belief that it no longer constitutes good law. The Supreme Court itself is the only Article III court that may properly overrule a Supreme Court precedent. Not surprisingly, the District Court is the only Article III Court in the United States ever come to the conclusion that IRCA constitutes field preemption. Indeed, the opposite conclusion has been reiterated by other federal courts, as well as by state courts.

In 2006, the U.S. Court of Appeals for the Second Circuit reviewed a preemption challenge under IRCA, and held that IRCA did *not* result in field preemption. *Affordable Hous. Found., Inc. v. Silva*, 469 F.3d 219, 240-41. In 2008, the Eastern District of Missouri held that IRCA could not possibly constitute field preemption, because IRCA expressly allows states and cities onto the field:

> Including a provision in the statute, as well as comments in the legislative history, allowing some state licensing regulations to exist, clearly conflicts with an intent to preempt the entire field of immigration regulations. Therefore the Court concludes that IRCA does not manifest an intent of Congress to occupy the entire field of immigration law.

*Gray*, slip op. at 23. The same conclusion was reached by the District of Arizona in 2007: "the fact that Congress expressly allowed states to impose licensing sanctions forecloses the argument that it impliedly occupied the same field." *Ariz. Contractors Ass'n*, slip op. at 19.

State courts have reached the same conclusion. "IRCA does not … so thoroughly occupy the field as to require a reasonable inference that Congress left no room for states to act." *Safeharbor Employer Servs. I, Inc. v. Cinto Velazquez*, 860 So. 2d 984, 986 (Fl. Ct. App. 2003). See also *Correa v. Waymouth Farms, Inc.*, 664 N.W.2d 324, 329 (Minn. 2003). In sum, the District Court's declaration that field preemption has occurred is an error that no other court in the country has committed.

### D. The District Court Erred in Finding the IIRA to be Preempted through Conflict Preemption

In *De Canas*, the Supreme Court made it perfectly clear that state and local governments have wide latitude to enact regulations affecting immigration without being displaced through implied conflict preemption: "[A]n independent review does not reveal any specific indication either in the wording of the legislative history of the INA that Congress to preclude even harmonious state regulation touching on aliens in general, or the employment of illegal aliens in particular."

424 U.S. at 357-58 (internal citations omitted).  States are free to enact statutes affecting immigration as long as they are harmonious with federal law and they do not defeat congressional objectives.  *Id*.  Conflict preemption only occurs if the state or local regulation "'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress' in enacting the INA." *Id*. at 363 (*quoting Hines*, 312 U.S. at 67).  Six years later, in *Plyler v. Doe*, 457 U.S. 202 (1982), the Supreme Court reiterated its holding in *De Canas* that states may take steps to prohibit the employment of illegal aliens.

> As we recognized in *De Canas v. Bica*, 424 U.S. 351 (1976), the States do have some authority to act with respect to illegal aliens, at least where such action mirrors federal objectives and furthers a legitimate state goal.  In *De Canas*, the State's program reflected Congress' intention to bar from employment all aliens except those possessing a grant of permission to work in this country.  *Id*. at 361.

457 U.S. at 225.  The Supreme Court has never departed from this holding.

### 1.  The District Court Erroneously Disregarded the Doctrine of Concurrent Enforcement, to which the IIRA Adheres

As explained further below, the District Court invented its own standard of conflict preemption, one that allows no local regulation that bolsters the enforcement of federal immigration laws in the interior of the United States. 496 F.Supp. 2d at 528.  This is the exact opposite of the correct approach.

States and localities are not preempted in the immigration arena when they

prohibit the same activity that is already prohibited under federal law. Every circuit to address the question has recognized that states and localities may undertake such concurrent enforcement activity. "Where state enforcement activities do not impair federal regulatory interests *concurrent enforcement activity is authorized.*" *Gonzales v. Peoria*, 722 F.2d 468, 474 (9th Cir. 1983)(*citing Paul*, 373 U.S. at 142 (emphasis added). Where "[f]ederal and local enforcement have identical purposes," preemption does not occur. 722 F.2d at 474. In the words of Judge Learned Hand, "it would be unreasonable to suppose that [the federal government's] purpose was to deny itself any help that the states may allow." *Marsh v. United States*, 29 F.2d 172, 174 (2d Cir. 1928). "No statute precludes other federal, state, or local law enforcement agencies from taking other action to enforce this nation's immigration laws." *Lynch v. Cannatella*, 810 F.2d 1363, 1367 (5th Cir. 1987).

Federal district courts reviewing laws similar to the IIRA have upheld those laws, based on the doctrine of concurrent enforcement. The District of Arizona pointed out that conflict preemption cannot occur where concurrent enforcement exists:

> The mere fact that the parallel procedures could result in an employer being found in violation of the [state] Act but not IRCA does not establish conflict preemption. That is simply the result of the *concurrent enforcement activity* in our federal system where Congress has specifically preserved state authority.

*Ariz. Contractors Ass'n*, slip op. at 21 (emphasis added).  The Eastern District of Missouri also applied the concurrent enforcement doctrine in rejecting a conflict preemption challenge:

> [G]enerally, a state has concurrent jurisdiction with the federal government to enforce federal laws. …This allows for greater enforcement of the federal law, while providing additional local sanctions through the licensing law.  There is no conflict between the two laws.

*Gray*, slip op. at 33 (*citing Gonzales*, 722 F.2d at 474).  The District Court in the case at bar completely disregarded this important doctrine of preemption law.

As explained above, the employment provisions of the IIRA were drafted with meticulous care to match the terminology and scope of federal law. The IIRA makes it unlawful "to knowingly recruit, hire for employment, or continue to employ, or to permit, dispatch, or instruct any person who is an unlawful worker to perform work in whole or part within the City."  IIRA § 4.A.  The ordinance prohibits the same employer conduct described by federal law at 8 U.S.C. § 1324a(a)(1).  This is perfect concurrence of enforcement, going a good deal further than is required to avoid preemption.

In the same way, the harboring provisions of the IIRA also constitute concurrent enforcement.  The harboring provisions of the IIRA are consistent with the equivalent harboring provisions of the INA, which impose criminal penalties

on:

> Any person who … knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien *in any place, including any building* or any means of transportation.

8 U.S.C. § 1324(a)(1)(A)(iii).  The IIRA makes express reference to 8 U.S.C. § 1324(a)(1)(A) in Section 2.E.  Moreover, the terms of the harboring violation in the IIRA were drafted so as to match the terms of federal law:  it is unlawful "to let, lease or rent a dwelling unit to an illegal alien, knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law…."  IIRA, § 5.A(1).

As the IIRA correctly states in its findings section, "The provision of housing to illegal aliens is a fundamental component of harboring."  IIRA § 2.E. Federal courts have confirmed that the provision of an apartment or other housing to illegal aliens fits squarely within the federal crime of harboring under 8 U.S.C. § 1324(a)(1)(A), or its precursor 8 U.S.C. § 1324(a)(3).  See, e.g., *United States v. Aguilar*, 883 F.2d 662, 669-670 (9th Cir., 1989)(providing apartment to illegal aliens found to constitute harboring).  The broad range of activities proscribed under the federal crime of harboring include "'any conduct which tends to substantially facilitate an alien's remaining in the United States illegally.'" *United States v. Rubio-Gonzales*, 674 F.2d 1067, 1073 (5th Cir. 1982)(*quoting United*

59

*States v. Varkonyi*, 645 F.2d 453, 459 (5th Cir. 1981). Hazleton's IIRA prohibits a subset of activities that falls within the larger federal crime of harboring and therefore constitutes concurrent enforcement. The IIRA also adopts federal statutory language and employs federal standards, deferring entirely to federal officials' judgments about the legal status of any alien in question. IIRA §§ 2.E, 3.D, 5.B(3), 5.B(9), 7.E, 7.G.

### 2. The IIRA is Consistent with the Congressional Objective of Maximizing State and Local Assistance in Immigration Enforcement

The central question in conflict preemption is whether the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Geier v. Amer. Honda Motor Co., Inc*., 529 U.S. 861, 899 (2000). The District Court noted this standard, 496 F.Supp. 2d at 526, but then proceeded to ignore the vast body of federal law that expresses the congressional objective of *encouraging* state and local efforts to reinforce federal immigration law—efforts like the IIRA. Congress has consistently encouraged states to assist in restoring the rule of law to immigration. As the Tenth Circuit held, "in the months following the enactment of § 1252c, Congress passed a series of provisions designed to encourage cooperation between the federal government and the states in the enforcement of federal immigration laws." *Vasquez-Alvarez*, 176 F.3d at

60

1300.  A number of Congressional actions are particularly salient in this regard.

First and most importantly, Congress created a federal statutory structure to accommodate local programs by enacting 8 U.S.C. § 1373 in 1996.  Congress placed the executive branch under a statutory *obligation* to respond to all local inquiries:

> **Obligation to respond to inquiries**
> The Immigration and Naturalization Service *shall respond* to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency *for any purpose authorized by law*, by providing the requested verification or status information.

8 U.S.C. § 1373(c)(emphasis added).  In the same section, Congress also recognized the interest of cities in "[s]ending" and "[m]aintaining" such "information regarding the immigration status, lawful or unlawful, of any individual."  8 U.S.C. § 1373(b)(1)-(2).  Importantly, Congress wanted municipalities to be able to *send* and *maintain* information—not just receive it— about an alien's legal status.  This is definitive proof that Congress expected state and local governments to implement programs under which they would make inquiries about the legal status of aliens.  No other conclusion can logically be drawn from this statutory text.  In addition, the Senate Report accompanying this legislation clearly spelled out Congress's objective of encouraging states to make their own efforts to assist in immigration enforcement.

> Effective immigration law enforcement requires a cooperative effort between all levels of government. The acquisition, maintenance, and exchange of immigration-related information by State and local agencies is consistent with, and potentially of considerable assistance to, the Federal regulation of immigration and the *achieving of the purposes and objectives of the Immigration and Nationality Act*.

Sen. Rep. No. 104-249, 104th Cong., 2d Sess. at 19-20 (1996)(emphasis added). The IIRA was built around 8 U.S.C. § 1373 and the cooperative effort that it envisions. Indeed the IIRA makes express reference to this federal statute throughout the ordinance. IIRA §§ 3.D, 4.B(3), 4.B(7), 5.B(3), 5.B(4), 5.B(7), 5.B(9), 7.D(2), 7.E, 7.G.

Second, Congress enacted the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA), Pub. L. No. 104-193, 110 Stat. 2105 (1996). In so doing, Congress required states and localities to verifying with the federal government the status of aliens seeking public benefits. Congress mandated that an "unqualified" alien who is unlawfully present in the United States "is not eligible for any State or local public benefits." 8 U.S.C. § 1621(a). States and localities were not only encouraged to determine the status of aliens seeking such benefits, they were *required* to do so.

In order to implement these provisions, the federal government expanded the SAVE Program which enables state and local government agencies to verify electronically whether an alien is lawfully present in the United States. There are

at least 215 participating government agencies across the country that are currently using the SAVE program to verify individuals' immigration status.  SAVE User Agencies List, Appx. A2647.  The IIRA will utilize the SAVE Program unless the federal government instructs Hazleton to use another system for verifying aliens' statuses, pursuant to 8 U.S.C. § 1373(c).

Third, in 1994 Congress created and began appropriating funds for the Law Enforcement Support Center (LESC) in Williston, Vermont.  "The primary mission of the LESC is to support other law enforcement agencies by helping them determine if a person they have contact with, or have in custody, is an illegal, criminal, or fugitive alien.  The LESC provides a 24/7 link between federal, state, and local officers and the databases maintained by the INS."[1]  In so doing, Congress created yet another system whereby local officials could verify with the federal government the immigration status of particular aliens.

Fourth, Congress created the E-Verify Program as part of the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) of 1996, P.L. 104-208, Division C, Section 403(a), 8 U.S.C. § 1324a; see specifically IIRIRA § 403(a).  Originally named the "Basic Pilot Program," it is an employment eligibility verification system that any employer in the United States may utilize to

---

[1] Testimony of Joseph R. Green, Acting Dep. Exec. Assoc. Comm'r for Field Operations, INS, before Subcommittees of the House Comm. on Gov. Reform, 107th Congress 97 (2001).

verify over the internet whether an individual seeking employment is authorized to work in the United States. Congress reauthorized the Basic Pilot Program and expanded it to all fifty states in 2004. Verification takes less than two seconds in approximately 92 percent of the cases. DHS Statement to Congress, April 24, 2007, Appx. A2900. As Secretary of Homeland Security Michael Chertoff announced in August 2007, the federal government's objective is to continue to expand the use of the program. Remarks by Secretary Chertoff, Appx. A2921.

Fifth, in 1996 Congress expressly put to rest any notion that it did not welcome state and local efforts to assist with the problem of illegal immigration. In passing 8 U.S.C. § 1357(g), a provision allowing states enter into agreements to deputize specially-trained state officers to exercise the full "function[s] of an immigration officer" of the United States, Congress affirmed that no such agreement was necessary for states to act. States and localities retained unpreempted authority to otherwise assist in immigration enforcement: "Nothing in this subsection shall be construed to require an agreement under this subsection in order for any officer or employee of a State or political subdivision … otherwise to cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States." 8 U.S.C. § 1357(g)(10).

Taken together, these statutes constitute overwhelming evidence of

congressional intent to encourage state and local programs to discourage illegal immigration and the employment of unauthorized aliens. The District Court erred by failing to even acknowledge this congressional objective.


### 3. The District Court Erred by Inventing a Theory of "Excessive Enforcement"

Unable to find any congressional objectives on the face of federal law that the IIRA obstructs, the District Court resorted to inventing a congressional objective. In what is undoubtedly the most creative section of its opinion, the Court concocted a theory of "excessive enforcement." Under this theory, "there are two types of immigration enforcement: border enforcement … and interior enforcement." 496 F.Supp. 2d at 527. According to the Court, while Congress would like to see federal law fully enforced at the border, *Congress does not wish to see federal law fully enforced in the interior*. Doing so would result in what the Court termed "excessive enforcement." "Excessive enforcement jeopardizes our [foreign] alliances and cooperation with regard to matters such as immigration enforcement, drug interdiction and counter-terrorism investigations." *Id*. at 528. The District Court even imagined, without any support or explanation, that "[t]oo stringent of an enforcement system will result in the wrongful removal of United

States citizens and legal immigrants."[2]  The District Court did not offer a shred of

case law, evidence of congressional intent, or any other form of legal support for

this bizarre theory.

The District Court's theory rests upon the assumption that Congress does not

wish to see its immigration laws fully enforced if the alien in question is in the

interior of the United States.  This theory is obviously incorrect.  If Article III

Courts were to adopt it, then those very courts would stand as an obstacle to the

congressional objectives expressed in statute.  "The Court must enforce the law as

the Court presumes Congress intended."  *In re Elmendorf*, 345 B.R. 486 (Bankr.

D.N.Y. 2006).  See also *Becker v. IRS* (*In re Becker*), 407 F.3d 89 (2d Cir.

2005)(recognizing "the public interest in full enforcement of the law.").  An

Article III Court steps well beyond its proper constitutional authority when it

declares that some federal laws are not meant to be fully enforced.


### 4.  The District Court Erred by Assuming Preemption Occurs Wherever Slight Variations in Federal and Local Statutes Exist

In addition to basing its conflict preemption holding on the tenuous theory of

"excessive enforcement," the District Court also created a novel preemption

---

[2]The District Court offered no examples of U.S. citizens being wrongfully removed
from the United States.  Nor did the District Court explain how Hazleton's IIRA
might result in such a removal.  The IIRA does not in any way attempt to involve
the City of Hazleton in the removal of any individuals from the United States.

standard under which any slight difference in approach between federal and state statutes constitutes conflict preemption. As the District Court stated, "Although the federal and local laws have a similar goal, the means to reach that goal are different." 496 F.Supp. 2d at 526. The District Court then attempted to identify small discrepancies between the terms and structure of the IIRA and those of the INA. (In fact, most of these discrepancies do not exist, as explained below.) The District Court's standard has no basis in law; and the District Court offered no case support whatsoever for its notion of conflict preemption.

On the contrary, the District Court's approach has been rejected many times over by the Supreme Court and by numerous inferior federal courts. In the controlling precedent of *De Canas*, the Supreme Court stated that the duty of a court is to *reconcile* any differences in federal and state law in preemption cases, not to seize upon minute distinctions as the basis for finding preemption:

> "[T]he proper approach is to reconcile 'the operation of both statutory schemes with one another rather than holding [the state scheme] completely ousted.'"

*De Canas*, 424 U.S. at 358 (*quoting Merrill Lynch, Pierce, Fenner & Smith v. Ware*, 414 U.S. 117, 127 (1973). "A mere difference between state and federal law is not conflict." *Ariz. Contractors Ass'n.*, slip op. at 13. Contrary to the holding of the District Court, a difference in the means chosen by the federal government and the local government does not result in conflict preemption:

> [T]his does not mean that every slight difference in emphasis between the federal requirements and the local requirements creates such a conflict. The purpose of the federal law is clearly to control the employment of undocumented aliens; the ordinance is aimed at the same conduct.

*Gray*, slip op. at 27-8.

Where differences exist in the wording or processes of the respective statutes, preemption occurs only if "compliance with both State and federal law is impossible." *Mich. Canners & Freezers Ass'n, Inc. v. Agric. Mktg. & Bargaining Bd.* 467 U.S. 461, 469 (1984); *Ariz. Contractors Ass'n.*, slip op. at 13. This is a very difficult hurdle for a party bringing a preemption claim to overcome.

Unavoidable conflict is required for preemption to occur:

> Tension between federal and state law is not enough to establish conflict preemption. *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 256 (1984). We find preemption only in "those situations where conflicts will necessarily arise." *Goldstein v. California*, 412 U.S. 546, 554 (1973). A "hypothetical conflict is not a sufficient basis for preemption." *Total TV v. Palmer Communications, Inc.*, 69 F.3d 298, 304 (9th Cir. 1995).

479 F. 3d at 1010. Holding that conflict between a state employment law and IRCA was possible, but not inevitable, the Ninth Circuit concluded: "[I]n this case, California law does not conflict with federal law; it was possible to comply with and satisfy the purposes of both." *Id.* at 1013.

The same question must be asked in the case at bar: is it possible for the

Appellees to comply with both federal law and local law in Hazleton? The answer is plainly yes. By declining to hire unauthorized aliens in the future, employers may comply with all of the requirements of 8 U.S.C. § 1324a while also complying with the IIRA. By asking the Hazleton Code Enforcement Office to verify the legal presence of aliens seeking to rent from them, landlords may comply with 8 U.S.C. § 1324(a)(1)(A)(iii) while also complying with the IIRA. The District Court did not explain how any of the Appellees in this case could be placed in a position in which compliance with both federal and local law would be impossible.

### 5. The District Court Erred in its Identification of Supposed Differences Between the IIRA and Federal Law

Having set up an incorrect standard for conflict preemption, the District Court then proceeded to search for any slight differences in the approach of the IIRA and federal law. The Court incorrectly pointed to three differences, concerning: (1) whether or not use of the E-Verify system is required, (2) whether or not the IIRA allows for the E-Verify contest procedure to occur, and (3) whether or not independent contractors and casual domestic labor are covered by the IIRA. As explained below, these differences are either nonexistent or insufficient to constitute conflict preemption.

Consider first the District Court's contention that "[u]nder federal law,

participation in the Basic Pilot Program [E-Verify] is not mandatory. Under IIRA, participation … is at times mandatory." 496 F.Supp. 2d at 527. The District Court then noted that the IIRA requires the City itself to use E-Verify when hiring city employees, and makes participation in E-Verify a condition of receiving a City contract or grant exceeding $10,000, IIRA §§ 4.C-D. However, the District Court erred in stating that this is a difference between local and federal practice. While it is true that the City requires itself, as well as its contract recipients, to participate in the E-Verify Program, *so does the federal government*. The federal government requires federal contractors to participate in E-Verify. Remarks by Secretary Chertoff, Appx. A2921. And the federal government requires all federal agencies to participate. IIRIRA § 402(e)(1). There is one other limited instance in which the IIRA could potentially compel a business entity to participate in E-Verify—as a consequence of unlawfully employing two or more unauthorized aliens and failing to correct the violation. IIRA § 4.B(6)(b). Here too, Hazleton's practice mirrors federal practice. Federal law provides that a business entity can be compelled to participate in the E-Verify Program as a consequence of violating 8 U.S.C. § 1324a. Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), § 401(e)(2).

Thus, local and federal practice are mirror images of one another—making E-Verify "mandatory" only in these limited contexts. Where "[f]ederal and local

enforcement have identical purposes," preemption does not occur. *Gonzales v. Peoria*, 722 F.2d at 474. Moreover, even if federal and local practices were not the same, these IIRA provisions still would not be preempted. The District Court identified no federal law or regulation prohibiting government entities from encouraging employers to use E-Verify. "The Court does not see Congress's decision not to make the program mandatory as restricting state or local government's authority under the police powers." *Gray*, slip op. at 33

The second aspect of the IIRA that that District Court erroneously labeled a "conflict" concerns the contest procedure under E-Verify. The E-Verify Program allows an employee to contest a "tentative nonconfirmation" of his work status within eight days of the issuance of the tentative non-confirmation. 62 C.F.R. 48309(IV)(B)(2)(a). The District Court erroneously assumed that a conflict exists because "[u]nder IIRA, no appeal right is provided to the employee, and in fact, the employer must terminate the employee within three (3) business days." 496 F.Supp. 2d at 527. Evidently, the District Court misread the text of the IIRA and ignored the testimony of City's Code Enforcement Officer at trial. The IIRA was carefully drafted to allow time for the eight-day contest procedure of 62 C.F.R. 48309(IV)(B)(2)(a) to occur before the City would take any action. The receipt of a tentative non-confirmation response from the federal government triggers IIRA § 7.E, which specifically accommodates this federal process when DHS is only able

to offer a "tentative" answer, rather than a final "verification":

> If the federal government notifies the City of Hazleton that it is unable to *verify* whether … an employee is authorized to work in the United States, the City of Hazleton shall take no further action on the complaint until a verification from the federal government concerning the status of the individual is received.

IIRA § 7.E. (emphasis added). A tentative nonconfirmation, which currently occurs in approximately eight percent of E-Verify cases, is by definition *tentative*. See DHS Statement to Congress, April 24, 2007, Appx. A2900. DHS has not "verified" an alien's work authorization status until it issues a final non-confirmation of work authorization or a final confirmation of work authorization. Until that point, the City "shall take no further action on the complaint." IIRA § 7.E. Only after a *final* nonconfirmation is received from the federal government does the City notify the business entity of a violation and start the three-day clock running. IIRA § 4.B(4). In other words, the three-day period of the IIRA does not in any way conflict with the eight-day period to contest a "tentative nonconfirmation" under the E-Verify Program because the three-day period does not begin to run until *after* the eight-day contest period (and the succeeding period during which DHS attempts to verify the alien's status) has concluded. In addition, the IIRA also allows the employer to toll the IIRA enforcement process to pursue a second or successive attempt at verification of the worker's authorization "pursuant to the procedures of the Basic Pilot Program." IIRA § 7.C(2). The

Eastern District of Missouri, reviewing *identical* procedures, correctly found no conflict:

> In the event that the [E-Verify] program reports back a tentative nonconfirmation, then the Ordinance's three day time table is tolled, pending completion of the federal determination, which allows the employee eight federal government business days to respond to the nonconfirmation. There is no conflict between these two provisions such that the employer cannot comply with both. *Incalza*, 479 F.3d at 1010.

*Gray*, slip op. at 30.

This procedure was also explained by Robert Dougherty, the Director of Planning and Public Works, who will oversee the enforcement of the IIRA. Mr. Dougherty confirmed that if a tentative non-confirmation is received, "there is no change in the employee's status. The individual remains employed. There is no action that can be taken." Trans. vol. V, p. 108, Appx. A1841. Upon receipt of a tentative non-confirmation, the employee would be notified and would then have eight days to contest the tentative non-confirmation or provide additional information to verify his work authorization. Appx. A1842. Only after the eight-day period ended and the City received a final non-confirmation from the federal government would the three-day period to correct a violation under the IIRA Ordinance commence. *Id.* The District Court ignored this testimony completely.

The third area in which the District Court attempted to find an inconsistency between the IIRA and federal law is with respect to independent contractors and

casual domestic workers.  The Court asserted that the IIRA fails to exclude those categories of workers.  496 F.Supp. 2d at 526.   Once again, the District incorrectly described the IIRA.

Under federal law, it is illegal for a person or other entity to hire an individual for employment in the United States without complying with certain employment eligibility verification requirements involving the filling out of I-9 Forms.  8 U.S.C. 1324a(a)(1)(B)(i).  There is a narrow exception for casual domestic workers under 8 C.F.R. § 274a.1(h).  What the District Court failed to comprehend is that this regulatory exception only extends to "casual employment *by individuals*" where the workers "provide domestic service *in a private home* that is sporadic, irregular or intermittent."  8 C.F.R. § 274a.1(h)(emphasis added). The Ninth Circuit has construed this "domestic" employment exemption narrowly—including only household tasks that would normally be completed by a resident of the household, namely "cleanup, moving or gardening" work.  *Jenkins v. Immigration and Naturalization Services*, 108 F.3d 195, 197 (9th Cir. 1997).  In addition, "domestic" work only referred to household tasks completed *within* one's private abode.  *Id*.

What the District Court failed to recognize is that the IIRA extends only to employment relationships involving a "business entity."  IIRA § 4.A.  The term "business entity" is applies only to:  "any business entity that possesses a business

74

permit, any business entity that is exempt by law from obtaining such a business permit, and any business entity that is operating unlawfully without such a business permit." IIRA § 3.A(2). Therefore the IIRA does not cover a homeowner employing a casual domestic worker. Because the casual domestic worker exception is defined so narrowly by federal regulation and case law, there is no overlap with the IIRA. In addition, the activity of performing chores in one's own household does not fall with in the activities of a business entity described in IIRA § 3.A. There is no possible conflict with federal law.

The District Court's assertion regarding independent contractors was also erroneous. While it is true that employers have no duty under federal law to undertake the Form I-9 process to determine the employment eligibility of independent contractors, federal law expressly prohibits any employer from using "a contract, subcontract, or exchange … to obtain the labor of an alien in the United States knowing that the alien is an unauthorized alien…." 8 U.S.C. § 1324a(a)(4). If an employer is made aware that an alien is unauthorized, then federal law effectively transforms that business-independent contractor relationship into an employer-employee relationshi. The business entity that engages in such prohibited contractual activity "shall be considered to have hired the alien for employment in the United States in violation of paragraph 1(A)." *Id*. Furthermore, it is an additional violation of federal law for a business entity to

continue to "employ" an independent contractor once the business entity has learned that the person "is (or has become) an unauthorized alien…." 8 U.S.C. § 1324a(a)(2). In other words, under federal law, once a business entity becomes aware an independent contractor is an unauthorized alien, that relationship is treated as an employer-employee relationship, and the business entity has a statutory duty to terminate the services of such a contractor. The IIRA is entirely consistent with this federal law. If the City receives a verification from the federal government that the alien worker is unauthorized, the business entity receives official notification of that fact from the City under IIRA § 4.B(3). At that point, federal law treats the business entity-independent contractor relationship as an employer-employee relationship for the purposes of IRCA. Accordingly, in requiring the business entity to terminate the employment of the unauthorized alien or otherwise correct the violation, the IIRA is consistent with federal law. In addressing precisely the same challenge, the Eastern District of Missouri concluded, "The Court can find no conflict between compliance with both statutes." *Gray*, slip op. at 27.

## V. The District Court Erred in Finding a Facial Due Process Violation

### A. The District Court Failed to Apply the *Salerno* Standard

The District Court erred in failing to apply the well-established standard

controlling all facial procedural due process claims. As the Supreme Court stated in *U.S. v. Salerno,* 481 U.S. 739 (1987), "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully since the challenger must establish that *no set of circumstances exists under which the Act would be valid.*" *Id*. at 745 (emphasis added). Because Appellees brought this lawsuit prior to the IIRA actually being enforced against anyone, they have saddled themselves with this standard. As the Supreme Court explained, presenting a worst case scenario under a facial challenge will not suffice. "The fact that the [Act] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid…." *Id.* Far from meeting this standard, the District Court did not present *any* circumstances under which the IIRA would deny due process.

The District Court launched into its consideration of the due process challenge without even mentioning the *Salerno* standard. 496 F.Supp. 2d at 533-38. The District Court then compounded its error by *refusing* to acknowledge the procedural protections described by the official in charge of implementing the IIRA. See Trans. vol. VI, pp. 92-119, Appx. A1825-52. The Court declared, without any support, "As we are dealing with a facial challenge … we do not have to take into consideration the testimony of the manner in which the Code Enforcement Office intends to enforce the ordinances." *Id*. at 535, n.59. On the

contrary, under *Salerno*, the Court *must* consider the most procedurally-protective

implementation of the act. "[W]here a statute is susceptible to two constructions,

by one of which grave and doubtful constitutional questions arise and by the other

of which such questions are avoided, [the Court's] duty is to adopt the latter." *U.S.

v. Edmonds,* 80 F.3d 810, 819 (3d Cir. 1993). Thus, the Court's framing of the due

process issue was erroneous from the outset.

The fundamental requirements of due process are notice and a meaningful

opportunity to be heard that is appropriate to the circumstances. *Harris v. City of

Philadelphia*, 47 F.3d 1333, 1338 (3d Cir. 1994); *Mathews v. Eldridge*, 424 U.S.

319, 333 (U.S. 1976). There is no rigid set of procedural requirements that must be

satisfied. *Id*. at 348. Contrary to the District Court's holding, the plain text of the

IIRA provides notice as well as multiple meaningful opportunities to be heard,

including judicial evidentiary hearings. In so doing, it goes well beyond the

minimum requirements of due process. The District Court also failed to balance

the three factors involved in any due process challenge, as required by *Mathews*:

(1) the private interests affected, (2) the risk of erroneous deprivation, and (3) the

government's interests involved. *Id*. at 334-35.


**B. The Employment Provisions of the IIRA Provide Due Process**

All business entities are placed on notice at the time of applying for a

business permit that they must sign an affidavit stating that they do not knowingly utilize the services of or hire any unlawful worker. IIRA § 4.A. From the outset, any business entity may fully immunize itself against potential violations of the IIRA by verifying the work authorization of its employees through E-Verify. IIRA § 4.B(5).

Enforcement may be initiated only by means of a valid, written, and signed complaint. IIRA § 4(B)(1). Upon receipt of a valid complaint, the business entity is given three business days simply to collect identity information from the employee(s) in question. IIRA Ordinance § 4.B(3). In providing this information to the Hazleton Code Enforcement Office, the employer is given his first opportunity to be heard—by affording him an opportunity to present *any* information that he relied on when hiring the employee. The District Court declared that a due process violation exists because the City does not specify what information is allowed at this hearing. 496 F.Supp. 2d at 536. The Court was correct that there is no limitation on the information that can be provided. But it incorrectly concluded, without support, that this lack of specificity denies due process. On the contrary, the City affords the employer maximum opportunity to be heard by allowing the employer the latitude to present *any* information he wishes. See Appx. A1844-45. These procedures "provide sufficient pre-deprivation notice and opportunity to be heard to satisfy the requirements of due

process." *Gray*, slip op. at 52.

The City then submits any and all information concerning the employee's work authorization to the federal government. IIRA § 4.B(3). The City is also required to notify the business entity of any answer received from the federal government. Only upon receiving a final nonconfirmation of an alien's unauthorized status would the business entity have to correct the violation within three business days. IIRA § 4.B(4). However, the business entity may toll the three-day period by requesting another verification from the federal government. IIRA § 7.C(2). "The pre-deprivation procedure provided is in line with the factors articulated in *Mathews*, and fairly balances the interests of the government with the potential wrongful deprivation of a ... business license." *Gray*, slip op. at 53.

However, yet another layer of procedural protections exist—for both the employer and the employee. *At any stage* in the process, either pre-deprivation or post-deprivation, an employer or employee may challenge and stay the enforcement of the IIRA in the Magisterial District Court of Hazleton, with right of appeal to the Luzerne County Court of Common Pleas, with all procedural protections afforded in that forum. IIRA § 7.F.

The District Court brushed aside this hearing process as insufficient, based on the Court's unsupported assertion that state courts "do not have jurisdiction over determinations of immigration status." 496 F.Supp. 2d at 536-37. While it is

80

true that the IIRA requires the Magisterial District Court to defer to the federal government's verification of any alien's immigration status, IIRA § 7.G, that does not mean that the state court is without power to protect the interests of all parties. Furthermore, state courts are courts of general jurisdiction that possess the authority to apply federal law, including the power to determine a person's immigration status. *Arizona Farmworkers Union v. Phoenix Vegetable Distributors*, 747 P.2d 574, 581 (Az. Ct. App. 1987)(J. Haire, concurring).

The District Court also stated, without support, that the IIRA does not give the *employee* adequate notice to satisfy the requirements of due process. 496 F.Supp. 2d at 536. The Court's statement contains three errors. First it is factually incorrect: the head of the Code Enforcement Office explained at trial that all employees *would* receive notice from the City upon the filing of any complaint. Appx. A1843. Second, when a business entity presents information to the City regarding the work authorization of an employee in the hearing process of IIRA § 4.B(3), that information inevitably must come from the employee himself— resulting in constructive notice. Third, assuming *arguendo* that an employee did not receive notice, that does not necessarily result in a denial of due process. It must be remembered that under federal law, the *employer* not the *employee* interacts with the federal government through E-Verify. *See* 8 U.S.C. § 1324a, note., P.L. 104-208, Sec. 403(a). The *employer* not the *employee* is notified of any

tentative non-confirmation. *See id.* at 403(a)(4)(B). If the IIRA violates due process in this respect, then the E-Verify system itself would be in violation of due process—something Plaintiffs did not allege in their complaint.

Finally, it must be noted that the IIRA provides considerably *more* process than is due by allowing two opportunities for pre-deprivation hearings. With respect to business licenses, due process does not require any pre-deprivation hearing. *Tanasse v. City of St. George*, 1999 U.S.App. LEXIS 2389 (10th Cir., 1999).

## C. The Harboring Provisions of the IIRA Provide Due Process

The hearing process used in enforcing the harboring provisions of the IIRA is parallel to the same hearing process in the employment provisions. At the outset, a dwelling unit owner may immunize himself from any violation by requesting a verification of a tenant's status prior to any enforcement action. § 5.B(9). After a complaint is recognized as valid, the City notifies the dwelling unit owner; and he has an opportunity to be heard during which he may provide whatever information he wishes to the City. IIRA § 5.B(3). Any information supporting the tenant's lawful presence in the United States will be forwarded to the federal government. *Id*. The tenant is provided notice, along with the rental unit owner. Appx. A1843. All of this process occurs *prior* to any deprivation of

the owner's rental license.   Importantly, the rental unit owner *and the tenant* enjoy the right to enjoin enforcement at any point in the Magisterial District Court of Hazleton.  IIRA § 7.F.

## VI.  The District Court Erred in Holding that the IIRA Violates 42 U.S.C. § 1981

### A.  Illegal Aliens are not "Persons" Covered by § 1981

Enacted in the wake of the Civil War to prohibit the "black codes" of the unreconstructed South, 42 U.S.C. § 1981 provides that "all persons" shall have the same right to make and enforce contracts as "white citizens."  The District Court erroneously concluded that this statute protects the right of illegal aliens to enter into tenancy contracts.  496 F.Supp. 2d at 546-48.  The threshold question is whether illegal aliens constitute "persons" within the meaning of § 1981.

The Supreme Court has held that § 1981 prohibits public discrimination against *legal* aliens; however, it has never held that § 1981 prohibits discrimination against illegal aliens.  *Takahashi v. Fish and Game Commission*, 334 U.S. 410, 418-19 (1948).  In *Takahashi*, the Supreme Court found that a state could not "prevent *lawfully* admitted aliens within its borders from earning a living."  *Id.* (emphasis added).  Although the Court was not presented with the question of whether illegal aliens were protected under § 1981, the Court's purposeful use of

the phrase "lawfully admitted aliens" demonstrates that a different result likely would have occurred if the plaintiff had been an illegal alien. See also *Graham v. Richardson*, 403 U.S. 365, 378 (1971).

The District Court reached its holding by assuming without support that "persons" under § 1981 has the same meaning as "person" in the Fourteenth Amendment. 496 F.Supp. 2d at 547. That assumption contradicts the many precedents establishing that the protections of § 1981 are not commensurate with those of the Fourteenth Amendment. For example, "section 1981 does not prohibit discrimination based on the basis of gender or religion." *Anderson v. Conboy*, 156 F.3d 167, 171 (2d Cir. 1998); *Runyon v. McCrary*, 427 U.S. 160, 167 (1976). Similarly, it does not prohibit discrimination based on national origin. *Saint Francis College v. Al-Khazraji*, 481 U.S. 604, 613 (1987).


**B. § 1981 is Limited to Instances of Racial Discrimination**

Not only is § 1981 narrower in scope than the Fourteenth Amendment, this Court has recognized that § 1981 "is limited to issues of *racial* discrimination in the making and enforcing of contracts." *Anjelino v. The New York Times Company*, 200 F.3d 73, 98 (3d Cir. 1999)(emphasis added). Here, Appellees' claims are based upon differential treatment resulting from their immigration statuse, not their race. Since the IIRA applies only to aliens unlawfully present in

84

the United States, regardless of race, there is no discrimination on the basis of race. See *Anderson*, 156 F.3d at 180 ("If an employer refuses to hire a person because that person is in the country illegally, that employer is discriminating on the basis not of alienage but of noncompliance with federal law.").  The District Court's holding erroneously expanded the scope of § 1981 beyond the limits recognized by this Court.

### C.  More Recent Federal Statutes Prohibit the District Court's Interpretation of § 1981

The District Court correctly recognized that more recent federal immigration laws can limit § 198, and held that IRCA would bar any extension of § 1981 to employment contracts involving unauthorized aliens.  496 F.Supp. 2d 547. However, the District Court then declared that, "Otherwise the unauthorized workers have the same right to contract as other citizens."  *Id.*  That is obviously incorrect.  A contract that requires a violation of subsequent federal law cannot be protected by § 1981.  Federal law prohibits the harboring of an illegal alien "in any place, including any building or any means of transportation,"  8 U.S.C. § 1324(a)(1)(A)(iii), and any act that aids or abets such harboring.  8 U.S.C. § 1324(a)(1)(A)(v)(II).  Clearly, those provisions of federal immigration law prohibit a landlord from entering into a contract to harbor an illegal alien in an apartment.

Similarly, federal law prohibits the transportation of illegal aliens. 8 U.S.C. §

1324(a)(1)(A)(ii). However, under the District Court's expansive view of § 1981,

an illegal alien would have a statutory right to contract with an alien smuggler to

be transported within the United States. That view is unsustainable.


## VII.   The District Court Erred in Holding that the IIRA's Private Right of Invalid under Pennsylvania Law

The District Court held that IIRA § 4.E, which creates a private right of

action for an unfairly discharged employee, is *ultra vires*. 496 F.Supp. 2d at 552.

Contrary to the Court's conclusion, the City has the legal authority to create a

private right of action under 53 P.S. § 37403(16), which authorizes a Third Class

City to enact laws to abate nuisances, and also under 53 P.S. § 37403(60), which

authorizes a Third Class city to enact any laws that are not inconsistent with the

Constitution or the laws of Pennsylvania.

In enacting the IIRA, Hazleton specifically found "[t]hat the City of

Hazleton is authorized… to abate the nuisance of illegal immigration by diligently

prohibiting the acts and policies that facilitate illegal immigration in a manner

consistent with federal law and the objectives of Congress." IIRA § 2.D. Thus,

through the IIRA, Hazleton has identified illegal immigration as a public nuisance,

and the private right of action is a measure designed to abate this nuisance. The

District Court erred by completely disregarding this source of authority.

Instead, the Court focused on the City's authority under 53 P.S. § 37403(60). That statute permits a Third Class City to enact any ordinances "as may be expedient or necessary for the proper management, care and control of the city and its finances, and the maintenance of the peace, … safety and welfare, ... and its trade, commerce and manufactures" that are not inconsistent with the Constitution or the laws of Pennsylvania. "This provision constitutes a grant of extremely broad powers, and such 'general welfare clauses' have always been liberally construed to accord municipalities a wide discretion in the exercise of police power." *Adams v. New Kensington*, 55 A.2d 392, 395 (Pa. 1947).

In the face of this grant of authority, the District Court asserted two frail arguments, both of which collapse upon close inspection. First, the Court declared that the private right of action was "unnecessary." The Court recognized that a City's power to enforce compliance with ordinances encompasses various mechanisms, but then declared without support that a private right of action is "unnecessary" to Hazleton's regulatory scheme. 496 F.Supp. 2d at 552. The Court concluded that, because Hazleton can use its Code Enforcement Office to enforce the terms IIRA, a private right of action is "unnecessary." *Id.* In so doing, the District Court once again improperly stepped out of its judicial role to make a policy judgment. Contrary to the Court's conclusion, a private right of action is a

necessary complement to the IIRA's other enforcement provisions. It provides an additional means of identifying the employment of unauthorized aliens where the City may not be aware of the practice. The private right of action also provides employers with an incentive to enroll in the E-Verify program in order to take advantage of the defenses to such an action under IIRA § 4.E. And perhaps most importantly, the federal government deemed a similar private right of action to be necessary to discouraging the employment of unauthorized aliens at the federal level. In 1996, Congress amended the Racketeer Influenced and Corrupt Organizations (RICO) Act to make the employment of illegal aliens a RICO violation, and enable persons economically injured by the employment of unauthorized aliens to sue for treble damages in civil court. 18 U.S.C. § 1961(1)(F). See *Trollinger v. Tyson Foods*, 370 F.3d 602, 611 (6th Cir. 2004). Thus the District Court's view of what is "unnecessary" is not shared by Congress.

The second argument made by the District Court is that the private right of action conflicts with state law. As the Court properly noted, since there are no state statutes that regulate the employment of illegal aliens, the rest of the IIRA does not violate state statutory law. 496 F.Supp. 2d at 549. However, the District Court went on to hold that the IIRA's private right of action "contradicts" Pennsylvania common law, because Pennsylvania is an at-will employment state. *Id*. at 549-50. This conclusion is erroneous for several reasons.

First, the District Court improperly looked to the Pennsylvania common law to limit a municipality's authority under § 37403(60). Section 37403(60) specifically provides that "…no ordinance, … shall be made or passed which contravenes or violates any of the provisions of the Constitution of the United States or of this Commonwealth, or of *any act of Assembly* heretofore or that may be hereafter passed and in force in said city." 53 P.S. § 37403(60)(emphasis added). The General Assembly specifically chose the phrase "act of Assembly" rather than "common law." Unfortunately, the District Court did exactly what the General Assembly was obviously trying to avoid—usurp the exclusive authority of the General Assembly with judicially-created law

Second, Hazleton's private right of action for discharged employees does not contradict Pennsylvania common law, because there are exceptions to the at-will employment doctrine. As the Pennsylvania Supreme Court noted: "Exceptions to the [at-will employment] doctrine have generally been limited to instances where a statute or contract limits the power of an employer unilaterally to terminate the employment relationship." *Knox v. Bd. of Directors of Susquenita School Dist.*, 888 A.2d 640, 647 (Pa. 2005). Thus, Pennsylvania recognizes that legislative enactments can create exceptions to the employment-at-will doctrine. This is exactly what Hazleton has done: created a statutory exception to the employment-at-will doctrine where an employee is discharged by an employer who employs an

unlawful worker.

## VIII.  **The District Court Erred in Holding that the Ordinances Exceed the Police Powers of the City**

Based upon its conclusion that Hazleton's ordinances violate Appellees' rights under the U.S. Constitution, the District Court simply determined, without any further analysis, that the ordinances exceeded the City's police powers.  496 F.Supp. 2d at 554.  However, as discussed above in detail, Hazleton's Ordinances do not violate Appellees' constitutional rights.

Had the Court conducted a complete police powers analysis, it would have come to the obvious conclusion that the ordinances constitute a reasonable exercise of a city's police power to provide for the health, safety, welfare and morality of its citizens.  An exercise of the police power need only be "reasonable."  Moreover, "[d]ebatable questions as to 'reasonableness' are not for the courts but for the Legislature and therefore the presumption of reasonableness is with the State." *Commonwealth v. Harmar Coal Company*, 306 A.2d 308, 317 (Pa. 1973)  Most importantly, the U.S. Supreme Court in *De Canas* specifically recognized that state legislation "to prohibit the knowing employment by [state] employers of persons not entitled to lawful residence in the United States, let alone to work here, is certainly within the mainstream of such police power regulation."  424 U.S. at 356.

Having established that the test is one of reasonableness, the question is whether the City could reasonably conclude that the IIRA would promote the health, safety, welfare or morality of its citizens. The City produced extensive evidence at trial that the IIRA was reasonably calculated to reduce wage depression caused by unauthorized aliens, Trans. vol. pp. 27-34, Appx. A1941-47, public services consumed by illegal aliens, Appx. A1399-1400, crimes committed by illegal aliens, Appx. A2187, the burden on the school district caused by illegal aliens, Appx. A1682, and emergency room wait times resulting from excessive use by illegal aliens, Appx. A2297. Hazleton reasonably concluded that by discouraging the unlawful employment and harboring of illegal aliens, it would address all of these problems. The IIRA is therefore a legitimate exercise of the police power.

## CONCLUSION

Because the District Court erred in all of the respects described above, Appellants respectfully request this Court to reverse the decision below for lack of standing, or if this Court concludes that Appellees possess standing, to reverse the decision below on the merits; and to void the District Court's Orders of December 8, 2006, and January 26, 2007.

ORAL ARGUMENT REQUESTED

Respectfully submitted,

_____

Kris W. Kobach, Esquire

Harry G. Mahoney, Esquire
Carla P. Maresca, Esquire
Andrew B. Adair, Esquire

Attorneys for Appellant

**CERTIFICATE OF BAR MEMBERSHIP**

I, Kris W. Kobach, Esquire, hereby certify that I have been admitted before the bar of the United States Court of Appeals for the Third Circuit and that I am a member of good standing of the Court.

_____
Kris W. Kobach, Esquire
Attorney for Appellant

## CERTIFICATE OF BAR MEMBERSHIP

I, Harry G. Mahoney, Esquire, hereby certify that I have been admitted before the bar of the United States Court of Appeals for the Third Circuit and that I am a member in good standing of the Court.

_____
Harry G. Mahoney, Esquire
Attorney for Appellant

## CERTIFICATE OF BAR MEMBERSHIP

I, Andrew B. Adair, Esquire, hereby certify that I have been admitted before the bar of the United States Court of Appeals for the Third Circuit and that I am a member in good standing of the Court.

_____
Andrew B. Adair, Esquire
Attorney for Appellant

## CERTIFICATE OF BAR MEMBERSHIP

I, Carla P. Maresca, Esquire, hereby certify that I have been admitted before the bar of the United States Court of Appeals for the Third Circuit and that I am a member of good standing of the Court.

_____
Carla P. Maresca, Esquire
Attorney for Appellant

# CERTIFICATE OF COMPLIANCE

I, Kris Kobach, Esquire, hereby certify that:

1.     This Brief complies with type-volume limitation of Fed.R.App.P. 32(a)(7)(B), as modified by the Court's grant of leave to file an over length brief not to exceed 20,000 words, because:

This Brief contains exactly 20,000 words, excluding the parts of the Brief exempted by Fed.R.App.P. 32(a)(7)(B)(III).

2.     This Brief complies with the typeface requirements of Fed.R.App.P. 32(a)(5) and the type style requirements of Fed.R.App.P. 32 (a)(6) because:

This Brief has been prepared in a proportionately spaced typeface using MS Word, font size 14 point Times New Roman.

3.     The hard copy and the electronic copy of this brief are identical.

4.     The electronic copy of this brief has been virus scanned using Symantec Mail Security virus software.

_____
Kris W. Kobach, Esquire
Attorney for Appellant

**CERTIFICATE OF SERVICE**

I, Kris Kobach, Esquire, hereby certify that this brief has been served, via

U.S. mail, on February 7, 2008, to the following individuals:

Thomas G. Wilkinson, Esq.        Lee Gelernt, Esq.
Thomas B. Fiddler, Esq.           Omar Judwat, Esq.
Cozen & O'Connor             ACLU
1900 Market St., 3rd Floor      125 Broad St, 18th Floor
Philadelphia, PA 19103        New York, NY 10004-2400

Foster Maer, Esq.             Witold J. Walczak, Esq.
Ghita Schwartz, Esq.         ACLU
Jackson Chin, Esq.           313 Atwood St.
Puerto Rican Legal Defense Fund  Pittsburgh, PA 15213
99 Hudson St, 14th Floor
New York, NY 10013

Lucas Guttentag, Esq.       Jennifer Chang, Esq.
ACLU                  ACLU
405 14th Street, Suite 300     39 Drumm St.
Oakland, CA 94612        San Francisco, CA 94111

Shamaine A. Daniels, Esq.
Community Justice Project
118 Locust St
Harrisburg, PA 17101

_____
Kris W. Kobach, Esquire
Attorney for Appellant

## I.  Relevant Federal Statutes

**8 U.S.C. § 1324(a)(1)(A):**

**(a) Criminal penalties**

(1)(A) Any person who—

(i) knowing that a person is an alien, brings to or attempts to bring to the United States in any manner whatsoever such person at a place other than a designated port of entry or place other than as designated by the Commissioner, regardless of whether such alien has received prior official authorization to come to, enter, or reside in the United States and regardless of any future official action which may be taken with respect to such alien;

(ii) knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, transports, or moves or attempts to transport or move such alien within the United States by means of transportation or otherwise, in furtherance of such violation of law;

(iii) knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation;

(iv) encourages or induces an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law; or

(v)(I) engages in any conspiracy to commit any of the preceding acts, or
(v)(II) aids or abets the commission of any of the preceding acts,

Shall be punished as provided in subparagraph (B).

**8 U.S.C. § 1324a(a)(1)-(2)**

**(a) Making employment of unauthorized aliens unlawful**

**(1) In general**
It is unlawful for a person or other entity--

> (A) to hire, or to recruit or refer for a fee, for employment in the United States an alien knowing the alien is an unauthorized alien (as defined in subsection (h)(3) of this section) with respect to such employment, or

> (B) (i) to hire for employment in the United States an individual without complying with the requirements of subsection (b) of this section or (ii) if the person or entity is an agricultural association, agricultural employer, or farm labor contractor (as defined in section 1802 of Title 29), to hire, or to recruit or refer for a fee, for employment in the United States an individual without complying with the requirements of subsection (b) of this section.

**(2) Continuing employment**
It is unlawful for a person or other entity, after hiring an alien for employment in accordance with paragraph (1), to continue to employ the alien in the United States knowing the alien is (or has become) an unauthorized alien with respect to such employment.


**8 U.S.C. § 1324a(h)(2)**

**Preemption**
The provisions of this section preempt any State or local law imposing civil or criminal sanctions (other than through licensing and similar laws) upon those who employ, or recruit or refer for a fee for employment, unauthorized aliens.

**8 U.S.C. § 1373**

**(a) In general**
Notwithstanding any other provision of Federal, State, or local law, a Federal, State, or local government entity or official may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual.

**(b) Additional authority of Government entities**
Notwithstanding any other provision of Federal, State, or local law, no person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from doing any of the following with respect to information regarding the immigration status, lawful or unlawful, of any individual:

> (1) Sending such information to, or requesting or receiving such information from, the Immigration and Naturalization Service.

> (2) Maintaining such information.

> (3) Exchanging such information with any other Federal, State, or local government entity.

**(c) Obligation to respond to inquiries**
The Immigration and Naturalization Service shall respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information.

**8 U.S.C. § 1644**

Notwithstanding any other provision of Federal, State, or local law, no State or local government entity may be prohibited, or in any way restricted, from sending to or receiving from the Immigration and Naturalization Service information regarding the immigration status, lawful or unlawful, of an alien in the United States.

## II.  Relevant State Statutes

### 53 P.S. § 37403(16)

Nuisances and obstructions.—To prohibit nuisances, including, but not limited to, accumulations of garbage and rubbish and the storage of abandoned or junked automobiles or other vehicles on private or public property, and the carrying on of any offensive manufacture or business, and to require the removal of any nuisance or dangerous structure from public or private places upon notice to the owner, and, upon his default, to cause such removal and collect the cost thereof, together with a penalty of ten per centum of such cost, from the owner, by an action in assumpsit. The cost of removal and the penalty may be entered as a lien against such property in accordance with existing provisions of law. In the exercise of the powers herein conferred, the city may institute proceedings in courts of equity.

### 53 P.S. § 37403(60)

Local Self-Government.—In addition to the powers and authority vested in each city by the provisions of this act, to make and adopt all such ordinances, by-laws, rules and regulations, not inconsistent with or restrained by the Constitution and laws of this Commonwealth, as may be expedient or necessary for the proper management, care and control of the city and its finances, and the maintenance of the peace, good government, safety and welfare of the city, and its trade, commerce and manufactures; and also all such ordinances, by-laws, rules and regulations as may be necessary in and to the exercise of the powers and authority of local self-government in all municipal affairs; and the said ordinances, by-laws, rules and regulations to alter, modify, and repeal at pleasure; and to enforce all ordinances inflicting penalties upon inhabitants or other persons for violations thereof, and impose penalties in accordance with section 4131.1: Provided, however, That no ordinance, by-law, rule or regulation shall be made or passed which contravenes or violates any of the provisions of the Constitution of the United States or of this Commonwealth, or of any act of Assembly heretofore or that may be hereafter passed and in force in said city.

## III.  Relevant Local Ordinances

**ILLEGAL IMMIGRATION RELIEF ACT ORDINANCE (IIRA)**
**(Ordinance 2006-18, as amended by Ordinances 2006-40 and 2007-7)**

ILLEGAL IMMIGRATION RELIEF ACT ORDINANCE
BE IT ORDAINED BY THE COUNCIL OF THE CITY OF HAZLETON AS
FOLLOWS:

SECTION 1. TITLE

This chapter shall be known and may be cited as the "City of Hazleton Illegal
Immigration Relief Act Ordinance."

SECTION 2. FINDINGS AND DECLARATION OF PURPOSE

The People of the City of Hazleton find and declare:

A.   That state and federal law require that certain conditions be met
     before a person may be authorized to work or reside in this country.

B.   That unlawful workers and illegal aliens, as defined by this ordinance
     and state and federal law, do not normally meet such conditions as a
     matter of law when present in the City of Hazleton.

C.   That unlawful employment, the harboring of illegal aliens in dwelling
     units in the City of Hazleton, and crime committed by illegal aliens
     harm the health, safety and welfare of authorized US workers and
     legal residents in the City of Hazleton.  Illegal immigration leads to
     higher crime rates, subjects our hospitals to fiscal hardship and legal
     residents to substandard quality of care, contributes to other burdens
     on public services, increasing their cost and diminishing their
     availability to legal residents, and diminishes our overall quality of
     life.

D.  That the City of Hazleton is authorized to abate public nuisances and empowered and mandated by the people of Hazleton to abate the nuisance of illegal immigration by diligently prohibiting the acts and policies that facilitate illegal immigration in a manner consistent with federal law and the objectives of Congress.

E.  That United States Code Title 8, subsection 1324(a)(1)(A) prohibits the harboring of illegal aliens. The provision of housing to illegal aliens is a fundamental component of harboring.

F.  This ordinance seeks to secure to those lawfully present in the United States and this City, whether or not they are citizens of the United States, the right to live in peace free of the threat crime, to enjoy the public services provided by this city without being burdened by the cost of providing goods, support and services to aliens unlawfully present in the United States, and to be free of the debilitating effects on their economic and social well being imposed by the influx of illegal aliens to the fullest extent that these goals can be achieved consistent with the Constitution and Laws of the United States and the Commonwealth of Pennsylvania.

G.  The City shall not construe this ordinance to prohibit the rendering of emergency medical care, emergency assistance, or legal assistance to any person.

## SECTION 3. DEFINITIONS

When used in this chapter, the following words, terms and phrases shall have the meanings ascribed to them herein, and shall be construed so as to be consistent with state and federal law, including federal immigration law:

A.  "Business entity" means any person or group of persons performing or engaging in any activity, enterprise, profession, or occupation for gain, benefit, advantage, or livelihood, whether for profit or not for profit.

(1)  The term business entity shall include but not be limited to self-employed individuals, partnerships, corporations, contractors, and subcontractors.

104

(2)    The term business entity shall include any business entity that possesses a business permit, any business entity that is exempt by law from obtaining such a business permit, and any business entity that is operating unlawfully without such a business permit.

B.    "City" means the City of Hazleton.

C.    "Contractor" means a person, employer, subcontractor or business entity that enters into an agreement to perform any service or work or to provide a certain product in exchange for valuable consideration. This definition shall include but not be limited to a subcontractor, contract employee, or a recruiting or staffing entity.

D.    "Illegal Alien" means an alien who is not lawfully present in the United States, according to the terms of United States Code Title 8, section 1101 et seq. The City shall not conclude that a person is an illegal alien unless and until an authorized representative of the City has verified with the federal government, pursuant to United States Code Title 8, subsection 1373(c), that the person is an alien who is not lawfully present in the United States.

E.    "Unlawful worker" means a person who does not have the legal right or authorization to work due to an impediment in any provision of federal, state or local law, including but not limited to a minor disqualified by nonage, or an unauthorized alien as defined by United States Code Title 8, subsection 1324a(h)(3).

F.    "Work" means any job, task, employment, labor, personal services, or any other activity for which compensation is provided, expected, or due, including but not limited to all activities conducted by business entities.

G.    "Basic Pilot Program" means the electronic verification of work authorization program of the Illegal Immigration Reform and Immigration Responsibility Act of 1996, P.L. 104-208, Division C, Section 403(a); United States Code Title 8, subsection 1324a, and operated by the United States Department of Homeland Security (or a

105

successor program established by the federal government.)

## SECTION 4. BUSINESS PERMITS, CONTRACTS, OR GRANTS

A.    It is unlawful for any business entity to knowingly recruit, hire for employment, or continue to employ, or to permit, dispatch, or instruct any person who is an unlawful worker to perform work in whole or part within the City. Every business entity that applies for a business permit to engage in any type of work in the City shall sign an affidavit, prepared by the City Solicitor, affirming that they do not knowingly utilize the services or hire any person who is an unlawful worker.

B.    Enforcement: The Hazleton Code Enforcement Office shall enforce the requirements of this section.

(1)    An enforcement action shall be initiated by means of a written signed complaint to the Hazleton Code Enforcement Office submitted by any City official, business entity, or City resident. A valid complaint shall include an allegation which describes the alleged violator(s) as well as the actions constituting the violation, and the date and location where such actions occurred.

(2)    A complaint which alleges a violation on the basis of national origin, ethnicity, or race shall be deemed invalid and shall not be enforced.

(3)    Upon receipt of a valid complaint, the Hazleton Code Enforcement Office shall, within three business days, request identity information from the business entity regarding any persons alleged to be unlawful workers. The Hazleton Code Enforcement Office shall suspend the business permit of any business entity which fails, within three business days after receipt of the request, to provide such information. In instances where an unlawful worker is alleged to be an unauthorized alien, as defined in United States Code Title 8, subsection 1324a(h)(3), the Hazleton Code Enforcement Office shall submit identity data required by the federal government to

verify, pursuant to United States Code Title 8, section 1373, the immigration status of such person(s), and shall provide the business entity with written confirmation of that verification.

(4)     The Hazleton Code Enforcement Office shall suspend the business permit of any business entity which fails correct a violation of this section within three business days after notification of the violation by the Hazleton Code Enforcement Office.

(5)     The Hazleton Code Enforcement Office shall not suspend the business permit of a business entity if, prior to the date of the violation, the business entity had verified the work authorization of the alleged unlawful worker(s) using the Basic Pilot Program.

(6)     The suspension shall terminate one business day after a legal representative of the business entity submits, at a City office designated by the City Solicitor, a sworn affidavit stating that the violation has ended.

(a)     The affidavit shall include a description of the specific measures and actions taken by the business entity to end the violation, and shall include the name, address and other adequate identifying information of the unlawful workers related to the complaint.

(b)     Where two or more of the unlawful workers were verified by the federal government to be unauthorized aliens, the legal representative of the business entity shall submit to the Hazleton Code Enforcement Office, in addition to the prescribed affidavit, documentation acceptable to the City Solicitor which confirms that the business entity has enrolled in and will participate in the Basic Pilot Program for the duration of the validity of the business permit granted to the business entity.

(7)     For a second or subsequent violation, the Hazleton Code Enforcement Office shall suspend the business permit of a

business entity for a period of twenty days. After the end of the suspension period, and upon receipt of the prescribed affidavit, the Hazleton Code Enforcement Office shall reinstate the business permit. The Hazleton Code Enforcement Office shall forward the affidavit, complaint, and associated documents to the appropriate federal enforcement agency, pursuant to United States Code Title 8, section 1373. In the case of an unlawful worker disqualified by state law not related to immigration, the Hazleton Code Enforcement Office shall forward the affidavit, complaint, and associated documents to the appropriate state enforcement agency.

C.     All agencies of the City shall enroll and participate in the Basic Pilot Program.

D.     As a condition for the award of any City contract or grant to a business entity for which the value of employment, labor or, personal services shall exceed $10,000, the business entity shall provide documentation confirming its enrollment and participation in the Basic Pilot Program.

E.     Private Cause of Action for Unfairly Discharged Employees

(1)     The discharge of any employee who is not an unlawful worker by a business entity in the City is an unfair business practice if, on the date of the discharge, the business entity was not participating in the Basic Pilot program and the business entity was employing an unlawful worker.

(2)     The discharged worker shall have a private cause of action in the Municipal Court of Hazleton against the business entity for the unfair business practice. The business entity found to have violated this subsection shall be liable to the aggrieved employee for:

(a)     three times the actual damages sustained by the employee, including but not limited to lost wages or compensation from the date of the discharge until the date the employee has procured new employment at an

equivalent rate of compensation, up to a period of one hundred and twenty days; and

(b)     reasonable attorney's fees and costs.

## SECTION 5. HARBORING ILLEGAL ALIENS

A.     It is unlawful for any person or business entity that owns a dwelling unit in the City to harbor an illegal alien in the dwelling unit, knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, unless such harboring is otherwise expressly permitted by federal law.

(1)     For the purposes of this section, to let, lease, or rent a dwelling unit to an illegal alien, knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, shall be deemed to constitute harboring. To suffer or permit the occupancy of the dwelling unit by an illegal alien, knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, shall also be deemed to constitute harboring.

(2)     A separate violation shall be deemed to have been committed on     each day that such harboring occurs, and for each adult illegal alien harbored in the dwelling unit, beginning one business day after receipt of a notice of violation from the Hazleton Code Enforcement Office.

(3)     A separate violation of this section shall be deemed to have been committed for each business day on which the owner fails to provide the Hazleton Code Enforcement Office with identity data needed to obtain a federal verification of immigration status, beginning three days after the owner receives written notice from the Hazleton Code Enforcement Office.

B.     Enforcement: The Hazleton Code Enforcement Office shall enforce the requirements of this section.

(1)     An enforcement action shall be initiated by means of a written signed complaint to the Hazleton Code Enforcement Office submitted by any official, business entity, or resident of the City. A valid complaint shall include an allegation which describes the alleged violator(s) as well as the actions constituting the violation, and the date and location where such actions occurred.

(2)     A complaint which alleges a violation on the basis of national origin, ethnicity, or race shall be deemed invalid and shall not be enforced.

(3)     Upon receipt of a valid written complaint, the Hazleton Code Enforcement Office shall, pursuant to United States Code Title 8, section 1373(c), verify with the federal government the immigration status of a person seeking to use, occupy, lease, or rent a dwelling unit in the City. The Hazleton Code Enforcement Office shall submit identity data required by the federal government to verify immigration status. The City shall forward identity data provided by the owner to the federal government, and shall provide the property owner with written confirmation of that verification.

(4)     If after five business days following receipt of written notice from the City that a violation has occurred and that the immigration status of any alleged illegal alien has been verified, pursuant to United States Code Title 8, section 1373(c), the owner of the dwelling unit fails to correct a violation of this section, the Hazleton Code Enforcement Office shall deny or suspend the rental license of the dwelling unit.

(5)     For the period of suspension, the owner of the dwelling unit shall not be permitted to collect any rent, payment, fee, or any other form of compensation from, or on behalf of, any tenant or occupant in the dwelling unit.

(6)     The denial or suspension shall terminate one business day after a legal representative of the dwelling unit owner submits to the Hazleton Code Enforcement Office a sworn affidavit stating

that each and every violation has ended. The affidavit shall include a description of the specific measures and actions taken by the business entity to end the violation, and shall include the name, address and other adequate identifying information for the illegal aliens who were the subject of the complaint.

(7) The Hazleton Code Enforcement Office shall forward the affidavit, complaint, and associated documents to the appropriate federal enforcement agency, pursuant to United States Code Title 8, section 1373.

(8) Any dwelling unit owner who commits a second or subsequent violation of this section shall be subject to a fine of two hundred and fifty dollars ($250) for each separate violation. The suspension provisions of this section applicable to a first violation shall also apply.

(9) Upon the request of a dwelling unit owner, the Hazleton Code Enforcement Office shall, pursuant to United States Code Title 8, section 1373(c), verify with the federal government the lawful immigration status of a person seeking to use, occupy, lease, or rent a dwelling unit in the City. The penalties in this section shall not apply in the case of dwelling unit occupants whose status as an alien lawfully present in the United States has been verified.

## SECTION 6. CONSTRUCTION AND SEVERABILITY

A. The requirements and obligations of this section shall be implemented in a manner fully consistent with federal law regulating immigration and protecting the civil rights of all citizens and aliens.

B. If any part of provision of this Chapter is in conflict or inconsistent with applicable provisions of federal or state statutes, or is otherwise held to be invalid or unenforceable by any court of competent jurisdiction, such part of provision shall be suspended and superseded by such applicable laws or regulations, and the remainder of this Chapter shall not be affected thereby.

# SECTION 7.  IMPLEMENTATION AND PROCESS

A.   *Prospective Application Only*.  The default presumption with respect to Ordinances of the City of Hazleton—that such Ordinances shall apply only prospectively—shall pertain to the Illegal Immigration Relief Act Ordinance.  The Illegal Immigration Relief Act Ordinance shall be applied only to employment contracts, agreements to perform service or work, and agreements to provide a certain product in exchange for valuable consideration that are entered into or are renewed after the date that the Illegal Immigration Relief Act Ordinance becomes effective and any judicial injunction prohibiting its implementation is removed.  The Illegal Immigration Relief Act Ordinance shall be applied only to contracts to let, lease, or rent dwelling units that are entered into or are renewed after the date that the Illegal Immigration Relief Act Ordinance becomes effective and any judicial injunction prohibiting its implementation is removed.  The renewal of a month-to-month lease or other type of tenancy which automatically renews absent notice by either party will not be considered as entering into a new contract to let, lease or rent a dwelling unit.

B.   *Condition of Lease*.  Consistent with the obligations of a rental unit owner described in Section 5.A., a tenant may not enter into a contract for the rental or leasing of a dwelling unit unless the tenant is either a U.S. citizen or an alien lawfully present in the United States according to the terms of United States Code Title 8, Section 1101 et seq.  A tenant who is neither a U.S. citizen nor an alien lawfully present in the United States who enters into such a contract shall be deemed to have breached a condition of the lease under 68 P.S. Section 250.501.  A tenant who is not a U.S. citizen who subsequent to the beginning of his tenancy becomes unlawfully present in the United States shall be deemed to have breached a condition of the lease under 68 P.S. Section 250.501.

C.   *Corrections of Violations—Employment of Unlawful Workers*.  The correction of a violation with respect to the employment of an unlawful worker shall include any of the following actions:

112

(1)    The business entity terminates the unlawful worker's employment.

(2)    The business entity, after acquiring additional information from the worker, requests a secondary or additional verification by the federal government of the worker's authorization, pursuant to the procedures of the Basic Pilot Program.  While this verification is pending, the three business day period described in Section 4.B.(4) shall be tolled.

(3)    The business entity attempts to terminate the unlawful worker's employment and such termination is challenged in a court of the Commonwealth of Pennsylvania.  While the business entity pursues the termination of the unlawful worker's employment in such forum, the three business day period described in Section 4.B.(4) shall be tolled.

D.    *Corrections of Violations—Harboring Illegal Aliens*.  The correction of a violation with respect to the harboring of an illegal alien in a dwelling unit shall include any of the following actions:

(1)    A notice to quit, in writing, issued and served by the dwelling unit owner, as landlord, to the tenant declaring a forfeiture of the lease for breach of the lease condition describe in Section 7.B.

(2)    The dwelling unit owner, after acquiring additional information from the alien, requests the City of Hazleton to obtain a secondary or additional verification by the federal government that the alien is lawfully present in the United States, under the procedures designated by the federal government, pursuant to United States Code Title 8, Subsection 1373(c).  While this second verification is pending, the five business day period described in Section 5.B.(4) shall be tolled.

(3)    The commencement of an action for the recovery of possession of real property in accordance with Pennsylvania law by the landlord against the illegal alien.  If such action is contested by

the tenant in court, the dwelling unit owner shall be deemed to have complied with this Ordinance while the dwelling unit owner is pursuing the action in court.  While this process is pending, the five business day period described in Section 5.B.(4) shall be tolled.

E.    *Procedure if Verification is Delayed.*  If the federal government notifies the City of Hazleton that it is unable to verify whether a tenant is lawfully present in the United States or whether an employee is authorized to work in the United States, the City of Hazleton shall take no further action on the complaint until a verification from the federal government concerning the status of the individual is received.  At no point shall any City official attempt to make an independent determination of any alien's legal status, without verification from the federal government, pursuant to United States Code Title 8, Subsection 1373(c).

F.    *Venue for Judicial Process.*  Any business entity or rental unit owner subject to a complaint and subsequent enforcement under this ordinance, or any employee of such a business entity or tenant of such a rental unit owner, may challenge the enforcement of this Ordinance with respect to such entity or individual in the Magisterial District Court for the City of Hazleton, subject to the right of appeal to the Luzerne County Court of Common Pleas.  Such an entity or individual may alternatively challenge the enforcement of this Ordinance with respect to such entity or individual in any other court of competent jurisdiction in accordance with applicable law, subject to all rights of appeal.

G.    *Deference to Federal Determinations of Status.*  The determination of whether a tenant of a dwelling is lawfully present in the United States, and the determination of whether a worker is an unauthorized alien shall be made by the federal government, pursuant to United States Code Title 8, Subsection 1373(c).  A determination of such status of an individual by the federal government shall create a rebuttable presumption as to that individual's status in any judicial proceedings brought pursuant to this ordinance.  The Court may take judicial notice of any verification of the individual previously provided by the federal government and may request the federal government to

provide automated or testimonial verification pursuant to United States Code Title 8, Subsection 1373(c).

**RENTAL REGISTRATION ORDINANCE**
**(Ordinance 2006-13)**


ESTABLISHING A REGISTRATION PROGRAM FOR RESIDENTIAL
RENTAL PROPERTIES; REQUIRING ALL OWNERS OF RESIDENTIAL
RENTAL PROPERTIES TO DESIGNATE AN AGENT FOR SERVICE OF
PROCESS; AND PRESCRIBING DUTIES OF OWNERS, AGENTS AND
OCCUPANTS; DIRECTING THE DESIGNATION OF AGENTS;
ESTABLISHING FEES FOR THE COSTS ASSOCIATED WITH THE
REGISTRATION OF RENTAL PROPERTY; AND PRESCRIBING PENALTIES
FOR VIOLATIONS BE IT ORDAINED BY THE GOVERNING BODY OF THE
CITY OF HAZLETON AND IT IS HEREBY ORDAINED AND WITH THE
AUTHORITY OF THE SAME AS FOLLOWS:

SECTION 1. DEFINITIONS AND INTERPRETATION.

The following words, when used in this ordinance, shall have the meanings
ascribed to them in this section, except in those instances where the context clearly
indicates otherwise. When not inconsistent with the context, words used in the
present tense include the future; words in the plural number include the singular
number; words in the singular shall include the plural, and words in the masculine
shall include the feminine and the neuter.

    a.      AGENT - Individual of legal majority who has been designated by the
Owner as the agent of the Owner or manager of the Property under the
provisions of this ordinance.

    b.      CITY - City of Hazleton

    c.      CITY CODE – the building code (property Maintenance Code 1996
as amendedor superceded) officially adopted by the governing body
of the City, or other such codes officially designated by the governing
body of the City for the regulation of construction, alteration,
addition, repair, removal, demolition, location, occupancy and
maintenance of buildings and structures.

    d.      ZONING ORDINANCE – Zoning ordinance as officially adopted by
the City of Hazleton, File of Council # 95-26 (as amended).

e.  OFFICE – The Office of Code Enforcement for the City of Hazleton.

f.  DWELLING UNIT – a single habitable unit, providing living facilities for one or more persons, including permanent space for living, sleeping, eating, cooking and bathing and sanitation, whether furnished or unfurnished. There may be more than one Dwelling Unit on a Premises.

g.  DORMITORY - a residence hall offered as student or faculty housing to accommodate a college or university, providing living or sleeping rooms for individuals or groups of individuals, with or without cooking facilities and with or without private baths.

h.  INSPECTOR - any person authorized by Law or Ordinance to inspect buildings or systems, e.g. zoning, housing, plumbing, electrical systems, heat systems, mechanical systems and health necessary to operate or use buildings within the City of Hazleton. An Inspector would include those identified in Section 8 – Enforcement.

i.  FIRE DEPARTMENT – the Fire Department of the City of Hazleton or any member thereof, and includes the Chief of Fire or his designee.

j.  HOTEL – a building or part of a building in which living and sleeping accommodations are used primarily for transient occupancy, may be rented on a daily basis, and desk service is provided, in addition to one or more of the following services: maid, telephone, bellhop service, or the furnishing or laundering of linens.

k.  LET FOR OCCUPANCY – to permit, provide or offer, for consideration, possession or occupancy of a building, dwelling unit, rooming unit, premise or structure by a person who is not the legal owner of record thereof, pursuant to a written or unwritten lease, agreement or license, or pursuant to a recorded or unrecorded agreement or contract for the sale of land.

l.  MOTEL – a building or group of buildings which contain living and sleeping accommodations used primarily for transient occupancy, may be rented on a daily basis, and desk service is provided, and has

individual entrances from outside the building to serve each such living or sleeping unit.

m.   OCCUPANT – a person age 18 or older who resides at a Premises.

n.   OPERATOR – any person who has charge, care or control of a Premises which is offered or let for occupancy.

o.   OWNER – any Person, Agent, or Operator having a legal or equitable interest in the property; or recorded in the official records of the state, county, or municipality as holding title to the property; or otherwise having control of the property, including the guardian of the estate of any such person, and the executor or administrator of the estate of such person if ordered to take possession of real property by a Court of competent jurisdiction.

p.   OWNER – OCCUPANT- an owner who resides in a Dwelling Unit on a regular permanent basis, or who otherwise occupies a non-residential portion of the Premises on a regular permanent basis.

q.   PERSON – any person, partnership, firm, association, corporation, or municipal authority or any other group acting as a single unit.

r.   POLICE DEPARTMENT – the Police Department of the City of Hazleton or any member thereof sworn to enforce laws and ordinances in the City, and includes the Chief of Police or his designee.

s.   PREMISES – any parcel of real property in the City, including the land and all buildings and structures in which one or more Rental Units are located.

t.   RENTAL UNIT – means a Dwelling Unit or Rooming Unit which is Let for Occupancy and is occupied by one or more Tenants.

u.   ROOMING UNIT – any room or groups of rooms forming a single habitable unit occupied or intended to be occupied for sleeping or living, but not for cooking purposes.

v.      TENANT – any Person authorized by the Owner or Agent who occupies a Rental Unit within a Premises regardless of whether such Person has executed a lease for said Premises.

## SECTION 2. APPOINTMENT OF AN AGENT AND/OR MANAGER

Each Owner who is not an Owner-occupant, or who does not reside in the City of Hazleton or within a ten (10) mile air radius of the City limits, shall appoint an Agent who shall reside in the City or within a ten (10) mile air radius of the City limits.

## SECTION 3. DUTIES OF THE OWNER AND/OR AGENT

a.      The Owner has the duty to maintain the Premises in good repair, clean and sanitary condition, and to maintain the Premises in compliance with the current Codes, Building Codes and Zoning Ordinance of the City of Hazleton. The Owner may delegate implementation of these responsibilities to an Agent.

b.      The duties of the Owner and/or Agent shall be to receive notices and correspondence, including service of process, from the City of Hazleton; to arrange for the inspection of the Rental Units; do or arrange for the performance of maintenance, cleaning, repair, pest control, snow and ice removal, and ensure continued compliance of the Premises with the current Codes, Building Codes and Zoning Ordinance in effect in the City of Hazleton, as well as arrange for garbage removal.

c.      The name, address and telephone number of the Owner and Agent, if applicable, shall be reported to the Code Enforcement Office in writing upon registering the Rental Units.

d.      No Dwelling Unit shall be occupied, knowingly by the Owner or Agent, by a number of persons that is in excess of the requirements outlined in 2003 International Property Maintenance Code, Chapter 4, Light, Ventilation, and Occupancy Limits, Section PM-404.5, Overcrowding, or any update thereof, a copy of which is appended hereto and made a part hereof.

## SECTION 4. NOTICES

a.  Whenever an Inspector or Code Enforcement Officer determines that any Rental Unit or Premises fails to meet the requirements set forth in the applicable Codes, the Inspector or Code Enforcement Officer shall issue a correction notice setting forth the violations and ordering the Occupant, Owner or Agent, as appropriate, to correct such violations. The notice shall:

1)  Be in writing;

2)  Describe the location and nature of the violation;

3)  Establish a reasonable time for the correction of the violation.

b.  All notices shall be served upon the Occupant, Owner or Agent, as applicable, personally or by certified mail, return receipt requested. A copy of any notices served solely on an Occupant shall also be provided to the Owner or Agent. In the event service is first attempted by mail and the notice is returned by the postal authorities marked "unclaimed" or "refused", then the Code Enforcement Office or Police Department shall attempt delivery by personal service on the Occupant, Owner or Agent, as applicable. The Code Enforcement Office shall also post the notice at a conspicuous place on the Premises. If personal service directed to the Owner or Agent cannot be accomplished after a reasonable attempt to do so, then the notice may be sent to the Owner or Agent, as applicable, at the address stated on the most current registration application for the Premises in question, by regular first class mail, postage prepaid. If such notice is not returned by the postal authorities within five (5) days of its deposit in the U.S. Mail, then it shall be deemed to have been delivered to and received by the addressee on the fifth day following its deposit in the United States Mail.

c.  For purposes of this Ordinance, any notice hereunder that is given to the Agent shall be deemed as notice given to the Owner.

d.  There shall be a rebuttable presumption that any notice that is given to the Occupant, Owner or Agent under this ordinance shall have been

received by such Occupant, Owner or Agent if the notice was served in the manner provided by this ordinance.

e.    Subject to paragraph 4.d above, a claimed lack of knowledge by the Owner or Agent, if applicable, of any violation hereunder cited shall be no defense to closure of rental units pursuant to Section 9, as long as all notices prerequisite to such proceedings have been given and deemed received in accordance with the provisions of this ordinance.

f.    All notices shall contain a reasonable time to correct, or take steps to correct, violations of the above. The Occupant, Owner or Agent to whom the notice was addressed may request additional time to correct violations. Requests for additional time must be in writing and either deposited in the U.S. Mail (post-marked) or handdelivered to the Code Enforcement Office within five (5) days of receipt of the notice by the Occupant, Owner or Agent. The City retains the right to deny or modify time extension requests. If the Occupant, Owner or Agent is attempting in good faith to correct violations but is unable to do so within the time specified in the notice, the Occupant, Owner or Agent shall have the right to request such additional time as may be needed to complete the correction work, which request shall not be unreasonably withheld.

g.    Failure to correct violations within the time period stated in the notice of violation shall result in such actions or penalties as are set forth in Section 10 of this ordinance. If the notice of violation relates to actions or omissions of the Occupant, and the Occupant fails to make the necessary correction, the Owner or Agent may be required to remedy the condition. No adverse action shall be taken against an Owner or Agent for failure to remedy a condition so long as the Owner or Agent is acting with due diligence and taking bona fide steps to correct the violation, including but not limited to pursuing remedies under a lease agreement with an Occupant or Tenant. The City shall not be precluded from pursuing an enforcement action against any Occupant or Tenant who is deemed to be in violation.

SECTION 5. INSURANCE

In order to protect the health, safety and welfare of the residents of the City, it is hereby declared that the city shall require hazard and general liability insurance for all property owners letting property for occupancy in the City.

a. Minimum coverage; use of insurance proceeds. All Owners shall be required to obtain a minimum of fifty thousand ($50,000.00) dollars in general liability insurance, and hazard and casualty insurance in an amount sufficient to either restore or remove the building in the event of a fire or other casualty. Further, in the event of any fire or loss covered by such insurance, it shall be the obligation of the Owner to use such insurance proceeds to cause the restoration or demolition or other repair of the property in adherence to the City Code and all applicable ordinances.

b. Property owners to provide City with insurance information. Owners shall be required to place their insurance company name, policy number and policy expiration date on their Rental Property Registration form, or in the alternative, to provide the Code Enforcement Office with a copy of a certificate of insurance. A registration Certificate (see Section 6 below) shall not be issued to any Owner or Agent unless the aforementioned information has been provided to the Code Enforcement Office. The Code Enforcement Office shall be informed of any change in policies for a particular rental property or cancellation of a policy for said property within thirty (30) days of said change or cancellation.

SECTION 6. RENTAL REGISTRATION AND LICENSE REQUIREMENTS

a. No Person shall hereafter occupy, allow to be occupied, advertise for occupancy, solicit occupants for, or let to another person for occupancy any Rental Unit within the City for which an application for license has not been made and filed with the Code Enforcement Office and for which there is not an effective license. Initial application and renewal shall be made upon forms furnished by the Code Enforcement Office for such purpose and shall specifically require the following minimum information:

1) Name, mailing address, street address and phone number of the Owner, and if the Owner is not a natural person, the name, address and phone number of a designated representative of the Owner.

2) Name, mailing address, street address and phone number of the Agent of the Owner, if applicable.

3) The street address of the Premises being registered.

4) The number and types of units within the Premises (Dwelling Units or Rooming Units) The Owner or Agent shall notify the Code Enforcement Office of any changes of the above information within thirty (30) days of such change.

b.    The initial application for registration and licensing shall be made by personally filing an application with the Code Enforcement Office by November 1, 2006. Thereafter, any new applicant shall file an application before the Premises is let for occupancy, or within thirty (30) days of becoming an Owner of a currently registered Premises. One application per property is required, as each property will receive its own license.

c.    Upon receipt of the initial application or any renewal thereof and the payment of applicable fees as set forth in Section 7 below, the Code Enforcement Office shall issue a Rental Registration License to the Owner within thirty (30) days of receipt of payment.

d.    Each new license issued hereunder, and each renewal license, shall expire on October 31 of each year. The Code Enforcement Office shall mail license renewal applications to the Owner or designated Agent on or before September 1 of each year. Renewal applications and fees may be returned by mail or in person to the Code Enforcement Office. A renewal license will not be issued unless the application and appropriate fee has been remitted.

SECTION 7. FEES.

a.      Annual License Fee. There shall be a license fee for the initial license and an annual renewal fee thereafter. Fees shall be assessed against and payable by the Owner in the amount of $5.00 per Rental Unit, payable at the time of initial registration and annual renewal, as more specifically set forth in Section 6 above.

b.      Occupancy Permit Fee. There shall be a one-time occupancy permit fee of $10.00 for every new Occupant, which is payable by the Occupant. For purposes of initial registration under this ordinance, this fee shall be paid for all current Occupants by November 1, 2006. Thereafter, prior to occupying any Rental Unit, all Occupants shall obtain an occupancy permit. It shall be the Occupant's responsibility to submit an occupancy permit application to the Code Enforcement Office, pay the fee and obtain the occupancy permit. If there are multiple Occupants in a single Rental Unit, each Occupant shall obtain his or her own permit. Owner or Agent shall notify all prospective Occupants of this requirement and shall not permit occupancy of a Rental Unit unless the Occupant first obtains an occupancy permit. Each occupancy permit issued is valid only for the Occupant for as long as the Occupant continues to occupy the Rental Unit for which such permit was applied. Any relocation to a different Rental Unit requires a new occupancy permit. All Occupants age 65 and older, with adequate proof of age, shall be exempt from paying the permit fee, but shall be otherwise required to comply with this section and the rest of the Ordinance.

1.      Application for occupancy permits shall be made upon forms furnished by the Code Enforcement Office for such purpose and shall specifically require the following minimum information:

a)      Name of Occupant

b)      Mailing address of Occupant

c)      Street address of Rental Unit for which Occupant is applying, if different from mailing address

d) Name of Landlord

e) Date of lease commencement

f) Proof of age if claiming exemption from the permit fee

g) Proper identification showing proof of legal citizenship and/or residency

2. Upon receipt of the application and the payment of applicable fees as set forth above, the Code Enforcement Office shall issue an Occupancy Permit to the Occupant immediately.

## SECTION 8. ENFORCEMENT

a. The following persons are hereby authorized to enforce this Ordinance:

1. The Chief of Police

2. Any Police Officer

3. Code Enforcement Officer

4. The Fire Chief

5. Deputy Fire Chief of the City of Hazleton.

6. Health Officer

7. Director of Public Works

b. The designation of any person to enforce this Ordinance or authorization of an Inspector, when in writing, and signed by a person authorized by Section 8.a to designate or authorize an Inspector to enforce this Ordinance, shall be prima facie evidence of such authority before the Magisterial District Judge, Court of Common

Pleas, or any other Court, administrative body of the City, or of this commonwealth, and the designating Director or Supervisor need not be called as a witness thereto.

## SECTION 9. FAILURE TO CORRECT VIOLATIONS.

If any Person shall fail, refuse or neglect to comply with a notice of violation as set forth in Section 4 above, the City shall have the right to file an enforcement action with the Magisterial District Judge against any Person the City deems to be in violation. If, after hearing, the Magisterial District Judge determines that such Person or Persons are in violation, the Magisterial District Judge may, at the City's request, order the closure of the Rental Unit(s), or assess fines in accordance with Section 10 below, until such violations are corrected. Such order shall be stayed pending any appeal to the Court of Common Pleas of Luzerne County.

## SECTION 10. FAILURE TO COMPLY WITH THIS ORDINANCE; PENALTIES

a. Except as provided in subsections 10.b and 10.c below, any Person who shall violate any provision of the Ordinance shall, upon conviction thereof after notice and a hearing before the Magisterial District Judge, be sentenced to pay a fine of not less than $100.00 and not more than $300.00 plus costs, or imprisonment for a term not to exceed ninety (90) days in default of payment. Every day that a violation of this Ordinance continues shall constitute a separate offense, provided, however, that failure to register or renew or pay appropriate fees in a timely manner shall not constitute a continuing offense but shall be a single offense not subject to daily fines.

b. Any Owner or Agent who shall allow any Occupant to occupy a Rental Unit without first obtaining an occupancy permit is in violation of Section 7.b and shall, upon conviction thereof after notice and a hearing before the Magisterial District Judge, be sentenced to pay a fine of $1,000 for each Occupant that does not have an occupancy permit and $100 per Occupant per day for each day that Owner or Agent continues to allow each such Occupant to occupy the Rental Unit without an occupancy permit after Owner or Agent is given notice of such violation pursuant to Section 4 above. Owner or

Agent shall not be held liable for the actions of Occupants who allow additional occupancy in any Rental Unit without the Owner or Agent's written permission, provided that Owner or Agent takes reasonable steps to remove or register such unauthorized Occupant(s) within ten (10) days of learning of their unauthorized occupancy in the Rental Unit.

c.  Any Occupant having an occupancy permit but who allows additional occupancy in a Rental Unit without first obtaining the written permission of the Owner or Agent and without requiring each such additional Occupant to obtain his or her own occupancy permit is in violation of Section 7.b of this ordinance and shall, upon conviction thereof after notice and a hearing before the Magisterial District Judge, be sentenced to pay a fine of $1,000 for each additional Occupant permitted by Occupant that does not have an occupancy permit and $100 per additional Occupant per day for each day that Occupant continues to allow each such additional Occupant to occupy the Rental Unit without an occupancy permit after Occupant is given written notice of such violation by Owner or Agent or pursuant to Section 4 above.

## SECTION 11. APPLICABILITY AND EXEMPTIONS TO THE ORDINANCE

The provisions of the ordinance shall not apply to the following properties, which are exempt from registration and license requirements:

a.  Hotels, Motels and Dormitories.

b.  Rental Units owned by Public Authorities as defined under the Pennsylvania Municipal Authorities Act, and Dwelling Units that are part of an elderly housing multi-unit building which is 75% occupied by individuals over the age of sixty-five.

c.  Multi-dwelling units that operate under Internal Revenue Service Code Section 42 concerning entities that operate with an elderly component.

    d.      Properties which consist of a double home, half of which is let for occupancy and half of which is Owner-occupied as the Owner's residence.

## SECTION 12. CONFIDENTIALITY OF INFORMATION

All registration information collected by the City under this Ordinance shall be maintained as confidential and shall not be disseminated or released to any individual, group or organization for any purpose except as provided herein or required by law. Information may be released only to authorized individuals when required during the course of an official City, state or federal investigation or inquiry.

## SECTION 13. SAVING CLAUSE

This ordinance shall not affect violations of any other ordinance, code or regulation existing prior to the effective date thereof and any such violations shall be governed and shall continue to be punishable to the full extent of the law under the provisions of those ordinances, codes or regulations in effect at the time the violation was committed.

## SECTION 14. SEVERABILITY

If any section, clause, provision or portion of this Ordinance shall be held invalid or unconstitutional by any Court of competent jurisdiction, such decision shall not affect any other section, clause, provision or portion of this Ordinance so long as it remains legally enforceable without the invalid portion. The City reserves the right to amend this Ordinance or any portion thereof from time to time as it shall deem advisable in the best interest of the promotion of the purposes and intent of this Ordinance, and the effective administration thereof.

## SECTION 15. EFFECTIVE DATE

This Ordinance shall become effective immediately upon approval. This Ordinance repeals Ordinance number 2004-11 and replaces same in its entirety.

## SECTION 16.

This Ordinance is enacted by the Council of the City of Hazleton under the authority of the Act of Legislature, April 13, 1972, Act No. 62, known as the "Home Rule Charter and Optional Plans Law", and all other laws enforceable the State of Pennsylvania.