*Received and Filed*
*07-3531*
*04/08/08*
*Marcia M. Waldron,*
*Clerk*

No. 07-3531

_____

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

_____

PEDRO LOZANO; HUMBERTO HERNANDEZ; ROSA LECHUGA; JOHN
DOE 1; JOHN DOE 2; JOHN DOE 3, a minor, by his parents; JANE DOE 1
JANE DOE 2; JANE DOE 3; JOHN DOE 4, a minor, by his parents, BRENDA
LEE MIELES; CASA DOMINICANA OF HAZLETON, INC.; HAZLETON
HISPANIC BUSINESS ASSOCIATION; PENNSYLVANIA STATEWIDE
LATINO COALITION; JANE DOE 5; JOHN DOE 7; JOSE LUIS LECHUGA,
*Plaintiffs-Appellees,*

v.

CITY OF HAZLETON,
*Defendant-Appellant.*

_____

**On Appeal from the United States District Court
for the Middle District of Pennsylvania (No. 3:06-cv-01586)**

_____

## BRIEF OF APPELLEES

_____

Witold J. Walczak, Esquire
AMERICAN CIVIL LIBERTIES
UNION OF PENNSYLVANIA
313 Atwood Street
Pittsburgh, PA 15213
Tel. (412) 681-7864
Fax: (412) 681-8707

Thomas G. Wilkinson, Jr., Esquire
Thomas B. Fiddler, Esquire
Ilan Rosenberg, Esquire
Elena Park, Esquire
Cozen O'Connor
1900 Market Street
Philadelphia, PA 19103
(215) 665-2000
     *Complete Counsel Listing on
     Signature Pages*

# CORPORATE DISCLOSURE STATEMENT

*Pedro Lozano, et al. v. City of Hazleton, No. 07-3531*

Pursuant to Rule 26.1 and Third Circuit LAR 26.1, Appellee Pennsylvania Statewide Latino Coalition makes the following disclosure:

1)      For non-governmental corporate parties please list all parent corporations:

None.

2)      For non-governmental corporate parties,  please list all publicly held companies that hold 10% or more of the party's stock:

None.

3)      If there is a publicly held corporation which is not a party to the proceeding before this Court but which has as a financial interest in the outcome of the proceeding, please identify all such parties and specify the nature of the financial interest or interests:

None.

4)      In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate must list:  1) the debtor, if not identified in the case caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is active participant in the bankruptcy proceeding.  If the debtor or trustee is not participating in the appeal, this information must be provided by appellant.

Not applicable.


_____/s/_____                    Dated:  April 7, 2008
Thomas B. Fiddler
Attorney for Pennsylvania Statewide Latino Coalition

# CORPORATE DISCLOSURE STATEMENT

*Pedro Lozano, et al. v. City of Hazleton, No. 07-3531*

Pursuant to Rule 26.1 and Third Circuit LAR 26.1, Appellee Hazleton Hispanic Business Association makes the following disclosure:

1)      For non-governmental corporate parties please list all parent corporations:

None.

2)      For non-governmental corporate parties,   please list all publicly held companies that hold 10% or more of the party's stock:

None.

3)      If there is a publicly held corporation which is not a party to the proceeding before this Court but which has as a financial interest in the outcome of the proceeding, please identify all such parties and specify the nature of the financial interest or interests:

None.

4)      In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate must list:  1) the debtor, if not identified in the case caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is active participant in the bankruptcy proceeding.  If the debtor or trustee is not participating in the appeal, this information must be provided by appellant.

Not applicable.


_____/s/_____                    Dated:  April 7, 2008
Thomas B. Fiddler
Attorney for Hazleton Hispanic Business Association

# CORPORATE DISCLOSURE STATEMENT

*Pedro Lozano, et al. v. City of Hazleton, No. 07-3531*

Pursuant to Rule 26.1 and Third Circuit LAR 26.1, Appellee Casa Dominicana of Hazleton, Inc. makes the following disclosure:

1)      For non-governmental corporate parties please list all parent corporations:

None.

2)      For non-governmental corporate parties,  please list all publicly held companies that hold 10% or more of the party's stock:

None.

3)      If there is a publicly held corporation which is not a party to the proceeding before this Court but which has as a financial interest in the outcome of the proceeding, please identify all such parties and specify the nature of the financial interest or interests:

None.

4)      In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate must list:  1) the debtor, if not identified in the case caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is active participant in the bankruptcy proceeding.  If the debtor or trustee is not participating in the appeal, this information must be provided by appellant.

Not applicable.


_____/s/_____                    Dated:  April 7, 2008
Thomas B. Fiddler
Attorney for Casa Dominicana of Hazleton, Inc.

# TABLE OF CONTENTS

**Page**

COUNTER-STATEMENT OF ISSUES ....................................................... 1

COUNTER STATEMENT OF THE CASE .................................................. 3

COUNTER STATEMENT OF THE FACTS ............................................... 6

    A.   Genesis of the Ordinances ............................................................ 6

    B.   Hazleton's Claims Regarding Undocumented Immigrants are
          Unsupported by the Trial Record .................................................. 7

    C.   Hazleton's Immigration Ordinances ......................................... 10

          1.   IIRA's Employment Provisions.......................................... 11

          2.   IIRA's Housing Provisions................................................. 14

          **3.**   Process Available Under IIRA ........................................... 15

          4.   Registration Ordinance ..................................................... 15

    D.   The Plaintiffs ............................................................................. 16

STANDARD OF REVIEW.................................................................... 22

SUMMARY OF ARGUMENT............................................................... 24

ARGUMENT ..................................................................................... 27

I.      THE DISTRICT COURT CORRECTLY HELD THAT
        APPELLEES HAVE STANDING................................................. 27

    A.   Undocumented Immigration Status Does not Negate
          Standing..................................................................................... 28

    B.   Plaintiffs Will Suffer Concrete and Particularized Injury That
          is Caused by the Ordinances and Redressable by the Court ...... 29

C.    The District Court's Findings of Injury are Fully Supported by the Record ........................................................................... 30

D.    Causation and Redressability are Satisfied Because Plaintiffs are Objects of the Ordinances ......................................... 34

E.    The Prudential Zone-of-Interest Test is Inapplicable, and Clearly Satisfied in any Event .................................... 36

II.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY GRANTING DOE PLAINTIFFS LEAVE TO PROTECT THEIR IDENTITIES ........................................................................ 37

III.    THE DISTRICT COURT PROPERLY HELD THAT THE ORDINANCES ARE PREEMPTED ......................................... 42

A.    The Housing Provisions Conflict With Federal Law ................................. 44

B.    The Employment Provisions Conflict With Federal Law .......................... 49

1.    IRCA Fundamentally Changed Federal Immigration Law ................ 50

2.    The Employment Provisions Conflict With Federal Law in Multiple Ways .......................................... 53

3.    Hazleton Relies on an Erroneous Legal Standard ......................... 62

C.    The Employment Provisions are Expressly Preempted ........................... 65

1.    The Savings Clause Does Not Authorize Sanctions Without a Federal IRCA Determination ........................................... 67

2.    The Employment Provisions do not Constitute a Permissible Licensing Law ....................................................... 70

3.    IRCA's Text Amending Other Provisions and its Legislative History Reinforce That the Employment Provisions are Expressly Preempted ........................................................................ 72

IV.    The District Court Correctly Held that IIRA Violates Due Process .......... 76

A.    IIRA Denies an Adequate Hearing ............................................... 77

B.    IIRA Fails to Provide Adequate Notice to Tenants and Employees .......... 81

C. The Standard for Facial Challenges Makes no Difference in This Case Because IIRA is Procedurally Deficient in Every Circumstance .................................................................. 82

V. The District Court Correctly Held that RO and IIRA Violate §1981 ........ 83

A. The District Court Properly Concluded That §1981 Prohibits Alienage Discrimination............................................................ 84

B. The District Court Properly Concluded That Undocumented Immigrants are "Persons" Under 42 U.S.C. §1981 .................................... 85

C. The District Court's Interpretation of 42 U.S.C. §1981 Does Not Conflict with Federal Harboring Law ...................................................... 86

VI. The District Court correctly held that the Ordinances VIOLATE State Law ............................................................................................. 87

A. Hazleton Lacks The Power Under Pennsylvania Law to Regulate Employment................................................................................ 87

B. Hazleton's Adoption of the Ordinances was not a Reasonable Exercise of its Police Powers .................................................... 89

CONCLUSION .............................................................................................. 91

CERTIFICATE OF BAR MEMBERSHIP .............................................................. 93

CERTIFICATE OF COMPLIANCE ...................................................................... 94

CERTIFICATE OF SERVICE.............................................................................. 95

# TABLE OF AUTHORITIES

**FEDERAL CASES**

*Aetna Health Inc. v. Davila,*
542 U.S. 200 (2004) ................................................................... 65

*Agri Processor Co., Inc. v. NLRB,*
514 F.3d 1 (D.C. Cir., Jan. 4, 2008) ......................................... 29

*Anderson v. Conboy,*
156 F.3d 167 (2d Cir. 1998) ....................................................... 84

*Anjelino v. New York Times Co.,*
200 F.3d 73 (3d Cir. 1999) ......................................................... 85

*Arnold v. Pennsylvania Dept. of Transp.,*
477 F.3d 105 (3d Cir 2007) ......................................................... 23

*Avila-Blum v. Casa de Cambio Delgado, Inc.,*
236 F.R.D. 190 (S.D.N.Y. 2006) ................................................. 40

*Barber v. Unum Life Ins. Co. of America,*
383 F.3d 134 (3d Cir. 2004) ....................................................... 30

*Bell v. Burson,*
402 U.S. 535 (1971) ................................................................... 80

*Bevles Co., Inc. v. Teamsters Local 986,*
791 F.2d 1391 (9th Cir. 1986) ................................................... 63

*Bhandari v. First Nat'l Bank of Commerce,*
829 F.2d 1343 (5th Cir. 1987), *vacated*, 492 U.S. 901, *reinstated*, 887
F.2d 609 (5th Cir. 1989) ............................................................. 84

*Bowers v. National Collegiate Athletic Ass'n,*
475 F.3d 524 (3d Cir. 2007) ....................................................... 72

*Bracamontes v. Weyerhaeuser Co.,*
840 F.2d 271 (5th Cir. 1988) ....................................................... 74

*C.E.R. 1988, Inc. v. Aetna Casualty and Surety Company,*
386 F.3d 263 (3d Cir 2004) ......................................................... 62

*Centeno-Bernuy v. Becker Farms*
    219 F.R.D. 59 (W.D.N.Y 2003) ........................................................ 29

*Choice, Inc. of TX v. Graham,*
    226 F.R.D. 545 (E.D. La. 2005) ..................................................... 39

*City of Chicago v. Morales,*
    527 U.S. 41 (1999) ......................................................................... 82

*Cleveland Bd. of Educ. v. Loudermill,*
    470 U.S. 532 (1985) ....................................................................... 78

*College Savings Bank v. Florida Prepaid Postsecondary Educ. Exp. Bd.,*
    131 F.3d 353 (3d Cir. 1997), *aff'd,* 527 U.S. 666 (1999) ............... 77

*Collins Foods Int'l, Inc., v. INS,*
    948 F.2d 549 (9th Cir. 1991) ............................................... 51, 53, 57

*Crandon v. United States,*
    494 U.S. 152 (1990) ....................................................................... 68

*Crosby v. Nat'l Foreign Trade Council,*
    530 U.S. 363 (2000) .......................................................42-44, 48, 62

*Danvers Motor Co., Inc. v. Ford Motor Co.,*
    432 F.3d 286 (3d Cir. 2005) .......................................................... 29

*Day v. Sebelius,*
    227 F.R.D. 668 (D. Kan 2005) ................................................. 40, 42

*De la Rosa v. Northern Harvest Furniture,*
    210 F.R.D. 237 (C.D. Ill. 2002) .................................................... 29

*DeCanas v. Bica,*
    424 U.S. 351 (1976) ......................................................52, 62-63, 75

*Dia v. Ashcroft,*
    353 F.3d 228 (3d Cir. 2003) .......................................................... 83

*Doe v. Barrow County, Georgia,*
    219 F.R.D. 189 (N.D. Ga. 2003) ................................................... 39

*Doe v. Colautti,*
    592 F.2d 704 (3d Cir. 1979) ................................................................ 37

*Doe v. Groody,*
    361 F.3d 232 (3d Cir. 2004) ................................................................ 37

*Doe v. Harlan County School Dist.,*
    96 F.Supp.2d 667 (E.D. Ky. 2000) .................................................... 39

*Doe v. Hartford Life and Acc. Ins. Co.,*
    237 F.R.D. 545 (D. N.J. 2006) ............................................................ 38

*Doe v. Merten,*
    219 F.R.D. 387 (E.D. Va. 2004) ................................................... 40-41

*Doe v. National Bd. of Medical Examiners,*
    199 F.3d 146 (3d Cir. 1999) ................................................................ 30

*Doe v. Pennsylvania Bd. of Probation and Parole,*
    513 F.3d 95 (3d Cir. 2008) .................................................................. 37

*Doe v. Porter,*
    370 F.3d 558 (6th Cir. 2004) .............................................................. 38

*Doe v. Provident Life and Acc. Ins. Co.,*
    176 F.R.D. 464 (E.D. Pa 1997) .......................................................... 38

*Doe v. Stegall,*
    653 F.2d 180 (5th Cir. 1981) .............................................................. 38

*Does I Thru XXIII v. Advanced Textile Corp.,*
    214 F.3d 1058 (9th Cir. 2000) ..................................................... 38, 40

*Duane v. GEICO,*
    37 F.3d 1036 (4th Cir. 1994) .............................................................. 84

*EEOC v. Bice of Chicago,*
    229 F.R.D. 581 (N.D. Ill. 2005) ........................................................ 40

*EEOC v. Restaurant Co.,*
    448 F. Supp. 2d 1085 (D. Minn. 2006) .............................................. 40

*Elk Grove Unified Sch. Dist. v. Newdow,*
  542 U.S. 1 (2004) ..................................................................... 36

*Fair Housing Council of Suburban Philadelphia v. Montgomery
  Newspapers,*
  141 F.3d 71 (3d Cir. 1998) ..................................................... 31

*Forum for Academic and Institutional Rights v. Rumsfeld,*
  547 U.S. 47 (2006) ................................................................. 27

*Fraternal Order of Police Lodge No. 5 v. Tucker,*
  868 F.2d 74 (3d Cir. 1989) ..................................................... 78

*Friends of the Earth, Inc.  v. Laidlaw Env. Serv.,*
  528 U.S. 167 (2000) ............................................................... 31

*Friends of the Earth v. Gaston Copper Recycling,*
  204 F.3d 149 (4th Cir. 2000) ................................................. 33

*Geier v. American Honda Motor Co., Inc.,*
  529 U.S. 861 (2000) ........................................ 44, 50, 60, 62, 65

*Gen'l Electric Co. v. EPA,*
  290 F.3d 377 (D.C. Cir. 2002) .............................................. 61

*General Instrument Corp. of Delaware v. Nu-Tek Electronics,*
  197 F.3d 83 (3d Cir. 1999) ..................................................... 30

*Gonzales v. City of Peoria,*
  722 F.2d 468 (9th Cir. 1983) ................................................. 48

*Government of the Virgin Islands v. Parrilla,*
  7 F.3d 1097 (3d Cir. 1993) ..................................................... 83

*Graham v. Richardson,*
  403 U.S. 365, 382 (1971) .................................................. 43, 84

*Gray v. City of Valley Park,*
  No. 4:07CV00881 ERW, 2008 WL 294294 (E.D. Mo., Jan. 31, 2008) ...... 64, 66

*Greene v. Lindsey,*
  456 U.S. 444 (1982) ............................................................... 77

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982) ........................................................................ 34

*Hines v. Davidowitz*,
    312 U.S. 52, 66-67, 74 (1941) ...................................................... 43

*Hoffman Plastic Compounds, Inc. v. NLRB*,
    535 U.S. 137 (2002) ................................................................. 50, 52

*Hunt v. Washington State Apple Comm'n*,
    432 U.S. 333 (1977) ........................................................................ 32

*In re Reyes*,
    814 F.2d 168 (5th Cir. 1987) ..................................................... 29, 40

*INS v. Legalization Assistance Project of the L.A. County Fed'n of Labor*,
    510 U.S. 1301 (1993) (O'Connor, J., in chambers) ......................... 37

*Int'l Paper Co. v. Ouellette*,
    479 U.S. 481 (1987) ................................................................. 44, 69

*Interfaith Community Org. v. Honeywell Int'l, Inc.*,
    399 F.3d 248 (2005) ....................................................................... 34

*James v. Jacobson*,
    6 F.3d 233 (4th Cir. 1993) ....................................................23, 37-38

*Javier H. v. Garcia-Botello*,
    211 F.R.D 194 (W.D.N.Y. 2002) ................................................... 40

*Kamara v. Attorney General*,
    420 F.3d 202 (3d Cir. 2005) ........................................................... 28

*Kehres v. Commonwealth of Pennsylvania*,
    No. 06-2247, 2008 WL 227878 (Jan. 29, 2008) ............................. 85

*Kentucky Dep't of Corrections v. Thompson*,
    490 U.S. 454 (1989) ....................................................................... 77

*King v. ZirMed, Inc.*,
    No. 3:05CV-181-H, 2007 WL 3306100 (W.D. Ky. Nov. 6, 2007) ................... 86

*Lujan v. Defenders of Wildlife,*
   504 U.S. 555 (1992) ................................................ 34

*Lynch v. Cannatella,*
   810 F.2d 1363 (5th Cir. 1987) ................................ 48

*Mariana v. Fisher,*
   338 F.3d 189 (3d Cir. 2003) .................................. 36

*Marsh v. United States,*
   29 F.2d 172 (2d Cir. 1928) .................................... 48

*Mathews v. Diaz,*
   426 U.S. 67 (1976) ................................................ 29

*Mullane v. Cent. Hanover Bank & Trust Co.,*
   339 U.S. 306 (1950) .............................................. 81

*Nat'l Ctr. for Immigrants' Rights, Inc. v. INS,*
   913 F.2d 1350 (9th Cir. 1990), *rev'd on other grounds,* 502 U.S. 183
   (1991) ................................................................... 51

*National Coalition of Latino Clergy, Inc. v. Henry,*
   2007 WL 4390650, Slip Op. (N.D. Okla.) ............ 37, 40

*Omega World Travel, Inc. v. Mummagraphics, Inc.,*
   469 F.3d 348 (4th Cir. 2006) ................................ 66

*Penn. Empl. Ben. Trust Fund v. Zeneca, Inc.,*
   499 F.3d 239 (3d Cir. 2007) .................................. 62

*Pennell v. City of San Jose,*
   485 U.S. 1 (1988) .................................................. 30

*Pennsylvania Family Inst. v. Black,*
   489 F.3d 156 (3d Cir. 2007) .............................. 23, 27

*Pilot Life Ins. Co. v. Dedeaux,*
   481 U.S. 41 (1987) ...................................... 65, 68, 70

*Plyler v. Doe,*
   457 U.S. 202 (1982) .......................................... 29, 46

*Roe v. Aware Woman Ctr. For Choice, Inc.,*
    253 F.3d 678 (11th Cir. 2001)............................................................. 38

*Rogers v. Larson,*
    563 F.2d 617 (3d Cir. 1977)................................................. 44, 57, 62

*Rowe v. New Hampshire Motor Trans. Ass'n,*
    128 S.Ct. 989 (2008) ......................................................................... 70

*Sagana v. Tenorio,*
    384 F.3d 731 (9th Cir. 2004)............................................................ 84

*Society Hill Towers Owners' Ass'n v. Rendell,*
    210 F.3d 168 (3d Cir. 2000)............................................................. 30

*St. Thomas-St. John Hotel & Tourism Assoc. v. Gov't of the United States*
    *Virgin Islands,*
    218 F.3d 232 (3d Cir. 2000)............................................................. 36

*States v. James Daniel Good Real Property,*
    510 U.S. 43 (1993) ........................................................................... 77

*Takahashi v. Fish & Game Comm'n,*
    334 U.S. 410 (1948) .................................................................. 84, 85

*Taliaferro v. Darby Township Zoning Bd.,*
    458 F.3d 181 (3d Cir. 2006)....................................................... 29, 31

*Tanasse v. City of St. George,*
    No. 97-4144, 1999 WL 74020 (10th Cir. Feb. 17, 1999) .................. 78

*Taylor v. Westly,*
    488 F.3d 1197 (9th Cir. 2007).......................................................... 81

*The Pitt News v. Fisher,*
    215 F.3d 354 (3d Cir. 2000), *cert. denied*, 531 U.S. 1113 (2001).............. 30, 35

*Toll v. Moreno,*
    458 U.S. 1, 10 (1982) ..................................................................42-43

*Topo v. Dhir,*
    210 F.R.D. 76 (S.D.N.Y. 2002) ....................................................... 29

*Tracinda Corp. v. DaimlerChrysler AG*,
  502 F.3d 212 (3d Cir. 2007)................................................................. 72

*United States v. Kim*,
  193 F.3d 567 (2d Cir. 1999)................................................................. 49

*United States v. Locke*,
  529 U.S. 89 (2000) ..........................................................64, 65, 68, 71

*United States v. Lopez*,
  521 F.2d 437 (2d Cir. 1975)................................................................. 49

*United States v. MacEwan*,
  445 F.3d 237 (3d Cir. 2006)................................................................. 23

*United States v. Salerno*,
  481 U.S. 739 (1987) ....................................................................... 82, 83

*United States v. Varkonyi*,
  645 F.2d 453 (5th Cir. 1981)................................................................. 47

*United States v. You*,
  382 F.3d 958 (9th Cir. 2004)................................................................. 47

*Valley Forge Christian College v. Americans United for Separation of
  Church and State*,
  454 U.S. 464 (1982) ............................................................................. 28

*Warth v. Seldin*,
  422 U.S. 490 (1975) ............................................................................. 35

*Washington v. Glucksberg*,
  521 U.S. 702 (1997) ............................................................................. 82

*Watters v. Wachovia Bank N.A.*,
  127 S.Ct. 1559 (2007) .......................................................................... 70

*Wisconsin Dept. of Indus. v. Gould Inc.*,
  475 U.S. 282 (1986) ............................................................................. 48

*Wong Wing v. United States*,
  163 U.S. 228 (1896) ............................................................................. 29

*Zadvydas v. Davis,*
    533 U.S. 678 (2001) ............................................................ 28, 43, 46

*Zschernig v. Miller,*
    389 U.S. 429 (1968) .................................................................... 43

**STATE CASES**

*Arizona Contractors Ass'n, Inc. v. Candelaria,*
    534 F. Supp.2d 1036 (D. Az. 2008) ............................................ 56

*Arizona Contractors Ass'n v. Candelaria,*
    No. CV07-2496, 2007 WL 4570322 (D. Az., Dec. 27, 2007) ...... 48, 66

*Arizona Farmworkers Union v. Phoenix Vegetable Distributors,*
    747 P.2d 574 (Az. Ct. App. 1987)................................................ 80

*Commonwealth v. Creighton,*
    639 A.2d 1296 (Pa. Commw. Ct. 1994)...................................... 89

*Gambone v. Commonwealth,*
    101 A.2d 634 (Pa. 1954) ............................................................ 89

*Genkinger v. City of New Castle,*
    84 A.2d 303 (Pa. 1951) .............................................................. 87

*In re Nomination Petition of Joseph Digiorlamo for Mayor,*
    No. 0501736-31, slip. op. (C.C.P. Bucks Apr. 6, 2005) .............. 87

*Kline v. City of Harrisburg,*
    68 A.2d 182 (Pa. 1949) .............................................................. 87

*Lutz v. Armour,*
    151 A.2d 108 (Pa. 1959) ............................................................ 89

*Mahony v. Township of Hampton,*
    651 A.2d 525 (Pa. 1994) ............................................................ 89

*McCartney v. Meadowview Manor, Inc.,*
    508 A.2d 1254 (Pa. Super. 1986)................................................ 88

*Smaller Manufacturers Council v. Council of City of Pittsburgh*,
  485 A.2d 73 (Pa. Commw. Ct. 1984)..................................................88

**FEDERAL STATUTES**

8 U.S.C. 1324a(b)(1)(A)(ii).............................................................55

8 U.S.C. §1101 *et seq.* .............................................................14, 49

8 U.S.C. §1158 ..........................................................................46

8 U.S.C. §1229a(a)(3) ..................................................................80

8 U.S.C. §1229b(b) .....................................................................46

8 U.S.C. §§1252c(a) ....................................................................63

8 U.S.C. §1255(i)........................................................................46

8 U.S.C. §1324 ......................................................................47, 49

8 U.S.C. §1324(a)(1)(A)(iii), (v) ......................................................86

8 U.S.C. §1324(c) .......................................................................63

8 U.S.C. §1324a ........................................................................74

8 U.S.C. §1324a(a)(1)(A) ..............................................................58

8 U.S.C. §1324a(a)(3) ..................................................................56

8 U.S.C. § 1324a(e) ....................................................................68

8 U.S.C. §1324a(e)(1)(B) ..............................................................54

8 U.S.C. §1324a(e)(2)-(3), (7)-(8)....................................................54

8 U.S.C. §1324a(e) note ........................................................57-58, 59

8 U.S.C. §1324a(h)(2) ...............................................25, 52, 65-68, 74

8 U.S.C. §1324b ........................................................................57

8 U.S.C. §1373 ............................................................... 78

8 U.S.C. §§1373(a) .......................................................... 41

8 U.S.C. §1373(c).................................................... *passim*

8 U.S.C. §§1621(a) .......................................................... 63

29 U.S.C. §1801 *et seq.* ................................................ 73

29 U.S.C. §1871 .............................................................. 73

42 U.S.C. §1981 ...................................................... *passim*

Illegal Immigrant Reform and Immigrant Responsibility Act ("IIRIRA"), §§401, 402(a), Pub. L. No. 104-208, Div. C (Sept. 30, 1996).......................... 59

Immigration Reform and Control Act of 1986 ("IRCA").............................. *passim*

P.L. 99-603, 100 Stat. 3359, §101(b) (1986) ................................. 50, 73-74

P.L. 99-603, 100 Stat. 3359, 8 U.S.C. §§1324a-1324b.......................... 50

Title VII of the Civil Rights Act of 1964 .............................. 29

**STATE STATUTES**

43 P.S. § 1301.501 *et seq.* (1983)................................... 73

43 P.S. § 1301.505(1) & (3) (1983) .................................. 72

53 P.S. § 37403............................................................. 88

Az. Rev. Stat. §§23-211 .................................................. 70

Az. Rev. Stat. §23-212(J) ................................................ 56

Cal. Lab. Code §1690(6) (1985) ...................................... 73

La. Rev. Stat. §23:996 .................................................... 70

Mississippi Employment Protection Act of 2008 .................. 70

N.J.S.A. §34:8A-11 ..................................................................... 73

Oklahoma Taxpayer and Citizen Protection Act of 2007 ......................... 70

Tenn. Code §50-1-103 ................................................................ 70

W. Va. Code §21-1B ................................................................. 70

## OTHER AUTHORITIES

8 C.F.R. § 274a.1(c)-(f) ............................................................... 58

8 C.F.R. §274a.12(b)(13), (14), (20) ............................................. 55

8 C.F.R. §274a.12(c)(8)-(11), (14) ............................................... 54

24 C.F.R. §5.508(e) .................................................................. 45

62 Fed. Reg. 48,309, 48,312-13 ................................................... 61

65 Fed. Reg. 58,301 ................................................................. 47

149 Cong. Rec. H 11582-01 (Nov. 19, 2003) ................................ 59

David A. Harris, *The War on Terror, Local Police, and Immigration Enforcement: A Curious Tale of Police Power in Post-9/11 America*, 38 Rutgers L. J. 1, 36-37 (2006) ..................................................... 43

Fed.R.Civ.P. 26(c)(1)(D) ........................................................... 44

H.R. Rep. No. 99-682(I) ..................................................... 51, 58, 74

S. 1033, 109th Cong., § 402 ....................................................... 60

S. 1200, 22 ............................................................................ 51

S. 1438, 109th Cong., § 321 ....................................................... 60

## COUNTER-STATEMENT OF ISSUES

1.    Did the District Court properly determine, based on the extensive evidence at trial, that plaintiffs have standing to challenge Hazleton's ordinances?

2.    Did the District Court abuse its discretion in allowing the Doe plaintiffs to proceed under pseudonyms and directing the parties to enter into a confidentiality agreement after finding that disclosure of their identities threatened serious harm?

3.    Did the District Court properly determine that federal immigration law expressly and impliedly preempts Hazleton's attempt to regulate employment and housing on the basis of immigration status?

4.    Did the District Court properly determine that the Illegal Immigration Relief Act (IIRA) Ordinance's provisions violate due process by failing to afford employers, employees, landlords and tenants sufficient notice and opportunity for a hearing prior to being sanctioned?

5.    Did the District Court properly determine that IIRA and the Tenant Registration Ordinance (RO), in limiting who can enter into a lease agreement based upon immigration status, violate 42 U.S.C. §1981, which extends the freedom to contract to "all persons" in the United States regardless of alienage status?

6. Did the District Court properly determine that Hazleton's enactment of a cause of action for discharged employees based on the immigration status of third parties was inconsistent with Pennsylvania law on at-will employment?

7. Did the District Court properly determine that the unconstitutional ordinances exceed Hazleton's police powers?

## COUNTER STATEMENT OF THE CASE

Beginning in July, 2006, the City of Hazleton enacted successive ordinances penalizing undocumented immigrants and those who did business with them. The City amended the ordinances repeatedly, including during the nine-day trial of this case in March 2007. Without objective evidence, Hazleton's mayor claimed the ordinances were necessary to reduce crime, improve schools and health care, and solve other ailments afflicting the City.

Hazleton passed its initial ordinances, 2006-10 (the original "Illegal Immigration Relief Act Ordinance") and 2006-13 ("Establishing a Registration Program for Residential Rental Properties"), on July 13 and August 15, 2006, respectively. Appendix (A) 3103, 215. As a result, many Latinos, including citizens and lawful permanent residents, were targeted for harassment or discrimination, and many left town. A1135-42; A1169-70; A1326-31.

Plaintiffs filed this action on August 15, 2006. A2964. On September 2, 2006, the District Court approved a Stipulation whereby Hazleton agreed to suspend enforcement of Ordinance 2006-10 pending passage of an updated version. A2949-950. On September 8, Hazleton adopted a companion "Official English Ordinance" (2006-19), that required all business with the City be conducted in English. On September 12, 2006, Hazleton replaced Ordinance 2006-10 by passing Ordinance 2006-18, also entitled the "Illegal Immigration Relief Act Ordinance." A225. Hazleton subsequently advised plaintiffs that Ordinances 2006-13 and 2006-18 would take effect on November 1, 2006. A3109. Plaintiffs amended their pleadings and sought emergency injunctive relief.

On October 31, 2006 the District Court, after a hearing, entered a Temporary Restraining Order prohibiting Hazleton from enforcing the ordinances until November 14, 2006. A2951. The Court subsequently approved a Stipulation and Order extending the restraining order, and providing for expedited discovery. A12.

On December 28, 2006, Hazleton adopted Ordinance 2006-40, which added a new §7 to Ordinance 2006-18. A242. Plaintiffs again amended their pleadings to reflect the new statutory scheme. A248.

The nine-day bench trial commenced on March 12, 2007. On the eve of closing arguments, Hazleton enacted Ordinance 2007-6, again amending Ordinance 2006-18. A247. The parties addressed the effect of the amendments in their post-trial submissions.

The District Court issued a 206-page decision permanently enjoining the ordinances on July 26, 2007. A5-210. The District Court found that eight plaintiffs have standing to raise their claims; that the Doe plaintiffs could proceed pseudonymously; and that Ordinances 2006-13 and 2006-18 (as amended) violate the Supremacy and Due Process Clauses of the U.S. Constitution; 42 U.S.C. §1981; and Pennsylvania municipality law, and are not a valid exercise of police powers. The Court held that two plaintiffs lacked standing and dismissed plaintiffs' Equal Protection, privacy, Fair Housing Act, and Pennsylvania Landlord/Tenant Law claims. A24-28; A160-67; A167-70; A185-88. The District

4

Court entered judgment on August 7, 2007.  A4.  Hazleton appealed on August 30,

2007.  A1-2.

## COUNTER STATEMENT OF THE FACTS

### A.    Genesis of the Ordinances

After decades of decline, Hazleton's population increased noticeably after

2000, growing from 23,000 to more than 30,000 in 2006.  A1348; A1672; A2060-

61; A3680-81.  The increase was due largely to an influx of immigrants, mostly

Latino, who moved from New York and New Jersey for a better life, new

employment and affordable housing.  A1022; A1339.  The newcomers were U.S.

citizens, lawful permanent residents, and undocumented immigrants.  A1879.

In May 2006, Mayor Louis Barletta created the text of Ordinance 2006-10

by copying, with minor changes, a proposed (but never enacted) San Bernardino,

California initiative he found on the Internet.  A1385-87.  Mayor Barletta cited

allegations that undocumented immigrants had been involved in the murder of a

Hazleton resident as the basis for his decision to introduce the ordinance.  A1382-

84, A2131-32.  He did not discuss the situation with any of the City's department

directors. A1778-79.

On June 15, 2006, Barletta introduced and the City Council first considered

Ordinance 2006-10.  A3103-06.  Neither Barletta nor the Council did research,

conducted studies, or retained consultants or experts to study the City's problems,

to assess the role of undocumented immigrants, or to determine the proposed

ordinances' effectiveness. A1257-58; A1293-94; A2309; A1436. City Council was unaware of any conviction of an undocumented immigrant prior to the passing of Ordinance 2006-13. A1308. The only information that City Council obtained concerning crimes allegedly committed by undocumented immigrants was from Barletta, who mentioned only the Derek Kichline homicide.[1] A1263-64.

On July 13, 2006, the City Council adopted Ordinance 2006-10. A3103. The ordinance's "Findings and Declarations of Purpose," copied wholesale from the San Bernardino initiative, states that "Illegal immigration leads to higher crime rates, subjects our hospitals to fiscal hardship and legal residents to substandard quality of care, contributes to other burdens on public services, increasing their cost and diminishing their availability to legal residents, and diminishes our overall quality of life." *Id.* §2.C. These assertions appear in the current IIRA. A103.

### B. Hazleton's Claims Regarding Undocumented Immigrants are Unsupported by the Trial Record

Hazleton claims that it adopted the ordinances because undocumented immigrants are responsible for Hazleton's economic, social and crime woes. The trial evidence demonstrates that these claims were unfounded.

---

[1] Although four undocumented immigrants were charged with Kichline's murder, none have ever been convicted. A2131-32.

7

Before May 2006, there was little public sentiment that undocumented immigrants were causing problems in Hazleton. To the contrary, an April 2006 news story featured on the City's website compared Hazleton's economic boom of earlier eras with the present, stating that "[i]mmigration once again buoys the City's workforce." A3398.

Indeed, the City's financial situation had improved markedly after the large influx of immigrants. Barletta's 2006 "Biography" claimed that he had led the City "through one of the most impressive economic revitalizations in regional history." A3431. The "monumental" $1.2 million budget deficit of 2000, A1349, became a $212,065 surplus in 2004, and a $33,000 surplus in 2005. A1887-88; A3681. Other indicators confirm the City's economic vitality.[2]

The City's 2007 Budget did not mention any costs allegedly generated by undocumented immigrants. A1885; A1358. Hazleton's audited financial statements (A2062-63) which by law must list all matters materially affecting the City's financial condition (A2066-67), also did not mention any such costs. A2068-69.

---

[2] *See, e.g.*, A1888 (City enjoyed "triple A" bond rating); A2102 (no recent services cuts); A3683 (tax assessments and property values increased three consecutive years for the first time in decade); A2069-75, A3822, A2070 (material increase in Hazleton's net assets); A2102, A3822 (income-tax collections far exceeded projections in 2005).

Although Barletta claimed that one-third of recent drug arrests involved illegal immigrants, (A1418-19), in fact it was only 10 out of 235. A2413; A2429; A3472-519; A3916-27; P-189-P-191. The Hazleton Police Department's own records showed that undocumented immigrants had committed relatively few crimes: only 21 out of 8,571 total crimes between 2001 and 2006 (A3928-29; A2153-55) *may* have involved undocumented immigrants. A2118-131. Out of 428 violent crimes (murders, rapes, robberies and aggravated assaults) committed during that period (A4027; A2156-58), Hazleton produced evidence that only three or four were allegedly committed by undocumented aliens. A2158-65.[3] Contrary to national trends (A 2166-67), and during a time when Hazleton's population grew substantially and the number of police officers declined, Hazleton's crime rate actually fell. A3928-29; A2155-56.

Hazleton's claim that undocumented immigrants were destroying the local public schools is also unsupported by the record. Neither Barletta nor any other City official could produce evidence about the number of undocumented-immigrant students (A1403-04; A958) whether average student test scores were

---

[3] The City did not demonstrate at trial that any undocumented immigrant was actually convicted of a crime. A2132-34.

trending up or down (A1411) or the number of overcrowded classrooms (A1409).
School district officials never publicly supported the ordinances. A958.

Hazleton's claim that illegal immigration "subjects our hospitals to …
substandard quality of care" was also baseless. The Greater Hazleton Healthcare
Alliance ("GHHA"), the primary healthcare provider for the Hazleton area
(A1905-06), has never publicly supported the ordinances. A962. Neither City nor
GHHA officials know how many undocumented immigrants are treated by local
hospitals. A1412-13. Barletta could not support his claim that undocumented
immigrants cause longer emergency-room waits. A1414-17. Indeed, emergency-
room visits to GHHA actually decreased by more than 4,000 from 2005 to 2006,
and patient wait times are comparable to other area hospitals. A960-61. GHHA
reported an operating profit of $1.2 million in 2005, and $4 million in 2006. A962.

### C.    Hazleton's Immigration Ordinances

Hazleton's Illegal Immigration Relief Act Ordinance 2006-18 (A225-31), as
amended by Ordinances 2006-40 (A242-44) and 2007-6 (A247) (hereinafter
"IIRA") and Tenant Registration Ordinance (2006-13, A215-24) (hereinafter
"RO") apply to every business, employee, tenant, and landlord in the City. They
impose penalties on those who employ "illegal" persons, require every adult
resident in rental housing to prove immigration status to the Code Enforcement
Office, and penalize both tenants and landlords for housing any unregistered or

"illegal" person. Their procedures are wholly separate from the federal procedures that determine whether a person may stay or work in the United States.

### 1.    IIRA's Employment Provisions

IIRA makes it "unlawful for any business entity to recruit, hire for employment, or continue to employ, or to permit, dispatch, or instruct any person who is an unlawful worker to perform work in whole or part within the City." §4.A. "Business entity" is defined broadly to encompass anyone who hires another for "gain, benefit, advantage, or livelihood, whether for profit or not for profit," §3.A (A1441-42), and includes landlords (A1447-48). IIRA applies to all "work," which also is defined broadly to include "any job, task, employment, labor, personal services, or any other activity for which compensation is provided, expected, or due, including but not limited to all activities conducted by business entities." §3.F; A1442-44. Thus, anyone who receives labor, services, or assistance from anyone else is subject to IIRA's requirements and penalties, regardless of federal or state law. A1442-50.

IIRA specifies: "Every business entity that applies for a business permit to engage in any type of work in the City shall sign an affidavit, prepared by the City Solicitor, affirming that they do not knowingly utilize the services or hire any person who is an unlawful worker." §4. The form of "affidavit" was never

disclosed. No business entity, including stores, businesses and landlords, can operate in Hazleton without a permit. A1447-48.

IIRA establishes a complaint-initiated enforcement system. §4.B.; A1447-48. Any Hazleton official, business entity or resident can file a complaint. A1448; A1783; A1794. Upon receiving a "valid" complaint, the Code Enforcement Official "shall" demand that the business entity produce "identity information" for the complained-about worker. §4.B.3; A227-28. IIRA does not define "identity information." The "Enforcement Office shall suspend the business permit of any business entity which fails, within three business days ... to provide such information." §4.B.3; A227-28. IIRA applies strict liability to this three-day requirement. A1450-52.

Hazleton could not explain how or to whom it would transmit the requested "identity data" for verification of an individual's work authorization. A1747-56; A1467-74. Hazleton City Counsel President Joseph Yannuzzi admittedly had no idea what information constituted "identity data." A1274-75. No federal agency has issued Hazleton a Memorandum of Understanding ("MOU") to access any federal verification system, or advised that one is forthcoming. A1467-72.

If a violation is charged, IIRA requires the Enforcement Office to "suspend the business permit of any business entity which fails to correct a violation ... within three business days." §4.B.4. Ordinance 2006-40 provides that a business

entity can "correct" a violation by (1) terminating the worker or (2) requesting a new verification of the worker's work authorization via the federal Basic Pilot Program (subsequently renamed "E-Verify") – even though re-verification is not permitted under the terms of that program. A1454-57.

A business entity's failure to "correct" a violation within three days results in mandatory suspension of its business permit, §4.B.4, and suspension continues until one day after the entity submits a "sworn affidavit" detailing the correction, §4.B.6. A second or subsequent violation requires the Code Office to suspend the business permit for 20 days, regardless of any corrective action. §4.B.7.

Entities found to employ more than one unauthorized worker or that seek City contracts over $10,000 are required to enroll in E-Verify, a voluntary and experimental employment-verification system that Congress purposefully authorized on a temporary, pilot basis because of concerns about unacceptably high error rates in the underlying databases. §§4.B.6.b, 4.D; A1510-19. In addition, any business entity may obtain full immunity from IIRA by enrolling in E-Verify.

IIRA also creates a private cause of action for any discharged employee who is an authorized worker. By showing that the business entity employed an "unauthorized worker," the discharged employee may recover treble damages, plus costs and attorney's fees, even if he was fired for cause. §4.E.

## 2. IIRA's Housing Provisions

IIRA makes it unlawful to knowingly "let, lease, or rent a dwelling unit to an illegal alien" or to "suffer or permit the occupancy of [a] dwelling unit by an illegal alien. A1472-73. An "illegal alien" is defined as "an alien who is not lawfully present in the United States, according to the terms of United States Code Title 8, section 1101 *et seq.*" §3.D. Each day that a landlord harbors an illegal alien constitutes a separate violation. §5.A.2; A1473.

IIRA also prohibits "illegal aliens" from "enter[ing] into a contract for the rental or leasing of a dwelling unit." IIRA deems it a "breach[] of a condition of the lease" for an individual who is or becomes not lawfully present to enter or continue a lease. §7(B).

IIRA employs a complaint-driven system for housing that mirrors the employment provisions. §5.B; A1473-74. Upon receiving a valid complaint, the Code Enforcement Office demands that the landlord produce the tenant's identity information within three business days. §5.B.3; A1473. As with the employment provisions, the verification process contemplated by §5.B.3 has not been approved by the federal government and is not operational. A1473-74.

If Hazleton finds a violation, landlords have five days to "correct" it. §5.B.4. A landlord can "correct" a violation in three ways: issue the tenant a notice to quit, seek additional verification based on new identity information, or

14

file a court action to recover possession of the property. IIRA §7.D; A1475-78.

The first and third options require the landlord to initiate the tenant's eviction.

A1476-77. If a landlord fails to correct a violation, IIRA mandates suspension of

the his operating license, without exception. §5.B.4, A1477-78. At trial, Mayor

Barletta was unable to identify any process that provided aggrieved parties an

opportunity to contest either a status determination or a sanction of an employer or

landlord. A1459-61.

### 3.     Process Available Under IIRA

IIRA does not require Hazleton, employers, or landlords to give notice to

affected employees or tenants about either a complaint filed against them or the

results of any verification query. The only procedure in IIRA for an aggrieved

business entity, worker, landlord or tenant to challenge a status determination,

license suspension or fines is to file an action in the "Magisterial District Court for

the City of Hazleton, subject to the right of appeal to the Luzerne County Court of

Common Pleas." A1461; A1478. IIRA requires the reviewing court to treat the

federal government's status determination as a "rebuttable presumption." A1479.

### 4.     Registration Ordinance

RO requires every adult, regardless whether listed on the lease, who resides

in a rental apartment to appear personally at the Code Enforcement office to obtain

an occupancy permit. RO §§1, 6.a., 7.b; A1480-81. Each tenant must pay a

registration fee. A3446; A1819. If a tenant moves, he must re-register and pay an additional fee. *Id.*

Applications must include "[p]roper identification showing proof of legal citizenship and/or residence." §7.b. In an October 2006 notice, Hazleton announced that U.S. citizens must prove citizenship by showing documents "such as a passport, birth certificate showing birth in the United States, or other document from the federal government establishing citizenship, e.g., naturalization papers." A3433. "In the case of an alien, the occupant must declare his nationality . . . and provide any documentation he possesses establishing his right to reside legally in the United States – either a paper indicating lawful permanent resident status or a relevant 'non-immigrant visa' or some other document from the U. S. Government indicating his/her right to reside in the United States." *Id.* RO prohibits landlords from renting any unit until all adult tenants present an occupancy permit. §6.a; A1819. For every unregistered tenant the landlord's liability is $1,000 per day. §10.

## D. The Plaintiffs

Hazleton's brief misstates numerous facts regarding plaintiffs in a manner contrary to the District Court's factual findings or unsupported by the record. App. Br. at 20-26, 28-30. Consistent with the District Court's findings (A4-13, A16-45), plaintiffs set forth the relevant facts:

Pedro Lozano is a Colombian citizen and lawful permanent resident of the U.S. who immigrated in 2002 to seek a better life. A1104-05. In Colombia, Lozano was a National Police Force official for 35 years. A1105. He moved from New York in search of affordable housing and better employment. A1106-07.

Lozano owns two rental units in Hazleton that were occupied until the ordinances were enacted, but the tenants left upon learning about Hazleton's new registration requirements. A1110; A1127; A1130. Lozano has been unable to rent continuously since then. A1108-18. When he informed prospective tenants about Hazleton's new requirements, they never returned. A1110-12. Lozano eventually rented one apartment to his daughter, but charged her less than other tenants. Her tenancy ended in January 2006, leaving the apartment vacant. A1118-21.

As a landlord, Lozano is a "business entity" under IIRA. He hires independent contractors to repair his housing units. A1116. Accordingly, he must submit an affidavit to the City attesting that he does not hire illegal aliens. A227-29. He also must investigate the immigration status of everyone he hires.

John Doe 1 was born in Mexico. He moved to Hazleton in 2001. A800. He is neither a U.S. citizen nor a lawful permanent resident. A810. His father filed an immigrant-relative visa petition for lawful permanent residency status for him, which has apparently been approved, but his precise status is uncertain. Doe 1 is

awaiting an appointment with U.S. Citizenship and Immigration Services. A850.
He works and pays taxes. A813-14; A816.

After Hazleton passed its ordinances, Doe 1's landlord insisted he vacate his
apartment, which he did in October 2006. The landlord informed Doe 1 that
because of his uncertain immigration status he "didn't want any problems" and
"didn't want to take the risk." A832. The landlord did not want Doe 1 to leave
because he was "a good tenant," but felt compelled to follow the ordinances.
A841.

John Doe 3 was born in Mexico, and moved to Hazleton in 2003. A865,
A874. He is neither a U.S. citizen nor a lawful permanent resident. A866. He
works and pays taxes. A875; A884-85. He and his family have been tenants in
Hazleton for four years. If the ordinances are enforced, Doe 3's landlord will have
to evict him, and Doe 3 will be unable legally to rent another apartment in
Hazleton. He will be forced to leave Hazleton, and his daughter will have to attend
another school, thereby losing her friends. A887-88.

Jane Doe 5 and John Doe 7 were born in Colombia. A913; A938. Doe 7
worked as an architect in Colombia and has been married to Doe 5 for over 28
years. A938, A939. Both moved to Hazleton in 2001. A912; A939. Neither is a
U.S. citizen or lawful permanent resident. A913; A939. Both are tenants residing

in Hazleton. A912, 938. If the ordinances are enforced, the couple will be unable to obtain a tenant permit and will be forced to leave Hazleton. A922-23; A944.

The Hazleton Hispanic Business Association ("HHBA") is a non-profit organization whose membership consists of approximately 27 Latino business and property owners from the Hazleton area. A1199-202; A1217-18. HHBA promotes the interests of its members, projects an image of the Hispanic business community in Hazleton, and assists the community. A1199-1200.

HHBA's business members have suffered monetary losses because of the ordinances. A1203-04. Some members were forced to close their businesses, others have lost clientele, and others ceased to expand their business as previously planned. For example, Isabella Rubio's Gift Shop and Santo Domingo Repair Shop lost numerous customers and income. Other businesses, such as Royal Prestige, were forced to close. A1203-04; A1236-37.

The ordinances have caused HHBA's membership to decline. Certain Latino-owned businesses, such as El Mariachi Restaurant, lost their Latino clientele but survived by replacing their customer base with non-Latino clientele. These businesses withdrew their membership from HHBA, fearing that participation in litigation would alienate their primary clientele. A1205-07; A1229-37.

HHBA's president, Rodolfo Espinal, came to the U.S. from the Dominican Republic in 1988, overstayed his visa, and became an undocumented immigrant. A1191-2000. In 1992, Espinal became a lawful permanent resident, and in 2006 he became a U.S. citizen. He moved with his family in December 2001 from New York to Hazleton. *Id.*

Espinal owns a real estate agency, A1197, and several rental units in Hazleton. A1210-1211. IIRA requires Espinal to ascertain the immigration status of all prospective tenants and to rent only to those who register with the City. He has had difficulty renting units since enactment of the ordinances. Espinal received several inquiries regarding a vacancy, including inquiries from two persons of Mexican descent, but they did not return after Espinal informed them about the occupancy-permit requirement. A1212-15.

Espinal must hire independent contractors to perform repairs on his housing units. A1221. Accordingly, the ordinances require him to submit an affidavit to the City attesting that he does not hire illegal aliens.

Pennsylvania Statewide Latino Coalition ("PSLC") is a non-profit organization established in 1994, that promotes the social, political, economic, and cultural development of Pennsylvania Latinos; develops leadership; and creates networks among Latino leaders and communities. A1177; A1150-51. PSLC's organizational activities include an annual conference, youth development, and

other advocacy activities. A1152. PSLC has approximately 6,000 members and relies almost exclusively on members' contributions. A1151; A1171-72. Approximately 20 PSLC members reside in Hazleton (A1177-78).

PSLC organized a community meeting on July 30, 2006, during which Latino residents and business owners voiced concerns about repercussions from the ordinances and the surrounding publicity, including inadequate trash pick up from Latino homes, a brick thrown at the window of a Mexican restaurant, Hazleton police officers stopping Latinos to request identification, and businesses losing customers due to the climate of fear that the ordinances had created in the community. A1027; A1154-55. Latino residents also expressed concern about the treatment of their children in school and fears about attending bilingual church services. A1155-57. PSLC incurred out-of-pocket costs and exceeded its Northeast-region budget to address Hazleton residents' concerns. A1165-75. PSLC member Dr. Agapito Lopez received threatening mail as a result of his public opposition to the ordinances. A1135-42.

Casa Dominicana de Hazleton, Inc. ("Casa") is a not-for-profit organization incorporated in August 2005. A1322. Casa provides assistance, orientation, and education to Hazleton's Latino community, and works to unify ties between the Latino and non-Latino communities. Casa provides members information, legal

referrals, and assistance with economic difficulties. Casa is committed to preventing youths from joining gangs. A1337-38.

Casa has 80 members who volunteer their time, approximately 55 of whom reside in Hazleton. A1324; A1330. They include tenants, landlords, and business owners, all of whom are directly impacted by the ordinances. A1322. Approximately twenty Casa members have expired immigration status, have lost immigration documents, are in the process of obtaining immigration documents, or do not have documents to indicate their immigration status. A1321-22; A1333.

Prior to the ordinances' enactment, Casa's membership grew steadily. Between December 2005 and June of 2006, its membership grew from 80 to 140. A1328. However, after the ordinances were proposed Casa lost about ten members by July 2006 and another 35 by August. A1328-29. At least one member informed President Saldana that he left town and terminated his membership because of the ordinances. A1329. The membership loss caused by the ordinances has prevented Casa from providing many services. A1328-30. Because Casa's services are now limited, it cannot justify charging a monthly membership fee, thus adversely impacting its financial situation. A1330.

## STANDARD OF REVIEW

The District Court's legal conclusions with respect to standing, preemption, due process, 42 U.S.C. §1981, and state law are reviewed de novo. *See, e.g,*

*United States v. MacEwan*, 445 F.3d 237, 243 (3d Cir. 2006) (exercising plenary review over challenges to constitutionality of a statute). The District Court's factual findings, including those relating to standing and pseudonymity, are reviewed for clear error. *See, e.g.*, *Pennsylvania Family Inst. v. Black*, 489 F.3d 156, 165 n.8 (3d Cir. 2007). The District Court's decisions to grant certain plaintiffs pseudonymity and to require a confidentiality agreement are reviewed for abuse of discretion. *See Arnold v. Pennsylvania Dept. of Transp.*, 477 F.3d 105, 107 (3d Cir 2007); *James v. Jacobson*, 6 F.3d 233, 239 (4th Cir. 1993).

## SUMMARY OF ARGUMENT

Hazleton has attempted to create its own system of immigration law that imposes new requirements and penalties on Hazleton's employers, employees, landlords, and tenants, and establishes a separate, municipal immigration enforcement regime. After a bench trial lasting nearly two weeks, the District Court properly reached the merits of plaintiffs' claims and correctly found the ordinances invalid on preemption, due process, §1981, and state law grounds.

The District Court correctly found that all but two plaintiffs have standing to bring this case. The trial record establishes that, at a minimum, IIRA and RO would compel plaintiff Lozano and plaintiff HHBA's member Espinal to take new measures to verify workers' and tenants' immigration status and submit affidavits attesting thereto. The ordinances would directly prohibit the Doe plaintiffs from renting in the City, void their leases, obligate them to produce documentation that they do not possess, and subject them to eviction. Unless the injunction is upheld, these concrete injuries are certain to occur.

The District Court did not abuse its discretion by granting the Doe plaintiffs' request to proceed pseudonymously and requiring an appropriate confidentiality order. These decisions were based on the District Court's factual findings that the Doe plaintiffs would face real danger if their identities were revealed. Moreover,

Hazleton deposed the Doe plaintiffs and can show no prejudice as resulting from these decisions.

The District Court correctly found the ordinances preempted by federal law. The ordinances' housing provisions conflict with federal immigration law. They ignore and contradict the overlapping system of statutes, regulations, agencies, and courts that determines whether any particular alien is permitted to stay in the United States, and would expel from the community persons whom the federal government allows to live in the United States.

The employment provisions are preempted on multiple grounds. Over two decades ago, Congress enacted a comprehensive employer sanctions scheme as a central feature of federal immigration law. In doing so, it carefully balanced several important goals, including enforcing the laws effectively, avoiding discrimination, and minimizing the burden on businesses.

The employment provisions of IIRA conflict with and upset Congress' carefully balanced law in at least seven ways, each of which provides a sufficient ground to invalidate the ordinance. In addition, and independently, IIRA's employment provisions are expressly preempted by 8 U.S.C. §1324a(h)(2) and are not saved from express preemption by that provision's parenthetical exception for "licensing and similar laws." That clause does not give states authority to erect their own broad employer sanctions schemes or their own mechanisms to

determine whether an employer has employed an unauthorized worker without regard to any finding under the federal employer sanctions system.

The District Court correctly held that IIRA violates due process. IIRA fails to provide any opportunity for a hearing before depriving persons of permit, license, employment, or housing. Even the post-deprivation process it allows is illusory because the forum offered is unable to adjudicate the critical issues in the proceeding. In addition, the ordinance provides no notice at all to affected tenants or employees.

Finally, the District Court correctly held that IIRA and RO violate 42 U.S.C. §1981 and state law. Section 1981 plainly prohibits alienage discrimination by governmental entities, and persons who lack immigration status are still "persons" within the law's ambit. Hazleton lacks power under Pennsylvania law to create a private right of action for discharged employees in excess of its enumerated powers and in conflict with state employment law, or to enact an ordinance where, as here, it lacks any reasonable basis to do so.

**ARGUMENT**

## I. THE DISTRICT COURT CORRECTLY HELD THAT APPELLEES HAVE STANDING

After extensive briefing and a nine-day trial, the District Court correctly held, based on comprehensive factual findings, that eight plaintiffs have standing. While this Court's review of standing determinations is "plenary," it must, "… as always, review the District Court's factual determinations for clear error." *Pennsylvania Family Inst.*, 489 F.3d at 165 n.8. Hazleton cannot demonstrate that the District Court's factual findings constitute clear error. *At a minimum,* the ordinances would cause immediate injury to Lozano and HHBA member Espinal, who would be compelled to submit affidavits and undertake identification and immigration-status-verification measures for all hired help and current and prospective tenants. The ordinances would also require Doe plaintiffs, as tenants, to register with the City and pay a fee. These concrete and particularized injuries inflicted by the ordinances are certain to occur absent an injunction and confer standing on plaintiffs.[4]

---

[4] Because only one plaintiff must have standing to challenge each ordinance, *see Forum for Academic and Institutional Rights v. Rumsfeld*, 547 U.S. 47, 53 n.2 (2006) ("the presence of one party with standing is sufficient"), we do not address in detail the District Court's alternate findings on economic injury and organizational standing (other than HHBA's standing through Espinal). Hazleton's further argument that plaintiffs must establish "proper jurisdictional

## A. Undocumented Immigration Status Does not Negate Standing

Hazleton asserts throughout its brief that "illegal aliens" have no standing to sue because they lack lawful immigration status. *See, e.g.,* App. Br. at 16-19, 24. That is contrary to over a century of Supreme Court jurisprudence. The District Court correctly held that "persons who enter this country without legal authorization [or currently lack legal status] are not stripped immediately of all their rights because of this single illegal act." A47-48.

The Supreme Court has repeatedly ruled that "the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) (citing cases). *See also, e.g., Kamara v. Attorney General*, 420 F.3d 202, 216 (3d Cir. 2005) (same). Nor can these cases be limited, as Hazleton argues, to claims regarding unlawful presence in the United States. Courts routinely consider and vindicate constitutional claims by undocumented

---

bases" for "every claim…" App. Br. at 15, does not relate to standing and misstates the law. *See Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 484 (1982) (citation omitted) ("standing focuses on [injury to] the party … not on the issues").

plaintiffs,[5] as well as claims under statutes including the National Labor Relations Act, Title VII of the Civil Rights Act of 1964, and the Fair Labor Standards Act.[6]

**B.      Plaintiffs Will Suffer Concrete and Particularized Injury That is Caused by the Ordinances and Redressable by the Court**

Three requirements – injury, causation and redressability – comprise the "irreducible constitutional minimum" for Article III standing. *Taliaferro v. Darby Township Zoning Bd.*, 458 F.3d 181, 188 (3d Cir. 2006) (citations omitted). " The plaintiff must show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant [and][t]he injury must be concrete and capable of being redressed by the court should the plaintiff prevail on the merits." *Id.* at 188-89.

"Injury-in-fact is not Mount Everest …The contours of the injury-in-fact requirement, while not precisely defined, are very generous." *Danvers Motor Co., Inc. v. Ford Motor Co.*, 432 F.3d 286, 294 (3d Cir. 2005) (citation omitted);

--------

[5] *See, e.g., Plyler v. Doe*, 457 U.S. 202, 210 (1982) ("Whatever his status under the immigration laws, an alien is surely a 'person' in any ordinary sense of that term."); *Mathews v. Diaz*, 426 U.S. 67, 77 (1976); *Wong Wing v. United States*, 163 U.S. 228, 238 (1896).

[6] *See, e.g., Agri Processor Co., Inc. v. NLRB*, 514 F.3d 1 (D.C. Cir., Jan. 4, 2008) (NLRA); *In re Reyes*, 814 F.2d 168, 170 (5th Cir. 1987) (FLSA); *Centeno-Bernuy v. Becker Farms*, 219 F.R.D. 59 (W.D.N.Y 2003) (AWPA & FLSA); *De la Rosa v. Northern Harvest Furniture*, 210 F.R.D. 237 (C.D. Ill. 2002) (Title VII & FLSA); *Topo v. Dhir*, 210 F.R.D. 76, 78 (S.D.N.Y. 2002) (Federal Tort Claims Act).

*General Instrument Corp. of Delaware v. Nu-Tek Electronics*, 197 F.3d 83, 87 (3d

Cir. 1999) ("identifiable trifle will suffice" for standing). The requisite showing

for standing is distinct from proving the merits: "The proper analysis of standing

focuses on whether the plaintiff suffered an actual injury, not on whether a statute

[or the constitution] was violated." *Doe v. National Bd. of Medical Examiners*,

199 F.3d 146, 153 (3d Cir. 1999). *See also The Pitt News v. Fisher*, 215 F.3d 354,

360 (3d Cir. 2000), *cert. denied*, 531 U.S. 1113 (2001).

### C. The District Court's Findings of Injury are Fully Supported by the Record

The District Court correctly found, based on trial testimony, that plaintiff

Lozano and HHBA President Espinal suffered economic harm caused by the

ordinances. A20-24, 30-35. These injuries alone suffice to confer standing. *See*

*Pennell v. City of San Jose*, 485 U.S. 1, 8 (1988) ("probability that landlord's rent

will be below what he or she would otherwise be able to obtain in absence of [rent

control] Ordinance is a sufficient threat of actual injury …"); *Taliaferro*, 458 F.3d

181 (decrease in property values); *Society Hill Towers Owners' Ass'n v. Rendell*,

210 F.3d 168 (3d Cir. 2000) (same). Nothing in Hazleton's arguments disproves

these findings or meets the burden of showing clear error.

The District Court also correctly found that plaintiffs' "injury comes in the

operation and requirements of the ordinances," such as "requiring them to seek

immigration information" from employees and tenants not required under federal law. A24, A35. Hazleton mistakenly seeks to confine injury to *economic* harm from the ordinances (App. Br. at 25), but *non*-economic injuries clearly satisfy the injury-in-fact requirement. *See, e.g., Friends of the Earth, Inc. v. Laidlaw Env. Serv.*, 528 U.S. 167, 183 (2000); *Taliaferro,* 458 F.3d at 189; *Fair Housing Council of Suburban Philadelphia v. Montgomery Newspapers*, 141 F.3d 71, 81 (3d Cir. 1998).

IIRA imposes document-inspection and status-verification requirements on every "business entity," including Lozano and Espinal. The District Court made factual findings that Lozano needed to hire contractors "to do more complicated repairs on his property, such as roofing," A21, and that Espinal needed to "perform repairs such as painting, carpeting and electrical work" on the rental units that would require hiring outside contractors, A32.

Contrary to Hazleton's argument, App. Br. at 26-27, and as detailed more fully below, IIRA imposes its own *new* verification requirements on Lozano and Espinal that are distinct from and not required by federal law. Lozano and Espinal are compelled by IIRA to check the immigration status of everyone they hire, including independent contractors, and to submit an affidavit affirming that they do not "knowingly utilize the services or hire any person who is an unlawful worker." §4.A. Violations result in severe sanctions, including loss of operating license,

31

§4.B.4-7, and risk of suit under the "private cause of action" that renders employers strictly liable for treble damages to any discharged worker who proves the business entity employed an unauthorized worker. §4.E. The only defense against this cause of action is for business entities to have first enrolled in the *voluntary* E-Verify program, incurring associated costs and burdens. §4.E.1.

The District Court further found that HHBA and Lozano have standing to challenge IIRA's housing provisions.[7] It credited HHBA member Espinal's testimony that, as a landlord, he had to "obtain information on immigration status from tenants that he normally would not seek." A32. Espinal testified that "when you rent an apartment, you ask people about their ability to pay the rent, if they are working or not, that kind of stuff. I don't think you should ask about their family composition or their religion or anything like that or their immigration status." A28-29 n.14. Espinal testified he had no training to evaluate a person's immigration status or documents. A28-29. Unless Espinal and Lozano, who is also a landlord, take steps to ascertain tenants' immigration status by demanding their documents, they are subject to sanction simply for not having the documents, §5.A.3, and for allowing an undocumented immigrant to remain on the premises,

---

[7] An association has standing if, as here, at least one individual member of that association can demonstrate standing. *Hunt v. Washington State Apple Comm'n*, 432 U.S. 333 (1977).

§§5.B.4-8. IIRA's requirements to question and verify tenants, to register with the City, and to submit an affidavit are distinct and palpable injuries that confer standing wholly apart from any economic impact.

The Doe plaintiffs also have standing to challenge IIRA because they are directly prohibited from renting in the City, are subject to having their leases voided, and are obliged to produce documentation that they do not possess. They are compelled to produce documents to satisfy the legal obligations imposed on landlords and inability to comply will result in eviction.

The Doe plaintiffs and landlords also have standing to challenge RO, which imposes additional requirements. The Does, as tenants, must obtain a permit from the Code Enforcement Office and pay a $10 fee. §7.b. Landlords must "notify all prospective Occupants of this [permit] requirement and shall not permit occupancy of a Rental Unit unless the Occupant first obtains an occupancy permit." *Id*. Failure to comply is subject to fines exceeding $1,000. §10.b. As the District Court found, Lozano and Espinal already have suffered this concrete injury. A23, 32 (informed prospective tenants about registration requirement).

The document-identification, status-verification, affidavit and registration requirements mandated by the two ordinances are not "conjectural or hypothetical"

injuries.[8] Hazleton's insistence on enforcing the ordinances compelled plaintiffs to move for a temporary restraining order, which the District Court granted. Mayor Barletta testified that the ordinances would be enforced immediately if the injunction were lifted. A1879. Therefore, the foregoing injuries are not speculative.[9]

### D. Causation and Redressability are Satisfied Because Plaintiffs are Objects of the Ordinances

When, as here, a plaintiff is an "object" of the challenged action, "there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562 (1992). Hazleton's effort to expel "illegal aliens" is accomplished by directly regulating employers ("business entities"), employees, landlords and tenants, which are precisely the groups from which plaintiffs hail.

_____

[8] Plaintiffs need not show that the injury has actually occurred; it can be "imminent." *See, e.g., Interfaith Community Org. v. Honeywell Int'l, Inc.*, 399 F.3d 248, 257 (2005), *citing Friends of the Earth v. Gaston Copper Recycling*, 204 F.3d 149, 160 (4th Cir. 2000) ("The Supreme Court has consistently recognized that threatened rather than actual injury can satisfy Article III") (collecting cases).

[9] The District Court also correctly determined that Plaintiffs PSLC and Casa have standing. A35-41. The havoc that the ordinances created in Hazleton's Latino community caused PSLC to expend additional resources, caused Casa to lose members and volunteers, and injured both organizations' members directly. A1135-42, A1171-75, A1322, A1328-31. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (drain on organizational resources sufficient injury for standing).

But for the ordinances, Lozano and Espinal would not have to check immigration status or submit affidavits. The Doe tenants would not have to register. The injunction has prevented these injuries, thereby demonstrating that judicial redress is effective and proper.

Hazleton cannot defeat plaintiffs' standing by arguing that any injury to the plaintiffs is caused, not by the ordinances, but instead by "the independent action of some third party not before the court," such as landlords "unilaterally evicting" tenants or residents filing complaints triggering enforcement action, App. Br. at 20-21, 25.

First, the non-economic, compliance injuries discussed above are caused directly by the ordinances. Those alone suffice to confer standing. Only the economic injuries, such as loss of rental and business income, eviction and employment termination, are indirect. But the "fact that the harm ... may [] result[] indirectly does not in itself preclude standing." *Warth v. Seldin*, 422 U.S. 490, 504-05 (1975) (citations omitted). This Court in *Pitt News*, 215 F.3d at 360-61, rejected a third-party-action argument that mirrors Hazleton's. The Court held that a student newspaper had standing to challenge restrictions imposed on advertisers because "the injury alleged [to the newspaper] ... is fairly traceable to the enforcement of [the statute]." *Id*. The same analysis pertains here. Landlords will evict tenants because landlords are required to check immigration status, and

tenants will leave because they cannot satisfy the registration requirement. Both injuries are "fairly traceable" to the ordinances.

### E. The Prudential Zone-of-Interest Test is Inapplicable, and Clearly Satisfied in any Event

Prudential standing is not jurisdictional but "embodies 'judicially self-imposed limits on the exercise of federal jurisdiction.'" *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004). Hazleton argues that plaintiffs should be denied standing because they cannot demonstrate that their interests are "within the zone of interests intended to be protected by the statute, rule or constitutional provision on which the claim is based." App. Br. at 17.[10]

Hazleton's argument is foreclosed here by this Court's decision in *St. Thomas-St. John Hotel & Tourism Assoc. v. Gov't of the United States Virgin Islands*, 218 F.3d 232 (3d Cir. 2000). *St. Thomas* held that in a Supremacy Clause challenge the pre-empting statute need not confer rights on the party arguing for pre-emption. *Id.* at 241 (employers had standing to claim that Virgin Islands law was preempted by federal statute conferring rights on employees). The only authority Hazleton cites was not a preemption case, does not raise any question

---

[10] The District Court correctly found that plaintiffs satisfied the other prudential standing considerations, even though Hazleton did not raise any contrary arguments below. A51 n. 20. *See Mariana v. Fisher*, 338 F.3d 189, 205 (3d Cir. 2003).

about plaintiffs' standing, and was correctly rejected by the District Court as inapposite. *See* A57-60 (discussing *INS v. Legalization Assistance Project of the L.A. County Fed'n of Labor*, 510 U.S. 1301 (1993) (O'Connor, J., in chambers)).[11]

## II. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY GRANTING DOE PLAINTIFFS LEAVE TO PROTECT THEIR IDENTITIES

The District Court's decision to grant pseudonymity to the Doe plaintiffs and to impose a protective order was correct and cannot constitute an abuse of discretion. *See James*, 6 F.3d at 239 (pseudonymity grants reviewed for abuse of discretion). The decision was based on factual findings that these plaintiffs would face harassment, intimidation, and other negative consequences if their identities were disclosed. Moreover, Hazleton has not shown prejudice, nor could it, as the District Court allowed the City's attorneys to depose the Does.

This Court has regularly adjudicated cases brought by pseudonymous plaintiffs, *e.g., Doe v. Pennsylvania Bd. of Probation and Parole*, 513 F.3d 95 (3d Cir. 2008); *Doe v. Groody*, 361 F.3d 232 (3d Cir. 2004); *Doe v. Colautti*, 592 F.2d

---

[11] Hazleton's remaining prudential-standing argument is also spurious. It relies on an unpublished Oklahoma district court decision that candidly confesses to inventing "a new ... prudential limitation on standing," namely, that "[a]n illegal alien, in willful violation of federal immigration law, is without standing to challenge the constitutionality of a state law." App. Brief at 18-19, 21, citing *National Coalition of Latino Clergy, Inc. v. Henry*, No. 07-CV-613-JHP, 2007 WL 4390650, at *9 (N.D. Okla. Dec. 12, 2007). Neither Hazleton nor the Oklahoma court cites authority supporting that view, and none exists. *See supra*, 28-29.

704 (3d Cir. 1979), without directly addressing the issue. District courts within this circuit have frequently granted such motions, using a case-specific multi-factor balancing test. *E.g., Doe v. Hartford Life and Acc. Ins. Co.*, 237 F.R.D. 545, (D. N.J. 2006); *Doe v. Provident Life and Acc. Ins. Co.*, 176 F.R.D. 464 (E.D. Pa 1997). Other circuits have explicitly approved pseudonymity. *E.g., Doe v. Porter*, 370 F.3d 558, 560-61 (6th Cir. 2004); *Roe v. Aware Woman Ctr. For Choice, Inc.*, 253 F.3d 678, 684-87 (11th Cir. 2001); *Does I Thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1067-73 (9th Cir. 2000); *James*, 6 F.3d at 238-43; *Doe v. Stegall*, 653 F.2d 180, 185-86 (5th Cir. 1981).

Pseudonymity is particularly appropriate where litigants may be exposed to public derision, hostility, or harassment because of their beliefs or practices revealed in the litigation. *E.g., Stegall*, 653 F.2d at 186 (finding pseudonymity warranted where "[e]vidence on the record indicates that the Does may expect extensive harassment and perhaps even violent reprisals if their identities are disclosed to a . . . community hostile to the viewpoint reflected in plaintiffs' complaint");[12] *Porter*, 370 F.3d at 560.[13]

---

[12] Hazleton erroneously cites *Stegall* for the proposition that fear of "public embarrassment" or "hostile public opinion" cannot overcome the need for public disclosure. App. Br at 33. In fact, the *Stegall* court *permitted* pseudonymity based on fear of community retaliation toward vulnerable plaintiffs. 653 F.2d at 186.

The District Court devoted twenty pages to its pseudonymity analysis, which included a careful examination of trial testimony about actual threats and danger to Latinos residing in Hazleton, especially those associated with opposition to the ordinances. A69-89. The court highlighted testimony about the highly inflamed atmosphere in Hazleton after the original IIRA was passed and this lawsuit filed, citing numerous examples, including group confrontations, intimidation, hate mail, threats, and a general "record of hostility" toward those opposed to the ordinances. A69-77. The court found that the Does, "with a more tenuous legal status[,] have an exponentially greater concern [than U.S. citizens] over the danger of participating in a lawsuit that has generated such intense sentiment." A77. The court concluded that pseudonymity was warranted because the Does reasonably feared that disclosing their identities would expose them to "intense anti-immigrant and anti-Latino sentiment," harassment, intimidation, possible deportation, and loss of "basic rights to shelter, education and a livelihood." A69, 72-77. The Doe plaintiffs' reasonable concern for their security and that of their families well justifies the District Court's exercise of discretion.

---

[13] *See also, Choice, Inc. of TX v. Graham*, 226 F.R.D. 545, 548 (E.D. La. 2005); *Doe v. Barrow County, Georgia*, 219 F.R.D. 189, 193-94 (N.D. Ga. 2003); *Doe v. Harlan County School Dist.*, 96 F.Supp. 2d 667, 671 (E.D. Ky. 2000).

Hazleton's further contention that fear of immigration-status disclosure does not justify a grant of pseudonymity ignores the factual record and is unsupported by law. The court found that pseudonymity is appropriate to protect the Doe plaintiffs from an actual threat of harm. Further, other courts have held that immigration status is highly sensitive information that deserves protection,[14] and have granted litigants fearing deportation permission to proceed pseudonymously in order to vindicate constitutional or statutory rights. *See, e.g., Advanced Textile Corp.*, 214 F.3d at 1069; *Javier H. v. Garcia-Botello*, 211 F.R.D 194, 196 (W.D.N.Y. 2002).[15]

Hazleton asserts that protecting the Doe plaintiffs' identities and status from public disclosure was "highly prejudicial" because the "Does' exact immigration status was essential to establishing" Hazleton's defense, App. Br. at 34, but never explains how it was prejudiced. Hazleton's lawyers deposed the Does, learned the Does lacked legal status, and probed the Does' personal backgrounds and life

---

[14] *See, e.g., In re Reyes,* 814 F.2d 168, 170 (5th Cir. 1987); *EEOC v. Restaurant Co.*, 448 F. Supp. 2d 1085, 1087 (D. Minn. 2006); *Avila-Blum v. Casa de Cambio Delgado, Inc.*, 236 F.R.D. 190, 191-92 (S.D.N.Y. 2006); *EEOC v. Bice of Chicago*, 229 F.R.D. 581, 583 (N.D. Ill. 2005).

[15] Hazleton's authority is distinguishable. For example, in neither *Doe v. Merten*, 219 F.R.D. 387 (E.D. Va. 2004), nor *Day v. Sebelius*, 227 F.R.D. 668, 677 (D. Kan 2005), did plaintiffs show extensive potential harm. *National Coalition of Latino Clergy v. Henry*, 2007 WL 4390650 (N.D. Okla. 2007) mentions anonymity but does not provide any analysis.

circumstances in Hazleton. Given the discretion vested in the District Court to decide this matter, the court's extensive review of the evidence and its careful legal analysis, and Hazleton's failure to articulate any prejudice, the grant of pseudonymity should be affirmed.

Nor did the District Court abuse its discretion in directing the parties to enter into a confidentiality agreement. District court judges have wide discretion under the Federal Rules of Civil Procedure to issue protective orders, including those "forbidding the inquiry into certain matters, or limiting the scope of disclosure or discovery to certain matters." Fed.R.Civ.P. 26(c)(1)(D). Nothing in 8 U.S.C. §§1373(a) or 1644 interferes with that discretion. Indeed, should Hazleton's contention be accepted, undocumented aliens could never be protected against exposure and deportation when they seek to vindicate even undisputed constitutional and legal rights.[16]

In any event, even if §1373(a) or §1644 did apply to a trial judge's management of litigation, nothing in the judge's two orders restricts or prohibits Hazleton officials from exchanging "information regarding the ... immigration status ...of any individual," 8 U.S.C. §1373(a), with immigration authorities.

---

[16] *Merten*, cited in App. Br. at 36, does not turn on §§1373(a) or 1644, and did not decide whether either statute "reaches a court's inherent power to control its proceedings." 219 F.R.D. at 395.

Instead, the Court directed the parties "to enter into a confidentiality agreement covering information obtained during discovery," A211, and subsequently permitted the Doe plaintiffs to withhold details "that would allow someone to identify them or their immigration status."[17]

## III. THE DISTRICT COURT PROPERLY HELD THAT THE ORDINANCES ARE PREEMPTED

The supremacy of federal over local or state regulation is a "fundamental principle of the Constitution" embodied in the Supremacy Clause, Article VI, §2. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000). In determining "whether a Federal act overrides a state law, the entire scheme of the statute must of course be considered," and what "must be implied is of no less force than that which is expressed." *Id.* at 373 (punctuation omitted).

Preemption concerns are especially acute in the immigration context because it is an area of uniquely federal responsibility. *Toll v. Moreno*, 458 U.S. 1, 10 (1982). Uniformity is of paramount importance given the "explicit constitutional

---

[17] The parties entered into a confidentiality agreement designating certain information about plaintiffs, including information related to immigration records, "Attorneys' Eyes Only." A692-707. Thus, Hazleton's private counsel were required to withhold limited information about Plaintiffs' immigration status from City officials. Since Hazleton officials never possessed such information, they were never restricted from releasing it. *See Day v. Sebelius,* 227 F.R.D. 668 (D. Kan 2005) (§§1373 and 1644 do not address restrictions on private parties' disclosure of immigration status).

requirement" in Article I, §8 of the Constitution,[18] and the myriad problems that would result for citizens and non-citizens alike if each of thousands of localities like Hazleton were permitted to adopt their own rules for the treatment of aliens. *Graham v. Richardson*, 403 U.S. 365, 382 (1971); *see Zadvydas v. Davis*, 533 U.S. 678, 700 (2001) (recognizing "Nation's need 'to speak with one voice' in immigration matters"); Hines v. Davidowitz, 312 U.S. 52, 66-67, 74 (1941) (invalidating Pennsylvania alien registration law and explaining that laws relating to foreign nationals are intertwined with foreign relations).[19]

A state or local law is conflict preempted if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" or makes it "impossible for a private party to comply with both state and federal law"; field preempted if it operates in an area that Congress intends federal law to occupy; and expressly preempted if federal law so provides. *Crosby*, 530 U.S. at 372-73. The District Court correctly found that IIRA and RO are preempted in

---

[18] *See, e.g.*, David A. Harris, *The War on Terror, Local Police, and Immigration Enforcement: A Curious Tale of Police Power in Post-9/11 America*, 38 Rutgers L. J. 1, 36-37 (2006) (discussing constitutional basis for uniform immigration policy and reluctance of local police to participate in immigration law enforcement).

[19] The Supreme Court has not hesitated to invalidate state laws that are preempted by federal immigration law. *See, e.g., Toll*, 458 U.S. at 9-10 (denial of student financial aid to certain visa holders); *Graham*, 403 U.S. at 377-80 (welfare denial); *Zschernig v. Miller*, 389 U.S. 429 (1968) (restriction on alien's receipt of property); *Hines*, 312 U.S. at 62-68 (Pennsylvania alien registration scheme).

their entireties. The Court held that the ordinances' housing and employment provisions are conflict preempted, and further held that the employment provisions are also expressly and field preempted.

## A. The Housing Provisions Conflict With Federal Law

State or local laws are conflict preempted when they "prevent or frustrate the accomplishment of a federal objective," "whether that obstacle goes by the name of conflicting; contrary to; repugnance; difference; irreconcilability; inconsistency; violation; curtailment; interference, or the like." *Geier v. American Honda Motor Co., Inc.*, 529 U.S. 861, 873 (2000) (punctuation omitted) (quoting *Hines*, 312 U.S. at 67); *Rogers v. Larson*, 563 F.2d 617, 621 (3d Cir. 1977) (invalidating alien employment regulation). "In determining whether [state] law 'stands as an obstacle' to the full implementation of the [federal statute], it is not enough to say that the ultimate goal of both federal and state law [is identical]. A state law also is pre-empted if it interferes with the methods by which the federal statute was designed to reach this goal." *Int'l Paper Co.*, 479 U.S. at 494; *see also Crosby*, 530 U.S. at 373. Both IIRA and RO plainly "stand[] as an obstacle" to Congress' objectives and methods and are therefore conflict preempted.

The Hazleton ordinances' housing provisions would deny residency to – and thereby expel from the community – persons whom the federal government permits to live in the United States. This plain conflict arises because Hazleton's

44

ordinances disregard the content, structure, and operation of federal immigration law, as the District Court explained in detail in its decision. A129-35. On appeal, the City has not challenged the District Court's analysis and has made only a minimal attempt to justify the housing provisions on other grounds.

The District Court found that the housing provisions "are in direct conflict with federal law because they are based upon the assumption that: 1) the federal government seeks the removal of all aliens who lack legal status and 2) 'a conclusive determination by the federal government that an individual may not remain in the United States can somehow be obtained outside of a formal removal hearing.'" A129. The District Court based this conclusion on a careful analysis of federal immigration law, supplemented by expert testimony regarding the practice of federal immigration authorities. *See, e.g.,* A129 n.56 (noting testimony of Professor Stephen Yale-Loehr).

By deeming any alien who currently lacks legal status "illegal" and making their continued rental a violation of law, Hazleton effectively nullifies federal immigration law, policy, and discretion. The federal government routinely allows persons who currently lack lawful immigration status to live in the United States. For example, the Department of Housing and Urban Development allows persons lacking lawful immigration status to nonetheless reside in federally-subsidized rental housing. *See* 24 C.F.R. §5.508(e) (providing that households in which some

but not all family members establish eligible immigration status may nonetheless receive a housing subsidy). *See also, e.g., Zadvydas*, 533 U.S. at 699-702 (requiring release of certain detained non-citizens who lack legal status). Many people who currently lack status may be eligible to adjust to a lawful status and, eventually, become naturalized citizens, as HHBA member Espinal did. *E.g.*, 8 U.S.C. §§ 1158, 1255(i), 1229b(b). And many persons who currently lack status, including those who are awaiting the processing of their applications to adjust to a lawful status like plaintiff Doe 1, are authorized by the federal government to work in, and implicitly to live in, the U.S. *See* 8 C.F.R. §274a.12(c)(8)-(11), (14) (designating categories of persons lacking lawful immigration status who are eligible to receive an Employment Authorization Document). Hazleton's housing provisions ignore and contradict these federal laws and policies.

The housing provisions also disregard the impossibility of determining whether any person must leave the United States without conducting formal removal proceedings. A134-35; *accord Plyler v. Doe*, 457 U.S. 202, 236 (1982) (Blackmun, J., concurring) ("[T]he structure of the immigration statutes makes it impossible for the State to determine which aliens are entitled to residence, and

which eventually will be deported"); *id.* at 241 n.6 (Powell, J., concurring).[20]

Hazleton deems certain aliens "illegal" and unfit to reside in Hazleton solely on the

basis of their *current* status, without a hearing, rendering the federal law and

procedure meaningless. *See* A132-34.

Hazleton does not address or dispute the District Court's analysis of the

fundamental incompatibility between the housing provisions and federal laws. The

City's only defense is a perfunctory assertion that because the ordinances

characterize renting as "harboring" and federal law also includes a prohibition on

"harboring" under certain limited circumstances, they "prohibit the same activity"

and are therefore valid under a "doctrine of concurrent enforcement." App. Br. at

58-59. But that is plainly incorrect; no federal statute deems rental of a dwelling

unit "harboring."[21] *Compare* IIRA §5.A.1 *with* 8 U.S.C. §1324. Moreover, the

_____

[20] Thus, the purported inquiry under 8 U.S.C. §1373(c) relied upon by Hazleton,
IIRA §5.B.3-4, is insufficient under federal law to make a final determination
about an individual's immigration status. *Accord* 65 Fed. Reg. 58,301 (federal
agencies cannot rely on SAVE to determine that an alien is not lawfully present).

[21] Courts have not found simple landlord-tenant relationships to constitute
harboring. *See, e.g., United States v. You*, 382 F.3d 958, 966 (9th Cir. 2004)
("harboring" under §1324 requires a finding that the defendants intended to violate
the law, such as a finding that defendant acted with "the purpose of avoiding [the
aliens'] detection by immigration authorities"); *United States v. Varkonyi*, 645 F.2d
453, 456 (5th Cir. 1981) ("[i]mplicit in the wording [of the harboring statute] is the
connotation that something is being hidden from detection"). Federal law also has

Supreme Court has squarely foreclosed the invention of the doctrine Hazleton

invokes. *See, e.g., Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 379-80

(2000) ( "[t]he fact of a common end hardly neutralizes common means" and

"conflict is imminent when two separate remedies are brought to bear on the *same*

*activity*" (emphasis added); *Wisconsin Dept. of Indus. v. Gould Inc.*, 475 U.S. 282,

286-87 (1986) (invalidating state statute that imposed additional sanction on

companies that violated federal law).[22]

Hazleton's argument actually demonstrates that the housing provisions are

also field preempted by the Immigration and Nationality Act ("INA"), 8 U.S.C.

---

no registration requirement, prohibition on entering into leases, or statutorily
imposed lease conditions comparable to those in Hazleton's ordinances.

[22] The various circuit cases cited by Hazleton likewise do not support the broad
conclusions that the City attributes to them. Those cases concern direct
enforcement of federal law by state officials, not whether states or localities may
pass their own laws on the same subjects. *Lynch v. Cannatella*, 810 F.2d 1363,
1371 (5th Cir. 1987); *Gonzales v. City of Peoria*, 722 F.2d 468, 475 (9th Cir.
1983); *Marsh v. United States*, 29 F.2d 172, 174 (2d Cir. 1928).

The two district court decisions Hazleton relies upon are on appeal and
involve only employment (not housing) statutes. App. Br. at 57-58 (citing *Arizona
Contractors Ass'n v. Candelaria*, No. CV07-2496, 2007 WL 4570322 (D. Az.,
Dec. 27, 2007) and *Gray v. City of Valley Park*, No. 4:07CV00881 ERW, 2008
WL 294294, at *19 (E.D. Mo., Jan. 31, 2008)). Neither supports Hazleton's
argument. The cases wrongly rely on *Gonzales*, which actually "assum[ed] that
the civil provisions of the [INA] ... constitute such a pervasive regulatory scheme,
as would be consistent with the *exclusive* federal power over immigration," 722
F.2d at 474-75 (emphasis added), and therefore suggests that cities cannot pass
their own civil immigration laws. The courts' rulings on employment are flawed
for many of the same reasons set forth below.

§1101 *et seq.* They are field preempted by the INA because they are plainly an attempt to determine who may live in Hazleton, based on immigration status. The INA's overall legislative scheme is devoted precisely to determining who may and who may not live in the United States based on immigration status, and it admits of no state or local vetoes or supplementation. The INA's harboring provision, 8 U.S.C. §1324, further demonstrates that the housing provisions are field preempted. Congress has carefully calibrated and modified the provision's reach and penalties over many years.[23] Field preemption, which the District Court did not address with respect to the housing provisions, thus constitutes an independent basis for affirmance.

## B.     The Employment Provisions Conflict With Federal Law

There are at least two independent grounds for affirming the District Court's ruling that IIRA's employment provisions are preempted. The provisions: 1) conflict with federal law in multiple ways and 2) are expressly preempted by a specific provision of federal law.

Plaintiffs begin with conflict preemption, which is a distinct and independent inquiry from express preemption. The Supreme Court has made clear that the

---

[23] *See United States v. Kim*, 193 F.3d 567, 572-74 (2d Cir. 1999); *United States v. Lopez*, 521 F.2d 437, 440-41 (2d Cir. 1975).

presence of an express preemption clause does not diminish the courts' obligation

to apply ordinary conflict preemption principles. *Geier*, 529 U.S. at 869; *see also,*

*e.g., Barber v. Unum Life Ins. Co. of America*, 383 F.3d 134, 141 (3d Cir. 2004)

(rejecting contention that statute was immunized from conflict preemption simply

because it fell within a savings clause); *accord* A104. Thus, as the District Court

correctly found, even if IIRA's employment provisions were not expressly barred

by federal law, they are nonetheless preempted because they conflict with the

federal employer sanctions system established in the Immigration Reform and

Control Act of 1986 ("IRCA"), P.L. 99-603, 100 Stat. 3359, 8 U.S.C. §§1324a-

1324b, to which we now turn. A125-26.

### 1. IRCA Fundamentally Changed Federal Immigration Law

Both the express and conflict preemption inquires are informed by

Congress's enactment of a comprehensive federal employer sanctions system in

1986 through IRCA. IRCA fundamentally changed federal law by regulating the

employment of aliens, adding penalties for employers who employ unauthorized

aliens and establishing a uniform federal system for verifying the work

authorization of new hires. IRCA created, for the first time, "a *comprehensive*

*scheme* prohibiting the employment of illegal aliens in the United States."

*Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137, 147 (2002) (emphasis

added). President Reagan declared IRCA "the most comprehensive reform of our

immigration laws since 1952." Statement by President Ronald Reagan Upon Signing S. 1200, 22 Weekly Comp. of Pres. Doc. 1534, 1986 USCCAN 5856-1.

IRCA's detailed employment provisions are "a carefully crafted political compromise which at every level balances specifically chosen measures discouraging illegal employment with measures to protect those who might be adversely affected." *Nat'l Ctr. for Immigrants' Rights, Inc. v. INS*, 913 F.2d 1350, 1366 (9th Cir. 1990), *rev'd on other grounds*, 502 U.S. 183 (1991). "Congress intended to minimize the burden and the risk placed on the employer in the verification process." *Collins Foods Int'l, Inc., v. INS*, 948 F.2d 549, 554 (9th Cir. 1991) (citing H.R. Rep. No. 99-682(I) (1986), 1986 USCCAN 5649).

IRCA's balance also reflected serious concerns that employers might, from fear of sanctions, discriminate against lawfully authorized workers who looked or sounded foreign. *See, e.g.*, H.R. Rep. No. 99-682(I) at 68, 1986 USCCAN at 5672 ("Numerous witnesses ... have expressed their deep concern that the imposition of employer sanctions will cause extensive employment discrimination against Hispanic-Americans and other minority group members."); *id.* at 68, 1986 USCCAN at 5694 ("every effort must be taken to minimize the potentiality of discrimination and ... a mechanism to remedy any discrimination that does occur must be a part of this legislation."); *Collins*, 948 F.2d at 554-55; A1508.

Congress balanced all of these concerns in creating IRCA's employment verification system, graduated scale of penalties, complementary anti-discrimination provisions, and extensive adjudicative process. *See* 8 U.S.C. §§1324a, 1324b. Congress explicitly codified its intent that this comprehensive scheme be uniform in the express preemption provision at 8 U.S.C. §1324a(h)(2) and in §115 of IRCA:

> It is the sense of the Congress that − (1) the immigration laws of the United States should be enforced vigorously and *uniformly*, and (2) in the enforcement of such laws, *the Attorney General* shall take due and deliberate actions necessary to safeguard the constitutional rights, personal safety, and human dignity of United States citizens and aliens.

P.L. 99-603 (emphases added); A1508-10.

In light of these critical changes in immigration law, Hazleton's reliance on *DeCanas v. Bica*, 424 U.S. 351 (1976) (App. Br. at 55-56), is unavailing. In 1976, when *DeCanas* was decided, the INA contained no general employer sanctions scheme. Thus, the Court concluded that "absent congressional action," the California law was not an improper "state incursion on federal power." *DeCanas*, 424 U.S. at 356. Ten years later, IRCA fundamentally altered the immigration statute's regulation of employment, filling the federal statutory void on which *DeCanas* hinged, with a comprehensive and *uniform* system. *See Hoffman Plastic*, 535 U.S. at 147. Hazleton's reliance on the *DeCanas* Court's now-outdated

assessments of the INA's relationship to alien employment regulation is therefore misplaced.

### 2. The Employment Provisions Conflict With Federal Law in Multiple Ways

Hazleton's employment provisions conflict with this uniform federal system in at least seven ways. The provisions: (1) bypass IRCA's procedures for determining whether an employer has knowingly hired an unauthorized worker, and provide no comparable alternative; (2) override the employment verification system prescribed by IRCA; (3) subject employers to strict liability, while IRCA requires knowledge; (4) fail to balance sanctions with anti-discrimination provisions; (5) apply to employment activity exempted from IRCA; (6) require businesses to enroll in E-Verify, which federal law makes voluntary; and (7) do not provide employees a cure period after potential problems in their status are initially identified, even though such a period is provided by federal procedures.

(1) Hazleton does not dispute the District Court's conclusion that several aspects of IIRA's enforcement scheme are inconsistent with and contrary to the detailed process Congress set out in IRCA. *See* A116-22. IRCA amended the INA to establish a detailed hearing and adjudication process for determining whether an employer knowingly hired an unauthorized worker. Only complaints with a "reasonable probability of validity" may be investigated. 8 U.S.C.

§1324a(e)(1)(B). There must be notice, an opportunity for an evidentiary hearing before a federal administrative law judge under procedures governed by the federal Administrative Procedure Act, a finding that a knowing violation has occurred based on a preponderance of the evidence, an opportunity for an administrative appeal, and the right to review in the federal Courts of Appeals. 8 U.S.C. §1324a(e)(2)-(3), (7)-(8).

In contrast, under IIRA any superficially valid complaint is investigated and penalties can be imposed without any court proceeding, after a mere inquiry to the federal government pursuant to 8 U.S.C. §1373(c). *See* IIRA, §§4.B(3), 4.B(4), 7.G. The §1373(c) inquiry on which IIRA depends does not address work authorization status. Section 1373(c) accommodates only "citizenship or immigration status" queries and critically, immigration status and employment authorization are distinct under federal law.[24] Even if a §1373(c) query did provide work authorization information, a mere database query cannot substitute for the

---

[24] *See* 8 C.F.R. § §274a.12(c)(8)-(11), (14) (designating categories of persons lacking lawful immigration status who are eligible to receive an Employment Authorization Document).

careful determination, with multiple safeguards, that Congress provided for in IRCA[25]

(2) As the District Court correctly found, the Hazleton verification process conflicts with IRCA's federal employment verification process. A116-18. Hazleton's brief fails to address this fundamental incompatibility.

IRCA established a uniform process – commonly known as the "I-9 process" – to verify the work authorization status of new hires while minimizing the burden on business and lawful workers. Employers are required to verify workers by requesting and examining relevant documents. In conducting that examination, the employer is required only to ensure that the document "reasonably appears on its face to be genuine." 8 U.S.C. 1324a(b)(1)(A)(ii). "Congress did not intend the statute to cause employers to become experts in identifying and examining a prospective employee's employment authorization documents." *Collins*, 948 F.2d at 554. As a key part of the balance that Congress struck, employers who can demonstrate good faith compliance with the I-9 process are entitled to an affirmative defense against a charge that they knowingly hired an unauthorized

---

[25] Hazleton now contends that it will ascertain the work authorization of individuals who are the subject of complaints by using the E-Verify program, *see* App. Br. at 6, but the City can only lawfully use E-Verify to check its own new workers. *See* A2630-31, at ¶¶ 8, 12, 13; A1468-69. Additionally, some aliens may legally work despite records showing that their work authorization has officially expired. *See* 8 C.F.R. §274a.12(b)(13), (14), (20).

alien. 8 U.S.C. §1324a(a)(3). IRCA was designed to limit the risk to businesses acting in good faith – not shutter them.

IIRA attempts to override the I-9 system, disregarding its carefully crafted protections and imposing draconian sanctions upon businesses even if they have complied with federal verification procedures. Under IIRA, an employer who follows federal law by examining a new hire's I-9 documents and determining that they reasonably appear to be genuine is *not* entitled to repose, contrary to Congress' intent. Rather, at any point, Hazleton officials or residents may initiate a complaint-driven procedure that requires the employer to provide "identity information" for the challenged employee and subjects the employer to sanctions based on the result of the §1373(c) query. §4.B.[26]

(3) Hazleton also brushes aside Congress' decision to impose liability on employers only if they acted with knowledge that an employee was unauthorized. Hazleton would subject employers to strict liability by giving disgruntled employees who are terminated, even for cause, a private right of action for treble damages if their former employer employs an unauthorized worker. *See* IIRA

---

[26] IIRA thus goes much further than the Arizona employer sanctions law, which at least purports to incorporate the I-9 defense. Az. Rev. Stat. §23-212(J). The Hazleton law would not pass muster even under the Arizona district court's flawed analysis. *Arizona Contractors Ass'n, Inc. v. Candelaria*, 534 F.Supp. 2d 1036, 1053 (D. Az. 2008).

§4.E. The employer's lack of knowledge is not a defense. The District Court properly found that this conflicts with IRCA (A125-26), and Hazleton's brief has not disputed this.[27]

(4) As the District Court also concluded, IIRA unsettles Congress' policy judgment by creating an enforcement-only scheme that contains no countervailing prohibition on discrimination by employers. A122. In contrast, the federal system sets forth detailed anti-discrimination provisions with separate penalties and sanctions. 8 U.S.C. §1324b. Congress viewed those anti-discrimination protections as a critical complement to IRCA's enforcement provisions. Hazleton has thus undermined the "delicate[] balance[]," *Collins*, 948 F.2d at 554, that Congress sought to achieve. *See, e.g., Rogers*, 563 F.2d at 626 (invalidating alien employment law that "strikes the balance" between multiple statutory objectives differently than Congress did).

(5) IIRA conflicts with federal law because it applies to a much broader range of employment activity than was contemplated by Congress. *See* A118. IIRA requires businesses, individuals, non-profits, and other entities to ensure that any person they "recruit, hire for employment, or continue to employ, or to *permit,*

---

[27] The private right of action is not severable from the remainder of IIRA because, in Hazleton's own words, it is a "necessary complement" to the other sanctions provisions in the ordinance. App. Br. at 88.

*dispatch, or instruct* ... to perform work in whole or part within the City" is an authorized worker. §4.A (emphasis added). The federal prohibition, however, reaches only "hir[ing]" or "recruit[ing] or refer[ring] for a fee, for employment in the United States." 8 U.S.C. §1324a(a)(1)(A). Federal law does *not* require that employers verify the immigration status of certain categories of workers, such as independent contractors and casual domestic workers, and does not apply to entities, such as unions, that refer individuals for employment but without a fee or profit motive. *See* 8 C.F.R. §274a.1(c)-(f); *see also* H.R. Rep. 99-682(I), at 57 (stating that "[i]t is not the intent of this Committee that sanctions would apply in the case of casual hires" and noting an exception for unions and similar entities). IIRA thus encompasses activities that Congress chose not to regulate, including union operations.

Hazleton argues that IIRA's regulation of "business entities" is no broader than federal law. App. Br. at 58, 74-76. That is flatly wrong. IIRA expressly defines "business entity" broadly to include "any person or group of persons performing or engaging in *any activity*, enterprise, profession, or occupation for gain, benefit, advantage, or livelihood, *whether for profit or not for profit."* §3.A (emphasis added). A business entity includes entities that need no business permit. §3.A.2. Hazleton also ignores IIRA's far-reaching description of the activities regulated ("to permit, dispatch, or instruct ... to perform work"). §3.F.

(6) As the District Court correctly concluded, IIRA also conflicts with federal law because it expressly requires enrollment in a program that Congress intentionally made optional. A118-19. Congress enacted E-Verify (then named "Basic Pilot") in 1996. *See* Illegal Immigrant Reform and Immigrant Responsibility Act ("IIRIRA"), §§401, 402(a), Pub. L. No. 104-208, Div. C (Sept. 30, 1996), *codified as amended at* 8 U.S.C. §1324a(e) note.

The statute creating E-Verify specifies that Congress wished to give employers a *choice* about whether or not to participate in E-Verify: "any person or other entity that conducts any hiring (or recruitment or referral) . . . *may elect* to participate in that pilot program," and the government "*may not require* any person or other entity to participate in a pilot program." IIRIRA §402(a) (emphases added). *See also* IIRIRA §402 (entitled "Voluntary election to participate in a pilot program"); *id.* §402(e) (listing "[s]elect entities required to participate").[28]

Yet, IIRA mandates that in certain circumstances businesses *must* enroll in E-Verify, §§4.B.6(b), 4.D., and even where it does not so require, subjects businesses to the risk of exorbitant penalties if they fail to enroll, §§4.B.5, 4.E.

_____

[28]Congress later declined to include a provision that would give state and local governments access to E-Verify. *See* 149 Cong. Rec. H 11582-01 (Nov. 19, 2003) (statement of Rep. Jackson-Lee) ("I am pleased to note that the Senate removed a provision that would give State and local governments access to the information collected with this program.").

IIRA's attempt to force employers to enroll in E-Verify is incompatible with Congress' explicit intent that participation be voluntary.[29] *Geier,* 529 U.S. at 875, 881 (concluding that where federal law "deliberately provided manufacturers with a range of choices," state tort claim that car manufacturer was required to provide an air bag was preempted because the state claim "would have would have presented an obstacle to the variety and mix of devices that the federal regulation sought").

Hazleton's argument that IIRA's mandate is permissible because the federal government plans to require certain *federal* contractors to enroll in the program misses the point. The federal government may decide to impose mandates on some, but it has decided to give others a choice. Hazleton may not override that decision. Moreover, Hazleton seeks to coerce all businesses in the City – not just those seeking City contracts – to enroll by creating the incentive of not one but *two*

---

[29] Mandatory electronic employment verification is a subject of ongoing congressional debate. *See* S. 1033, 109th Cong., §402; S. 1438, 109th Cong., 321. The trial record confirms that there is good reason for hesitation. E-Verify is riddled with problems. A1523. For instance, it suffers from high levels of erroneous tentative non-confirmations that disproportionately affect non-citizens and naturalized citizens. A1515-19, 1538.

Hazleton's unilateral decision to compel E-Verify use short-circuits national debate and is contrary to Congress' judgment as expressed in the statute. Citation to Secretary Chertoff's remarks is improper and irrelevant. *See* App. Br. at 64 (citing statements not in trial court record but improperly included in Appendix); F.R.A.P. 30(a)(1)(D) (appendix to include "parts of the record").

separate safe harbors. *See* §§4.B.5; 4.E. *Cf. Gen'l Electric Co. v. EPA*, 290 F.3d 377, 383 (D.C. Cir. 2002) (rule is "binding as a practical matter" "if ... private parties can rely on it as a norm or safe harbor by which to shape their actions"). Hazleton's E-Verify requirement is directly contrary to federal law. To uphold it would utterly eviscerate any form of implied conflict preemption.

(7) The procedures dictated by IIRA also conflict with E-Verify procedures. A118-20. Under E-Verify an employee who receives a "tentative nonconfirmation" is entitled to an eight-day period to challenge that finding, during which the employer is prohibited from taking action to terminate the employee. 62 Fed. Reg. 48,309, 48,312-13. Under IIRA, an employer may terminate an employee within 3 days of the City receiving a response from the federal government pursuant to 8 U.S.C. §1373(c). Ordinance §4.B.3. Only *after* termination can the employee challenge the finding, and then only by bringing suit in local court. Ordinance §7.C.3.

Hazleton argues incorrectly that its procedure does not conflict with the federal system because the City's three-day period begins running only after a *final* non-confirmation is received from E-Verify. App. Br. at 71-72. This argument confuses Hazleton's inquiry to the federal government under 8 U.S.C. §1373(c) with the response an employer would receive under e-Verify. E-Verify simply is

not available to the City for verification of individuals employed by other entities. *See supra*, n.25.

### 3. Hazleton Relies on an Erroneous Legal Standard

Instead of addressing or refuting these conflicts, Hazleton argues that they should not matter. App. Br. at 69-76. In addition to its reliance on the unsustainable "doctrine of concurrent enforcement," supra, 47, 48. Hazleton erroneously insists that inconsistencies between "the wording or processes" of local and federal statutes result in preemption "*only* if 'compliance with both State and federal law is impossible.'" App. Br. at 68 (emphasis added) (citing, *inter alia, Arizona Contractors, supra*); *see also* App. Br. at 69.[30] That is not the law.

"Obstacle" conflicts invalidate ordinances as surely as "impossibility" conflicts do. *Geier*, 529 U.S. at 873 ("both forms of conflicting state law are nullified by the Supremacy Clause" (punctuation and citation omitted)); *see also, e.g., Crosby*, 530 U.S. at 373-74; *Penn. Empl. Ben. Trust Fund v. Zeneca, Inc.*, 499 F.3d 239, 249-252 (3d Cir. 2007); *C.E.R. 1988, Inc. v. Aetna Casualty and Surety Company*, 386 F.3d 263, 270 (3d Cir 2004) (finding preemption where "application of state tort law would *impede* Congress's objectives") (emphasis added); *Rogers*, 563 F.2d at 626.

---

[30] Appellant cites the "obstacle" test elsewhere (*see* App. Br. at 60), but fails to apply it.

Hazleton also fundamentally misconstrues *DeCanas* by asserting that the case "made it perfectly clear that state and local governments have wide latitude to enact regulations affecting immigration without being displaced through implied conflict preemption." App. Br. at 55. To the contrary, *DeCanas* specifically did *not* decide whether the California law before it was conflict preempted. It left that question "open for inquiry on remand." 424 U.S. at 358, 363-65; *see also Bevles Co., Inc. v. Teamsters Local 986*, 791 F.2d 1391, 1394 (9th Cir. 1986) (recounting subsequent history). Moreover, as discussed *supra*, IRCA fundamentally altered the predicate on which *DeCanas* depended.

Hazleton also cites to a grab-bag of other federal statutes to support its assertions that Congress wishes to "maximiz[e] state and local assistance in immigration enforcement" (App. Br. at 60) and that Hazleton's ordinances are therefore legal. App. Br. at 60-65. In fact, these laws demonstrate that Congress has carefully defined specific circumstances in which states and localities are authorized to consider immigration status and provided tools and procedures to allow such participation. *E.g.*, 8 U.S.C. §§1621(a) (public benefits), 1357(g) (state and local immigration enforcement pursuant to intergovernmental agreement); *see also* 8 U.S.C. §§1252c(a), 1324(c) (providing state and local police authority to make arrests for certain immigration crimes). None of these statutes even remotely hints at authorizing local immigration ordinances like Hazleton's. Rather, the

careful and specific manner in which the federal government has authorized

limited state and local participation makes clear that there is no general invitation

for cities to make their own immigration laws.

Finally, Hazleton's invocation of a "presumption against preemption" is

misplaced. App. Br. at 36-39. The Supreme Court has instructed that "an

'assumption' of nonpre-emption is not triggered when the State regulates in an area

where there has been a history of significant federal presence." *United States v.*

*Locke*, 529 U.S. 89, 108 (2000). Immigration is an area where federal interests are

both well-established and particularly strong, and the ordinances address issues

central to federal immigration law. There is no basis for applying a presumption

against preemption in this case. Hazleton's argument to the contrary relies on a

district court opinion, a single-justice concurrence, and a dissent. *See* App. Br. at

37-38 (citing *Gray v. City of Valley Park*, No. 4:07CV00881, 2008 WL 294294

(E.D. Mo. Jan. 31, 2008); *Gade v. National Solid Wastes Management Ass'n*, 505

U.S. 88, 111-12 (1992) (Kennedy, J., concurring); *Cipollone v. Liggett Group, Inc.*,

505 U.S. 504, 524 (1992) (Blackmun, J., dissenting)). None of these sources can

overcome the controlling, majority opinion in *Locke,* which Hazleton fails entirely

to mention, much less distinguish. In any case, as the District Court held, IIRA

and RO are preempted regardless of any presumption. *See* A96-97 n.41.

## C.   The Employment Provisions are Expressly Preempted

The employment provisions of IIRA are also preempted on the separate and independent ground of express preemption. In IRCA's carefully balanced, comprehensive, and uniform scheme, Congress codified its intent to displace state and local employer sanctions laws through an express preemption clause, which provides: "The provisions of this section preempt any State or local law imposing civil or criminal sanctions (other than through licensing and similar laws) upon those who employ, or recruit or refer for a fee for employment, unauthorized aliens." 8 U.S.C. §1324a(h)(2). The District Court correctly found that IIRA's employment provisions impose civil sanctions based on a City determination. A100-01. The Act is therefore expressly preempted, unless it fits within the savings clause for "licensing [or] similar laws."

The District Court properly rejected Hazleton's reliance on the savings clause in §1324a(h)(2). Courts must "decline to give broad effect to saving clauses" in preemption statutes where, as here, a broad reading "would upset the careful regulatory scheme established by federal law." *Locke*, 529 U.S. at 106; *see also Aetna Health Inc. v. Davila*, 542 U.S. 200, 217 (2004); *Geier*, 529 U.S. at 870-71.

The Supreme Court has emphasized that a savings clause to a preemption provision must be read in light of the statutory scheme as a whole. *Pilot Life Ins.*

*Co. v. Dedeaux*, 481 U.S. 41, 51-52 (1987); *accord Omega World Travel, Inc. v. Mummagraphics, Inc.*, 469 F.3d 348, 355 (4th Cir. 2006) (rejecting "reading of [a] preemption clause [that] would . . . turn an exception to a preemption provision into a loophole so broad that it would virtually swallow the preemption clause itself" because to do so "would undermine Congress' plain intent").

The District Court properly recognized that Hazleton's reading of the parenthetical savings clause in §1324a(h)(2) would rob that section of any practical meaning and would upset Congress' clear attempt to create a uniform federal employer sanctions scheme. A100. IRCA's language, structure, purpose, and relationship to other statutes confirm that Congress intended to preempt state and local employer sanctions schemes such as Hazleton's. As the District Court determined, Congress chose to allow only a narrow range of measures that are both (1) predicated on a *federal* finding under IRCA's procedures that an employer has hired an unauthorized alien and (2) part of a bona fide licensing law.

Hazleton relies heavily (App. Br. 40-42, 44-45) on two district court opinions in cases currently under appeal, *Arizona Contractors* and *Gray*. Neither Arizona nor Valley Park goes as far as Hazleton's scheme,[31] and in neither case did

---

[31] The Arizona and Valley Park laws address only employment, and neither includes a private right of action for discharged employees. Further, the Arizona

the court conduct an extensive trial with live testimony from fact and expert witnesses, as the District Court did here. Moreover, these opinions share numerous analytical flaws: they apply a mistaken presumption against preemption, misread §1324a(h)(2), and disregard the comprehensive and balanced federal employer sanctions system, Congress' expressed desire for uniformity, and the Supreme Court's admonition that preemption savings clauses are to be read narrowly and in light of the statute as a whole.

As we explain in detail below, the Court should reject Hazleton's attempt to transform a narrow parenthetical exception into a sweeping grant of authority for states and localities to create their own broad employer sanctions enforcement schemes.[32]

### 1. The Savings Clause Does Not Authorize Sanctions Without a Federal IRCA Determination

Nothing in the language of the parenthetical savings clause authorizes municipalities to create their own adjudication and enforcement systems in which City officials make determinations about alien employment that are untethered to

---

law, unlike Hazleton's, purports to include an affirmative defense for good faith compliance with the I-9 process.

[32] The employment provisions are also field preempted because they are squarely within the field that Congress sought to occupy with the IRCA's comprehensive employer sanctions law. The fact that they are within the ambit of the express preemption provision confirms this fact and renders separate discussion of field preemption unnecessary.

any federal IRCA adjudication. Nor could such a reading be reconciled, as the law requires, with "the statute as a whole" and "its object and policy." *Crandon v. United States*, 494 U.S. 152, 158 (1990); *see Pilot Life Ins. Co*, 481 U.S. at 51. The District Court correctly recognized that Hazleton's failure to require a federal finding is one reason that the employment provisions are not covered by the savings clause. A101-02.

IRCA's statutory scheme makes clear that a federal finding is required. Congress sought in IRCA and §1324a(h)(2) to create a uniform, comprehensive, federal regulatory system with detailed procedures for deciding which employers may be sanctioned for hiring unauthorized aliens. *Supra*, 50-56. The savings clause does not entitle localities to find violations independently of the careful IRCA process Congress established in 8 U.S.C. § 1324a(e). The parenthetical savings clause cannot be read as silently authorizing the creation of hundreds or thousands of divergent local procedures and systems.

*Locke* is particularly instructive here. *Locke* concerned whether a savings clause permitting states to impose "additional liability or requirements" pertaining to "the discharge of oil or other pollution by oil within [a] [s]tate" allowed states to regulate the at-sea conduct of ships. 529 U.S. at 104. Before resolving the scope of the savings clause, the Court analyzed the comprehensive federal scheme regulating maritime commerce and conduct of ships. *Id.* at 99-103. Because of

68

this comprehensive federal regulation, the Supreme Court rejected a broad interpretation, finding that it was "quite unlikely that Congress would use *a means so indirect as the saving clauses* in [the statute] to upset the settled division of authority by allowing States to impose additional unique substantive regulation on the at-sea conduct of vessels." *Id.* at 106 (emphasis added); *see also Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 494 (1987) ("[W]e do not believe Congress intended to undermine this carefully drawn statute through a general saving clause").

The same analysis applies here. Contrary to Hazleton's assertions, it is inconceivable that Congress would intend a seven-word parenthetical to authorize a multiplicity of divergent adjudicatory systems that would negate IRCA's regulatory scheme. The District Court properly considered that fact when interpreting the savings clause. (A97-104). If Hazleton's view were to prevail, each state, city, and town could create its own process for determining whether an employer has hired an unauthorized alien and Congress' carefully-crafted system would be destroyed. An employer could be hauled into multiple fora – at the federal, state, and municipal levels – each with its own court system, procedures, and case law and each imposing its own penalties. The chaos that would result from this patchwork system is the opposite of what Congress intended.

As different schemes multiply, the web of conflicting requirements grows.[33]

Courts have repeatedly interpreted express preemption provisions to invalidate

laws that result in such divergent regulation. *See, e.g., Rowe v. New Hampshire*

*Motor Trans. Ass'n*, 128 S.Ct. 989, 996 (2008) (state law that would "easily lead to

a patchwork of state service-determining laws, rules, and regulations" expressly

preempted); *Watters v. Wachovia Bank N.A.*, 127 S.Ct. 1559, 1568 (2007).

## 2. The Employment Provisions do not Constitute a Permissible Licensing Law

Furthermore, IIRA does not fit within the licensing clause because it is not a

"licensing [or] similar law." *Cf. Pilot Life Ins.*, 481 U.S. at 50-51 ("common-sense

understanding" of savings clause does not encompass state-law action at issue).

Even after numerous amendments, it still does not purport to be a licensing law, or

anything similar. Its title and "Findings and Declaration of Purpose" make no

reference to licensing or licenses, and confirm instead that it is intended to regulate

---

[33] Several states and many municipalities have followed Hazleton's lead and passed, or are considering, laws sanctioning the employment of unauthorized aliens. *See, e.g.*, Tenn. Code §50-1-103; La. Rev. Stat. §23:996; W. Va. Code §21-1B; Mississippi Employment Protection Act of 2008, S.B. 2988, 2008 Reg. Sess. (Miss. 2008); Oklahoma Taxpayer and Citizen Protection Act of 2007, H.B. 1804, 51st Leg., Reg. Sess. (Okla. 2007); Az. Rev. Stat. §§23-211 to 23-214 (Supp.2007).

immigration.[34] IIRA does not establish qualifications or provide standards for licensing any particular industry's activities, it does not refer to any existing licensing provisions, and it applies to entities that do not require business licenses. Its purpose is to impose a general prohibition on the employment of unauthorized workers, not to impose particular conditions as part of a licensing or "fitness to do business" law. *See* A103 ("IIRA is aimed at preventing employers from hiring undocumented aliens.").

Hazleton's conclusory assertion that IIRA is "obviously permitted," App. Br. at 40, stretches the phrase "licensing law" beyond its broadest limits, without regard to common sense limitations on that phrase, the context in which Congress acted, or the nature of IIRA itself. *Cf. Locke*, 529 U.S. at 106 (savings clause should not be read broadly). If Hazleton's construction is adopted, any entity could trump Congress' preemption provision through the artifice of labeling some part of the law a "license."

Finally, as the District Court found, IIRA's private right of action is a further ground for invalidating the ordinance. A103. Hazleton's argument that only

---

[34] *See* §2.F ("This ordinance seeks to secure to those lawfully present ...the right to . . . be free of the debilitating effects on their economic and social well being imposed by the influx of illegal aliens to the fullest extent that these goals can be achieved consistent with the Constitution and Laws of the United States and the Commonwealth of Pennsylvania.")

monetary fines are "sanctions" and that a cause of action cannot be characterized as a "sanction" (App. Br. at 50), is contrary to this Court's construction of the term.[35]

### 3. IRCA's Text Amending Other Provisions and its Legislative History Reinforce That the Employment Provisions are Expressly Preempted

IRCA's legislative history and interaction with other statutes confirm the District Court's conclusion that Congress intended IRCA to preempt all but a narrow category of state licensing laws that does not include Hazleton's ordinances. The District Court properly considered IRCA's legislative backdrop given that Congress left the key phrase – "licensing and similar laws" – undefined.

In IRCA, Congress was directly concerned with the interaction between the new employer sanctions system and existing licensing laws regulating farm labor contractors ("FLCs"). Accordingly, in the subsection of IRCA immediately following the new employer verification scheme (§101(a)), Congress amended the Migrant and Seasonal Agricultural Worker Protection Act ("AWPA"). P.L. 99-

---

[35] *See, e.g., Bowers v. National Collegiate Athletic Ass'n*, 475 F.3d 524, 544, n.20 (3d Cir. 2007) ("Let us be perfectly clear. Sanctions are not limited to monetary imposts."); *Tracinda Corp. v. DaimlerChrysler AG*, 502 F.3d 212, 241 n.20 (3d Cir. 2007) (federal rules "authorize a district court to impose a variety of non-monetary litigation sanctions (including dismissing the case, striking claims or defenses, and barring evidence)").

603, 100 Stat. 3359, §101(b) (1986), note following 29 U.S.C. §1801 *et seq.*.

AWPA was (and still is) the federal law regulating the licensing of FLCs.

Until IRCA's enactment in 1986, AWPA contained an affirmative

prohibition on employment of unauthorized aliens by FLCs. P.L. 97-470, §106

(then codified at 29 U.S.C. §1816). By 1986, several states had adopted their own

FLC licensing or registration schemes, which were authorized by AWPA's

provision allowing "appropriate" state regulation, 29 U.S.C. §1871. Some state

schemes prohibited hiring unauthorized workers or specifically required FLCs to

comply with federal law, including AWPA's prohibition on employing

unauthorized workers.[36]

IRCA integrated the existing federal and state FLC licensing schemes with

the new federal employer sanctions system. It did so by requiring a *federal IRCA*

*finding* as the basis for enforcing both AWPA and the state licensing laws AWPA

authorized. To accomplish that end, Congress repealed AWPA's general

prohibition on FLCs' hiring unauthorized workers and replaced it with a provision

---

[36] For example, California, New Jersey, and Pennsylvania had such laws. Cal. Lab. Code §1690(6) (1985); N.J.S.A. §34:8A-11 (1975); 43 P.S. § 1301.501 *et seq.* (1983). Pennsylvania's "registration" law required FLCs to obtain a state certificate of registration, prohibited FLCs from knowingly engaging the services of a person violating the federal immigration laws, and provided that the state could refuse to issue, suspend, or revoke a certificate when any provision of the law was violated. 43 P.S. § 1301.505(1) & (3) (1983).

specifically requiring a finding under IRCA. P.L. 99-603, 100 Stat. 3359, §101(b)(B) (inserting reference to 8 U.S.C. §1324a, (C) (striking general prohibition).

Congress intended §1324a(h)(2) to have the same effect with regard to the existing state farm labor contractor laws. As the House Judiciary Committee Report confirms, the purpose of IRCA's preemption provision is to bar state and local laws – leaving only a narrow category of regulations whose sanctions are, like FLC licensing laws, *based on a federal finding of an IRCA violation*:

> The penalties contained in this legislation are intended to specifically preempt any state or local laws providing civil fines and/or criminal sanctions on the hiring, recruitment or referral of undocumented aliens.
>
> They are not intended to preempt or prevent lawful state or local processes concerning the suspension, revocation or refusal to reissue a license to any person who has been *found to have violated the sanctions provisions in this legislation*. Further, the Committee does not intend to preempt licensing or 'fitness to do business laws,' *such as state farm labor contractor laws or forestry laws*, which specifically require such licensee or contractor to refrain from hiring, recruiting or referring undocumented aliens.

H.R. Rep. No. 99-682(I) at 58, 1986 USCCAN at 5662 (emphases added).[37]

―――――――――――

[37] FLC licensing law often applies to the forestry context as well. *See Bracamontes v. Weyerhaeuser Co.*, 840 F.2d 271 (5th Cir. 1988).

The House Report underscores what IRCA itself establishes: Congress

intended that *any* sanction, even under a *federal* licensing law, must await

completion of the IRCA sanctions process, and a federal finding that the employer

has violated IRCA. That is the only procedure consistent with Congress'

enactment of a single, uniform procedure for enforcing employer sanctions.

The Report also confirms that Congress specifically had in mind laws

governing FLCs in creating the parenthetical savings clause, and that such

licensing laws could contain affirmative prohibitions on employment of

unauthorized aliens so long as sanctions were imposed only after a federal finding.

The laws in place at the time were *licensing* laws that established a state scheme to

regulate a specific industry; set forth qualifications for doing business in that

industry; imposed obligations relevant to that industry; and empowered a state

licensing authority to assess an applicant's qualifications, issue and renew licenses,

monitor compliance, and impose sanctions for noncompliance. *Supra*, n.36.

Hazleton's IIRA does not resemble these laws in the slightest.

\* \* \*

Although the District Court ruled that the ordinances do not infringe on the

exclusive federal power to regulate immigration generally, A112 n. 45 (citing

*DeCanas*), plaintiffs submit that the ordinances together set forth a broad and

integrated scheme that combines multiple provisions addressing different areas –

tenant registration, housing, and employment – to single out a group of immigrants and expel them from Hazleton. No court has ever allowed states or municipalities to regulate immigration in this manner. Making rules about who may stay and who must depart, and effectuating that departure, is the very core of immigration regulation.

Admittedly copied wholesale from a very different city in a very different place – San Bernardino, California – IIRA is not a regulation that "focuses directly upon … essentially local problems," nor does it have "some purely speculative and indirect impact on immigration," *DeCanas*, 424 U.S. at 355, 357. Hazleton seeks to intrude into the sphere of immigration law and policy because of its disagreement with Congress' choices and methods.[38] The City's interference with a core federal prerogative is unmistakable.

## IV.   THE DISTRICT COURT CORRECTLY HELD THAT IIRA VIOLATES DUE PROCESS

IIRA fails to provide even rudimentary process before depriving persons of property and liberty. The District Court properly applied the two-step

---

[38] On June 22, 2007, the Pennsylvania Bar Association House of Delegates approved a resolution supporting federal government enforcement of immigration laws and immigration reform legislation, and opposing local or state laws regulating immigration.

test established by the Supreme Court for examining procedural due process claims:

> [T]he first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient.

*Kentucky Dep't of Corrections v. Thompson*, 490 U.S. 454, 460 (1989) (citations omitted). The District Court correctly found that plaintiffs have protected interests in business, employment and housing. A137, A145-46. Hazleton does not—and cannot—claim otherwise.[39] The City challenges only the District Court's holding that IIRA fails to provide constitutionally adequate procedural protections. *See* A143-45, 148-50.

## A.    IIRA Denies an Adequate Hearing

IIRA is facially invalid because it fails to provide a constitutionally adequate hearing for *any* affected individual, in *any* case. IIRA provides no hearing before revocation or denial of a business permit, landlord's license, employment, or housing. "An essential principle of due process is that a deprivation of life, liberty, or property be *preceded by* notice and opportunity for hearing appropriate to the

---

[39] Deprivations of employment, business, and housing necessarily implicate liberty and property interests. *E.g.*, *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541, 543 (1985); *States v. James Daniel Good Real Property*, 510 U.S. 43, 53-54 (1993); *Greene v. Lindsey*, 456 U.S. 444, 450-51 (1982); *College Savings Bank v. Florida Prepaid Postsecondary Educ. Exp. Bd.*, 131 F.3d 353, 361 (3d Cir. 1997), *aff'd*, 527 U.S. 666, 675 (1999).

nature of the case." *Loudermill*, 470 U.S. at 542 (internal quotation marks omitted) (emphasis added).[40]

Hazleton contends that IIRA's requirement that employers and landlords submit "identity information" to the City in response to a complaint satisfies the constitutional requirement of a predeprivation "hearing." App. Br. at 79-80, 82. It is undisputed, however, that this interaction does not include the employee or tenant, so it cannot possibly substitute for a hearing with respect to those parties. Moreover, even with respect to landlords and employers, a processless, unilateral interaction in which an individual is compelled to submit information without any opportunity to examine and respond to the evidence or present witnesses does not qualify as a hearing. *See Loudermill*, 470 U.S. at 546 (at minimum, individual is "entitled to … an explanation of the … evidence, and an opportunity to present his side of the story"); *Fraternal Order of Police Lodge No. 5 v. Tucker*, 868 F.2d 74, 80 (3d Cir. 1989) ( "[A] *sina qua non* of a meaningful hearing is a sufficient explanation of the … evidence to permit a meaningful response.").

---

[40] On appeal Hazleton for the first time asserts that a predeprivation hearing is not required where a business license is at issue, citing an unpublished opinion. *See* App. Br. at 82 (relying on *Tanasse v. City of St. George*, No. 97-4144, 1999 WL 74020 (10th Cir. Feb. 17, 1999)). That case actually ruled that a *further* predeprivation hearing was not required because the plaintiffs had already had their day in court prior to the suspension of the business license.

The testimony at trial confirms that IIRA provides no pre-deprivation process. Mayor Barletta was unable to identify any Hazleton administrative process that provides aggrieved workers, business entities, landlords, or tenants an opportunity to contest adverse findings before consequences are imposed. A1459-61. Trial testimony also confirmed that an employer who fails to respond to a complaint or a finding of a violation would automatically face license suspension. *See, e.g.*, A1451; A1459, § 4.B.3 (employer would have to fire the employee within 3 days or face permit suspension).

At most, IIRA allows a *post*-deprivation hearing *after* the individual has been subject to "a complaint and *subsequent enforcement*." IIRA §7.F (emphasis added). Aggrieved parties under either the employment or housing provisions may file an action with the District Magistrate, with a right of appeal to the Luzerne County Common Pleas Court. The court is bound by a "rebuttable presumption" that the federal status determination pursuant to 8 U.S.C. §1373 is correct. IIRA §5.F; A1479. This post hoc procedure does not satisfy due process.

Moreover, the subsequent hearing is itself constitutionally deficient because the local court is unable to adjudicate the critical fact – work authorization status for the employment provisions or immigration status for the housing ordinance – questions that are entrusted exclusively to the federal government. Where deprivation turns on "an important factor," "the State may not, consistently with

due process, eliminate consideration of that factor in its prior hearing." *Bell v.*
*Burson*, 402 U.S. 535, 541 (1971).

As the District Court correctly found, the courts of Luzerne County lack
jurisdiction to make determinations regarding immigration status or unauthorized
employment. A144-45 (hearing before a federal immigration judge "is the sole
and exclusive procedure for determining whether an alien may be admitted to the
United States or, if the alien has been so admitted, removed from the United
States"); 8 U.S.C. §1229a(a)(3). Only the federal government is empowered to
adjudicate an individual's right to remain in the U.S., and even for the federal
government a database query cannot determine that an alien is not lawfully
present.[41] *Supra*, 45-46. Likewise, only the federal government is empowered to
determine, under the detailed procedures set forth in IRCA, whether an employer
has unlawfully employed an unauthorized alien. Title 8 U.S.C. §1373(c), on which
Hazleton would rely, cannot make that determination and is not a substitute for the
IRCA procedures. *Supra*, n.20. In any event, under no standard of due process

---

[41]  Hazleton relies on a concurring and dissenting opinion in a 20-year-old Arizona
state court case for the proposition that state courts can determine a person's
immigration status. The majority in *Arizona Farmworkers Union v. Phoenix
Vegetable Distributors*, 747 P.2d 574, 575 n.1 (Az. Ct. App. 1987), however,
explicitly declined to "decide whether a state court possesses the capacity or
expertise to make such a determination."

could a mere database query be used as a conclusive determination of a critical fact in an enforcement proceeding.

### B.  IIRA Fails to Provide Adequate Notice to Tenants and Employees

The District Court also properly concluded that IIRA fails to provide tenants and employees with any, much less sufficient, notice before depriving them of protected interests. A139, A148.[42] The text of IIRA does not provide for any notice to affected employees or tenants. *See* IIRA §4.B.3.; A1453 (no notice to employee required of either the complaint or the verification results); IIRA §5; A1843-44 (no requirement of notice to the aggrieved tenant that his or her verification has been rejected).

Nor does third party or constructive notice suffice, as Hazleton claims, App. Br. at 81. It is black-letter law that notice must be *actual* and *sufficient*. *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 315 (1950); *Taylor v. Westly*, 488 F.3d 1197, 1201 (9th Cir. 2007) (per curiam) (third-party notice likely cannot substitute for notice by the state).

_____

[42] Attempting to distract from IIRA's failure to provide notice, Hazleton contends the federal E-Verify program shares the same flaw. App. Br. at 81-82. The E-Verify procedures, however, have no bearing on whether Hazleton's enactment comports with constitutional due process requirements.

### C. The Standard for Facial Challenges Makes no Difference in This Case Because IIRA is Procedurally Deficient in Every Circumstance

Despite the obvious constitutional flaws in the procedures provided by IIRA on its face, Hazleton argues that the District Court nonetheless erred because it did not discuss a standard for facial challenges articulated in *United States v. Salerno*, 481 U.S. 739, 745 (1987). *See id.* ("A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid."). But the District Court had no need to discuss *Salerno* because, as plaintiffs have demonstrated above, IIRA is constitutionally invalid in all of its applications.

Further, the *Salerno* dicta has been repeatedly criticized by members of the Supreme Court, and the proper standard for evaluating facial challenges remains unsettled. *E.g., City of Chicago v. Morales,* 527 U.S. 41, 55 n. 22 (1999) (plurality opinion) ("To the extent we have consistently articulated a clear standard for facial challenges, it is not the *Salerno* formulation, which has never been the decisive factor in any decision of this Court").

Accordingly, courts often address facial challenges without reference to the controversial *Salerno* formulation. For example, in *Washington v. Glucksberg*, 521 U.S. 702 (1997), a facial due process challenge to a state criminal statute, the

Supreme Court conducted its analysis without making any reference to *Salerno* or to any other standard for facial challenges. *See also id.* at 740 (Stevens, J., concurring) (noting Court's failure to apply *Salerno* test in that case and stating, "I do not believe the Court has ever actually applied such a strict standard, even in *Salerno* itself"). Likewise, although the Third Circuit has on occasion quoted *Salerno*, it has in other cases adjudicated facial due process challenges without reference to the *Salerno* formulation. *E.g., Dia v. Ashcroft*, 353 F.3d 228 (3d Cir. 2003) (en banc) (examining facial validity, under the Due Process Clause, of federal immigration regulation without citing or discussing *Salerno*); *Government of the Virgin Islands v. Parrilla*, 7 F.3d 1097 (3d Cir. 1993) (concluding that criminal statute imposing mandatory presumption was unconstitutional on its face, even though presumption would be permissible in some cases).

## V. THE DISTRICT COURT CORRECTLY HELD THAT RO AND IIRA VIOLATE §1981

The District Court properly concluded that RO and § 5 of IIRA discriminate on the basis of alienage in violation of 42 U.S.C. §1981.[43] A170-74. Hazleton

---

[43] An additional ground for affirming the District Court's decision is that IIRA discriminates on the basis of race, ethnicity, and national origin in violation of the Fourteenth Amendment Equal Protection Clause. A150-60. Appellants disagree with the District Court's dismissal of this claim, but do not address the issue further here due to space limitations.

challenges the District Court's holding on three specific grounds (App. Br at 83-86), all of which are erroneous.

### A. The District Court Properly Concluded That §1981 Prohibits Alienage Discrimination

Contrary to Hazleton's contention (App. Br. at 84-85), the District Court properly concluded that 42 U.S.C. §1981 prohibits alienage discrimination by a governmental entity. *See* A170 n.74 (setting out statute). As the Supreme Court found long ago, §1981 "and the Fourteenth Amendment on which it rests in part protect 'all persons' against state legislation bearing unequally upon them *either because of alienage or color*." *Takahashi v. Fish & Game Comm'n*, 334 U.S. 410, 419-20 (1948) (emphasis added); *see also Graham,* 403 U.S. at 377. That is so because the statute provides that "all persons" shall have the same enumerated rights as "white citizens." It is well-settled that §1981 prohibits governmental alienage discrimination—the only question is whether it also prohibits *private* alienage discrimination. *See Sagana v. Tenorio*, 384 F.3d 731, 739 (9th Cir. 2004) ("It is settled that §1981 prohibits governmental discrimination on the basis of alienage."); *accord Anderson v. Conboy*, 156 F.3d 167, 175 (2d Cir. 1998); *Duane v. GEICO*, 37 F.3d 1036, 1040 (4th Cir. 1994); *Bhandari v. First Nat'l Bank of Commerce*, 829 F.2d 1343, 1348 (5th Cir. 1987), *vacated*, 492 U.S. 901, *reinstated*, 887 F.2d 609 (5th Cir. 1989).

This Court's passing reference to §1981's prohibition of race discrimination in *Anjelino v. New York Times Co.*, 200 F.3d 73 (3d Cir. 1999), cited in App. Br. at 84-85, casts no doubt on the statute's scope. *Anjelino* concerned a *gender* discrimination claim under §1981, which the Court rejected on the ground that "gender related claims are not cognizable under this statute." *Anjelino*, 200 F.3d at 97-98. The Court's further observation that §1981 "is limited to issues of racial discrimination," was in contrast to gender and did not express any view on the full reach of §1981.[44]

## B. The District Court Properly Concluded That Undocumented Immigrants are "Persons" Under 42 U.S.C. §1981

Hazleton argues incorrectly that the District Court's decision must be overturned because undocumented persons are not "persons" within the meaning of §1981. App. Br. at 83-84. As discussed above, the language of §1981 is based in part on the Fourteenth Amendment, and it was originally enacted just two years after the ratification of that Amendment. *See Takahashi*, 334 U.S. at 419-20. It is well settled that the phrase "all persons within the jurisdiction of the United

---

[44] Plainly, this Court does not construe its precedent as urged by Hazleton. In a recent unpublished opinion the Court noted that "Section 1981's provision addressing equal rights to make and enforce contracts" applies where a plaintiff alleges "discrimination on the basis of her race or *alienage*." *Kehres v. Commonwealth of Pennsylvania*, No. 06-2247, 2008 WL 227878, at *2 (Jan. 29, 2008) (emphasis added).

States," which appears identically in §1981, the Fourteenth Amendment, and the Fifth Amendment, applies to *all* persons, regardless of immigration status. *Supra,* 28-29.

Accordingly, Hazleton's argument that undocumented persons are not "persons" entitled to contractual rights "flies in the face of 42 U.S.C. §1981, which grants 'all persons within the jurisdiction of the United States' the 'same right ... to make and enforce contracts.'" *King v. ZirMed, Inc.,* No. 3:05CV-181-H, 2007 WL 3306100, at *5 (W.D. Ky. Nov. 6, 2007) (holding that stock options agreement entered into between undocumented employee and employer could not be voided by virtue of employee's unauthorized status).

### C.    The District Court's Interpretation of 42 U.S.C. §1981 Does Not Conflict with Federal Harboring Law

Finally, Hazleton erroneously contends on appeal that the District Court's conclusion that the Hazleton rental ordinances violate §1981 conflicts with the federal harboring statute, 8 U.S.C. §1324(a)(1)(A)(iii), (v). App. Br. at 85-86. The District Court never considered this particular argument, as it was never raised below.

The argument is therefore waived, but is in any event entirely without merit. Federal law does not render unlawful the act of entering into a lease agreement with a person who may currently lack a lawful immigration status, where the

landlord has no intent to assist the renter in evading the immigration laws. *Supra*, 47 & n.21. The District Court properly concluded that the housing ordinances violated §1981's prohibition on alienage discrimination.

## VI. THE DISTRICT COURT CORRECTLY HELD THAT THE ORDINANCES VIOLATE STATE LAW

### A. Hazleton Lacks The Power Under Pennsylvania Law to Regulate Employment

The District Court properly held that Hazleton does not possess the municipal powers to create a private right of action in favor of discharged employees as is set forth in Section 4.E. of IIRA. A179; *see also* A229.

"The general powers of all municipal governments, regardless of the style and plan selected, are limited to those bestowed by the state legislature." *In re Nomination Petition of Joseph Digiorlamo for Mayor*, No. 0501736-31, slip. op. at 3 (C.C.P. Bucks Apr. 6, 2005). Municipalities are not sovereigns and have no original or fundamental power of legislation. *Genkinger v. City of New Castle*, 84 A.2d 303, 304 (Pa. 1951); *see also Kline v. City of Harrisburg*, 68 A.2d 182 (Pa. 1949). Rather, they have only the powers to enact ordinances that are given to them by the General Assembly. *Genkinger*, 84 A.2d at 304. The Commonwealth has not granted Hazleton the right to create a private cause of action in favor of employees against employers.

Hazleton is a City of the Third Class operating under an Optional Plan B form of government, and as such possesses only those powers enumerated in the Third Class City Code, 53 P.S. §37403. The Third Class City Code enumerates 68 specific powers in such diverse areas as payment of debts and expenses, removal of garbage, destruction of dogs, and the sale and use of fireworks. *See* 53 P.S. §37403 (1), (6), (9) & (27). None of the enumerated powers authorizes Hazleton to create private causes of action or alter existing Pennsylvania law governing the employer-employee relationship. *Cf. Smaller Manufacturers Council v. Council of City of Pittsburgh*, 485 A.2d 73, 77 (Pa. Commw. Ct. 1984) (city ordinance placing obligation on employers exceeded delegated authority)

Pennsylvania is an employment-at-will state. *See, e.g., McCartney v. Meadowview Manor, Inc.*, 508 A.2d 1254, 1255 (Pa. Super. 1986). IIRA imposes responsibilities on employers in direct violation of the powers delegated under the Third Class City Code by adding a unique set of immigration-related employment regulations neither contemplated nor authorized by state law. §§4.B., 4.E., 7.C.

The District Court properly recognized the inherent conflict between the novel and punitive scheme under IIRA and those existing under Pennsylvania state law. Because IIRA attempts to impose unique local responsibilities upon employers and employees, it constitutes an *ultra vires* act.

**B.     Hazleton's Adoption of the Ordinances was not a Reasonable Exercise of its Police Powers**

"[A] law which purports to be an exercise of the police power must not be unreasonable, unduly oppressive or patently beyond the necessities of the case, and the means *which it employs must have a real and substantial relation to the objects sought to be attained." Mahony v. Township of Hampton*, 651 A.2d 525, 527 (Pa. 1994) (quoting *Lutz v. Armour*, 151 A.2d 108, 110 (Pa. 1959)) (emphasis in original); *Gambone v. Commonwealth*, 101 A.2d 634, 637 (Pa. 1954). An ordinance that simply declares that a nuisance or problem exists does not constitute evidence that there is an actual nuisance or problem. *See Commonwealth v. Creighton*, 639 A.2d 1296, 1299 (Pa. Commw. Ct. 1994). "Rather, the ordinance must be phrased in such a way as to require the municipality to affirmatively establish that a nuisance [or problem] in fact existed." *Id.* Moreover, the actual means used to achieve the goal of abating an actual nuisance or remedying a problem must be "reasonably necessary and not unduly oppressive." *Id.* at 1300.

The considerable factual record developed at trial confirms that there was no reasonable basis for the City's decision to regulate immigration.

IIRA's claimed basis is that "[i]llegal immigration leads to higher crime rates, subjects our hospitals to fiscal hardship and legal residents to substandard quality of case, contributes to other burdens on public services, increasing their

cost and diminishing their availability to legal residents, and diminishes our overall quality of life." IIRA §2.C. RO was adopted as part of the same effort. The boilerplate assertions in IIRA were copied wholesale from an Internet source and not subjected to any research, study, or testing until the trial of this case. When examined at trial, they turned out to be unsupportable or demonstrably false. Hazleton thus lacked a reasonable basis for adopting the ordinance and exceeded its police powers by doing so. In addition, as the District Court explained, IIRA and RO are not a valid exercise of police powers because they are unconstitutional. A189-90.

## CONCLUSION

For all of the foregoing reasons, the judgment of the District Court should be affirmed.

Dated: April 8, 2008

Respectfully submitted,

By: _____/s/_____
Thomas G. Wilkinson, Jr., Esquire
Thomas B. Fiddler, Esquire
Ilan Rosenberg, Esquire
Elena Park, Esquire
COZEN O'CONNOR
1900 Market Street
Philadelphia, PA 19103
Tel. (215) 665-2000
Fax: (215) 665-2013

Foster Maer, Esquire
Ghita Schwarz, Esquire
Jackson Chin, Esquire
PUERTO RICAN LEGAL
DEFENSE AND EDUCATION FUND
99 Hudson St. 14 Floor
New York, NY 10013-2815
Tel. (212) 739-7504
Fax: (212) 431-4276

Witold J. Walczak, Esquire
AMERICAN CIVIL LIBERTIES UNION
OF PENNSYLVANIA
313 Atwood Street
Pittsburgh, PA 15213
Tel. (412) 681-7864
Fax: (412) 681-8707

Omar C. Jadwat, Esquire
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
Immigrants' Rights Project[*]
125 Broad St., 18th Fl.
New York, NY 10004
Tel. (212) 549-2620
Fax: (212) 549-2654

Lucas Guttentag, Esquire
Jennifer C. Chang, Esquire
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
Immigrants' Rights Project
39 Drumm Street
San Francisco, CA 94111
Tel: (415) 343-0770
Fax: (415) 395-0950

Mary Catherine Roper, Esq.
AMERICAN CIVIL LIBERTIES UNION
OF PENNSYLVANIA
P.O. Box 40008
Philadelphia, PA 19106
Tel. (215) 592-1513 ext. 116

Shamaine Daniels, Esq.
Laurence E. Norton, II, Esq.
COMMUNITY JUSTICE PROJECT
118 Locust Street
Harrisburg, PA 17101
Tel. (717) 236-9486
Fax: (717) 233-4088

---

[*] Counsel gratefully acknowledge the assistance of ACLU Fellow Eunice Lee in preparing this brief.

# CERTIFICATE OF BAR MEMBERSHIP

The undersigned hereby certifies that I have been admitted before the bar of the United States Court of Appeals for the Third Circuit, and that I am a member in good standing of the Court.

_____/s/_____
Thomas G. Wilkinson, Jr., Esquire


_____/s/_____
Thomas B. Fiddler, Esquire

Attorneys for Appellees

# CERTIFICATE OF COMPLIANCE

I, Thomas B. Fiddler, hereby certify that:

1.  This Brief complies with the type-volume limitation of Fed.R.App.P. 32(a)(7)(B), as modified by the Court's grant of leave to file an over length brief not to exceed 20,000 words because this Brief contains 19,804 words, excluding the parts of the Brief exempted by Fed.R.App.P. 32(a)(7)(B)(iii ).

2.  This Brief complies with the typeface requirements of Fed.R.App. P. 32(a)(5) and the type style requirements of Fed.R.App.P. 32(a)(6) because this Brief has been prepared in a proportionately spaced typeface using MS Word, font size 14 point Times New Roman.

3.  The hard copy and the electronic copy of this Brief are identical.

4.  The electronic copy of this Brief has been virus scanned using Trend Micro virus software.

April 8, 2008

_____/s/_____
Thomas B. Fiddler

# CERTIFICATE OF SERVICE

I, Thomas B. Fiddler, counsel for Appellees, hereby certify that on this day I caused a copy of this Brief to be filed electronically with the Court and, and an original and ten (10) copies were filed via hand delivery. I further certify that on this day I caused two (2) copies of this Brief to be served by First Class United States Mail, postage prepaid, upon the following counsel of record for Appellant City of Hazleton.

Harry G. Mahoney, Esquire
Carla P. Maresca, Esquire
Andrew B. Adair
Deasey, Mahoney & Valenti, Ltd.
1601 Market Street, Suite 3400
Philadelphia, PA 19103

Kris W. Kobach, Professor
University of Missouri-Kansas City, School of Law
5100 Rockhill Road, Law 1-200
Kansas City, MO 64112

Michael M. Hethmon, Esquire
Immigration Reform Law Institute
25 Massachusetts Avenue, N.W.
Suite 335
Washington, D.C. 20001

Dated: April 8, 2008          By:  _____/s/_____
                                    Thomas B. Fiddler