*Received and Filed*
*07-3531*
*05/02/08*
*Marcia M. Waldron,*
*Clerk*

# UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

## No. 07-3531

## LOZANO V. CITY OF HAZLETON

_____

### APPELLANT'S REPLY BRIEF
_____

**APPEAL FROM FINAL DECISION AND JUDGMENT OF THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF PENNSYLVANIA AT DOCKET NO. 3:06-cv-01586 AND ANTECEDENT ORDERS ENTERED ON DECEMBER 15, 2006 and MARCH 9, 2007**
_____

**Kris W. Kobach, Esquire**
**Professor of Law**
**Univ. of Missouri (Kansas City)**
**5100 Rockhill Road**
**Kansas City, MO  64110-2499**
**(913) 638-5567**

**Harry G. Mahoney, Esquire**
**Carla P. Maresca, Esquire**
**Andrew B. Adair, Esquire**
**Deasey Mahoney & Valentini, Ltd.**
**1601 Market Street**
**Suite 3400**
**Philadelphia, PA 19103-2978**
**(215) 587-9400**

**Michael M. Hethmon, Esquire**
**Immigration Reform Law Institute**
**25 Massachusetts Avenue, N.W.**
**Suite 330 B**
**Washington, D.C. 20001**
**(202) 232-5590**

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS ....................................................................................ii

TABLE OF AUTHORITIES .............................................................................v

INTRODUCTION…………………………………………………………… 1

ARGUMENT…………………………………………………………………… 2

I.  THE SUPREME COURT IN *WASHINGTON STATE GRANGE* REAFFIRMED THE *SALERNO* STANDARD…………………………… 2

II.  APPELLEES FAIL TO ADDRESS THE ANALYSIS OF *GRAY* AND *ARIZONA CONTRACTORS* …………………..…………………………… 4

III.  APPELLEES LACK STANDING………………………………………… 5

   A.  Appellees Misunderstand the Prudential Standing Rule of *CONLAMIC* …………………………………………………………..5

   B.  Loss of Income from Illegal Aliens Cannot Constitute Injury-in-Fact … 7

   C.  Appellees Cannot Base Standing on Actions of Independent Third Parties ………………………………………………………….. 8

   D.  Non-Economic Compliance "Injury" Cannot Establish Standing ……. 11

IV.  THE PRESUMPTION AGAINST PREEMPTION APPLIES………………12

V.  THE ORDINANCES ARE NOT EXPRESSLY PREEMPTED……………...15

   A.  Appellees Misread a Committee Report to Invent a Requirement that the Federal Government Must First Find an Employer Guilty……15

VI.  THE ORDINANCES ARE NOT FIELD PREEMPTED …………………20

VII.   THE ORDINANCES ARE NOT CONFLICT PREEMPTED...............23

A.  Appellees' Seven Hypothetical "Conflicts" regarding the IIRA
    Employment Provisions do not Exist.......................................23

    1.  The IIRA is Consistent with the Employment Verification
        System of IRCA.....................................................23

    2.  The IIRA Does not Conflict with the I-9 Process...................25

    3.  The IIRA Private Right of Action Mirrors Federal Law.............27

    4.  The IIRA Need not Redundantly Duplicate Federal Anti-
        Discrimination Laws............................................... 28

    5.  The IIRA only Affects Employment Activity Covered
        by the IRCA.......................................................29

    6.  The IIRA does not Mandate E-Verify, but Doing so Would not
        Conflict with Federal Objectives in Any Event.....................31

    7.  The IIRA Allows Federal Cure Procedures to Occur...............34

B.  There are no Conflicts Between the IIRA Harboring Provisions and
    Federal Law...............................................................36

    1.  The IIRA Harboring Provisions Mirror the Federal Crime of
        Harboring Precisely...............................................37

    2.  Appellees' Argument that "No Alien is Unlawfully Present Until
        an Immigration Judge Says So" Has Been Rejected by Every
        Circuit...........................................................38

    3.  The Theory that Some Aliens are Unlawfully Present but
        Nonetheless Lawfully Residing in the United States
        is Erroneous......................................................40

    4.  HUD Regulations do not Authorize Illegal Aliens to Remain

in the United States……………………………………………43

VIII. APPELLEES MISCHARACTERIZE THE IIRA TO MANUFACTURE
A DUE PROCESS VIOLATION…………………………………….44

CONCLUSION………………………………………………………...47

CERTIFICATE OF COMPLIANCE………………...……………………48

CERTIFICATE OF SERVICE……………………………………………49

# TABLE OF AUTHORITIES

**Federal Cases**                                                                                    **Page**

*Affordable Housing Foundation, Inc. v. Silva*,
469 F.3d 219 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*AFGE v. Styles*, 123 Fed. Appx. 51 (3d. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . 8

*Arizona Contractors Ass'n v. Candelaria*,
534 F.Supp. 1036 (D. Ariz. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Arizona Contractors Ass'n v. Napolitano*,
526 F.Supp.2d 968 (D. Ariz. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Armstrong v. Toler*, 24 U.S. 258 (1826) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Bennett v. Spear*, 520 U.S. 154, 167 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Commer. Cleaning Servs. v. Colin Serv. Sys.*, 271 F.3d 374 (2d Cir. 2001) . . . . . 28

*DeCanas v. Bica*, 424 U.S. 351 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . .        *passim*

*Duquesne Light Co. v. United States EPA*, 166 F.3d 609 (3d Cir. 1999) . . . . . . . .10

*English v. General Elec. Co.*, 496 U.S. 72 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Equal Access Educ. v. Merten*, 305 F. Supp.2d 585 (E.D. Va. 2004) . . . . . . . . . . 22

*Exxon Mobil Corp. v. Allapattah Services, Inc.*, 545 U.S. 546 (2005) . . . . . . . . . 20

*Fla. Lime & Avocado Growers, Inc. v. Paul*,
373 U.S. 132 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 27, 31

*Gade v. Nat'l Solid Wastes Man. Ass'n*, 505 U.S. 88 (1992) . . . . . . . . . . . . . . . . 24

*Gonzales v. Peoria*, 722 F.2d 468 (9th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . 36

*Gray v. Valley Park*, 2008 U.S. Dist. LEXIS 7238 (E.D. Mo. 2008) . . . . . . *passim*

*Hoffman Plastic Compounds v. NLRB*, 535 U.S. 137 (2002) . . . . . . . . . . . . 23, 26

*Incalza v. Fendi*, 479 F.3d 1005 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . 31, 35

*LeClerc v. Webb*, 419 F.3d 405 (5th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Lozano v. City of Hazleton*, 496 F.Supp.2d 477 (M.D. Pa. 2007) . . . . . . . . . *passim*

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) . . . . . . . . . . . . . . . . . . . 8, 10, 11

*Lynch v. Cannatella*, 810 F.2d 1363 (5th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . 37

*Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163 (9th Cir. 2002) . . . . . . . . . . . . . . . . 28

*Mester Mfg. Co. v. INS*, 879 F.2d 561 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . 18

*Nantucket Investors II v. California Fed. Bank,*
61 F.3d 197 (3rd Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*New El Rey Sausage Co. v. INS*, 925 F.2d 1153 (9th Cir. 1991) . . . . . . . . . . . . . 18

*Pacific Merchant Shipping Ass'n v. Aubry,*
918 F.2d 1409 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 22

*Pitt News v. Fisher*, 215 F.3d 354 (3d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.,*
324 U.S. 806 (1945) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Ray v. Atlantic Richfield Co.*, 435 U.S. 151 (1978) . . . . . . . . . . . . . . . . . . . . . . . . 13

*Rice v. Norman Williams Co.*, 458 U.S. 654 (1982) . . . . . . . . . . . . . . . . . . . . . . . 24

*Roe 1 v. Prince William County*, 525 F.Supp.2d 799 (E.D. Va. 2007) . . . . . . . . . 12

*Rogers v. Larson*, 563 F.2d 617 (3d Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*San Diego County Gun Rights Comm. v. Reno*,
98 F.3d 1121 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26 (U.S. 1976) . . . . . . . . . . . . . . 9

*Sprietsma v. Mercury Marine*, 537 U.S. 51 (2002) . . . . . . . . . . . . . . . . . . . . . . . 13

*Total TV v. Palmer Communications, Inc.*, 69 F.3d 298 (9th Cir. 1995) . . . . . . . . 31

*Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602 (6th Cir. 2004) . . . . . . . . . . . . . . 28

*U.S. v. Bravo-Muzquiz*, 412 F.3d 1052 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . 39, 41

*U.S. v. Lucio*, 428 F.3d 519 (5th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*U.S. v. Salerno*, 481 U.S. 739 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 46

*United States v. Aguilar*, 883 F.2d 662 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . 38

*United States v. Atandi*, 376 F.3d 1186 (10th Cir. 2004) . . . . . . . . . . . . . . . . . 39, 41

*United States v. Bazargan*, 992 F.2d 844 (8th Cir. 1993) . . . . . . . . . . . . . . . . . . 39

*United States v. Gomez-Moreno*, 479 F.3d 350 (5th Cir. 2007) . . . . . . . . . . . . . . 38

*United States v. Igbatayo*, 764 F.2d 1039 (5th Cir. 1985) . . . . . . . . . . . . . . . . . . 39

*United States v. Kim*, 193 F.3d 567 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . 38

*United States v. Locke*, 529 U.S. 89 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

*United States v. Raines*, 362 U.S. 17 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*United States v. Rubio-Gonzalez*, 674 F.2d 1067 (5th Cir. 1982) . . . . . . . . . . . . 38

*United States v. Sanchez*, 963 F.2d 152 (8th Cir. 1992) . . . . . . . . . . . . . . . . . . . . 38

*United States v. Tipton*, 518 F.3d 591 (8th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . 38

*United States v. Varkonyi*, 645 F.2d 453 (5th Cir. 1981) . . . . . . . . . . . . . . . . 37, 38

*United States v. You*, 382 F.3d 958 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . 37

*United States v. Zheng*, 306 F.3d 1080 (11th Cir. 2002) . . . . . . . . . . . . . . . . . . . . 38

*Warth v. Seldin*, 422 U.S. 490 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Washington State Grange v. Washington State Republican Party*,
128 S. Ct. 1184 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 46

*Williams v. Mohawk Indus.*, 465 F.3d 1277 (11th Cir. 2006) . . . . . . . . . . . . . . . 28

## Federal Statutes

18 U.S.C. § 1961(1)(F) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

1986 U.S.C.C.A.N. § 5649 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

8 U.S.C. § 1158(d)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

8 U.S.C. § 1229b(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

8 U.S.C. § 1231(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

8 U.S.C. § 1324(a)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 36, 37, 38

8 U.S.C. § 1324a(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 25, 26, 30

8 U.S.C. §§ 1324a(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

8 U.S.C. § 1324a(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

8 U.S.C. § 1324a(h)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

8 U.S.C. § 1324b . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

8 U.S.C. § 1373 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

8 U.S.C. § 1373(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

8 U.S.C. § 1601(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

8 U.S.C. § 1621 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

8 U.S.C. § 1621(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

8 U.S.C. § 1641(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

H.R. Rep. 99-682(I) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

**State Statutes**

43 P.S. §§ 953-955 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

**Federal Regulations**

24 C.F.R. § 5.508 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

24 C.F.R. § 5.508(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

24 C.F.R. § 5.508(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43, 44

8 C.F.R. § 212.5(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

8 C.F.R. § 274a.1(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

8 C.F.R. § 274a.1(l)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

# INTRODUCTION

In this brief, Appellant addresses the arguments advanced by Appellees that warrant further discussion. Before doing so, Appellant describes two recent and relevant developments that Appellees fail to address—a Supreme Court decision, and two U.S. District Court decisions.

**ARGUMENT**

## I. THE SUPREME COURT IN *WASHINGTON STATE GRANGE* REAFFIRMED THE *SALERNO* STANDARD

The District Court erred by failing to apply the *Salerno* standard, which controls all facial constitutional challenges. "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully since the challenger must establish that no set of circumstances exists under which the Act would be valid." *U.S. v. Salerno,* 481 U.S. 739, 745 (1987).

Appellees attempt to justify the District Court's error by suggesting that the *Salerno* standard is in doubt. Appellees' Br. 82. Evidently, Appellees were unaware of a recent decision by the Supreme Court. On March 18, 2008, the Supreme Court in a 7-2 decision emphatically declared that the *Salerno* standard applies in *all* facial challenges. *Washington State Grange v. Washington State Republican Party*, 128 S. Ct. 1184 (2008). "Under *United States v. Salerno*, a plaintiff can only succeed in a facial challenge by 'establish[ing] that no set of circumstances exists under which the Act would be valid,' i.e., that the law is unconstitutional in all of its applications." 128 S. Ct. at 1190 (*quoting Salerno*, 481 U.S. at 745). The Court cautioned, "In determining whether a law is facially invalid, we must be careful not to go beyond the statute's facial requirements and speculate

about 'hypothetical' or 'imaginary' cases." *Id.* (*quoting United States v. Raines*, 362 U.S. 17, 22, (1960)). There, as here, "The State has had no opportunity to implement [the challenged law], and its courts have had no occasion to construe the law in the context of actual disputes…, or to accord the law a limiting construction to avoid constitutional questions." *Id.*

Failing to even mention the *Salerno* standard, the District Court plowed headlong into numerous hypothetical scenarios to speculate about possible conflicts with federal law. See 496 F.Supp. at 525-31. As is explained below, none of the hypothetical scenarios actually results in any conflict. However, the District Court erred by even considering such hypothetical conflicts.

As the Supreme Court emphasized, facial challenges are judicially disfavored. "They raise the risk of 'premature interpretation of statutes on the basis of factually barebones records.'" 128 S. Ct. at 1191 (*quoting Sabri v. United States*, 541 U.S. 600, 609 (2004)). They also "run contrary to the fundamental principle of judicial restraint that courts should neither 'anticipate a question of constitutional law in advance of the necessity of deciding it' nor 'formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.'" 128 S. Ct. at 1191 (*quoting Ashwander v. TVA*, 297 U.S. 288, 347 (1936)(Brandeis, J.,

concurring)).  The District Court ignored the *Salerno* standard and its principle of judicial restraint.  Appellees would have this Court make the same error.


## II.  APPELLEES FAIL TO ADDRESS THE ANALYSIS OF *GRAY* AND *ARIZONA CONTRACTORS*

There are two federal district courts that recently rejected the same preemption and due process claims embraced by the District Court below— *Gray v. Valley Park*, 2008 U.S. Dist. LEXIS 7238 (E.D. Mo. 2008), and *Arizona Contractors Ass'n v. Candelaria*, 534 F.Supp.2d 1036 (D. Ariz. 2008).

In *Gray*, the Eastern District of Missouri upheld an ordinance that was modeled on the Hazelton IIRA and was worded virtually identically.  The Court rejected precisely the same challenges raised in the case at bar.  *Gray*, at \*23-\*60, \*84-\*97.  In *Arizona Contractors*, the same preemption arguments were leveled against a state statute that *required* all employers in the state to participate in E-Verify and suspended the business licenses of employers that knowingly employ unauthorized aliens.  The District of Arizona rejected these preemption claim.  *Arizona Contractors*, at \*18-\*53. Thus, two of the three federal district courts that have addressed the issues presented in the case at bar have sustained the ordinances in question.  Only

the Middle District of Pennsylvania has come to the strained and implausible conclusion that such statutes are preempted.

Appellees make no attempt to answer the reasoning of *Gray* and *Arizona Contractors*. Instead, Appellees point to minor, irrelevant differences in the ordinances. For example, Appellees state that the Valley Park ordinance in *Gray* replicates the employment sections of the IIRA, but does not include the harboring sections. Appellees' Br. 66. This distinction is of course irrelevant in assessing preemption challenges to the employment sections. Appellees then offer only one sentence of argument, declaring in conclusory fashion that the opinions of the District of Arizona and the Eastern District of Missouri contain "analytical flaws." Appellees' Br. 67. Appellant respectfully urges this Court to review the detailed and incisive opinions of those two Courts holding that laws similar to the IIRA are constitutionally permissible.

## III. <u>APPELLEES LACK STANDING</u>

### A. Appellees Misunderstand the Prudential Standing Rule of *CONLAMIC*

In Appellant's Opening Brief (AOB), Appellant explained the holding of *National Coalition of Latino Clergy, Inc. v. Henry*, 2007 U.S. Dist. LEXIS 91487 (N.D. Okla. 2007)(hereinafter "*CONLAMIC*"), in which the

Court determined that illegal aliens lack prudential standing to challenge a state law that makes it more difficult for them to remain unlawfully present in the United States. As that Court held:

> [C]uriously absent from [Plaintiffs'] voluminous complaint is any challenge to the federal laws rendering their presence in this country illegal. Instead, these Plaintiffs… file this suit in order to remove any barriers the state of Oklahoma has erected to their continued violation of those federal laws. These illegal alien Plaintiffs seek nothing more than to use this Court as a vehicle for their continued unlawful presence in this country. To allow these Plaintiffs to do so would make this Court an "abetter of iniquity" and this Court finds that simply unpalatable….

*Id*., at \*24. Therefore, the prudential limits on standing, which are numerous and indefinite, prevent an Article III Court from exercising jurisdiction over such a case. *Id*., at \*21-\*22.

Contrary to Appellees' misreading, *CONLAMIC* did not hold that illegal aliens *never* have standing to sue because they lack lawful immigration status. Appellees' Br. 28. *CONLAMIC* held that: "An illegal alien, in willful violation of federal immigration law, is without standing to challenge the constitutionality of a state law, when compliance with federal law would absolve the illegal alien's constitutional dilemma—particularly when the challenged state law was enacted to discourage violation of the federal immigration law." *CONLAMIC* at \*28. The illegal alien retains standing to challenge the federal law that determines his illegal status, *id*. at

*26, or violations of his rights unrelated to his immigration status.

Appellees offer no answer to this prudential standing rule—one that is based firmly in Supreme Court precedent. "This equitable maxim—that 'he who comes into equity must come with clean hands'—is a judicial closing of the courthouse doors to those tainted with inequitableness or bad faith related to the matter in which they now seek relief." *Id.* at *24 (*quoting Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 814 (1945)). Illegal alien Appellees similarly lack standing to challenge local barriers that impede their unlawful presence.

### B. Loss of Income from Illegal Aliens Cannot Constitute Injury-in-Fact

Realizing that their standing is tenuous at best, Appellees resort to advancing a standing theory *that even the District Court declined to embrace*. Appellee landlords and business owners contend that they have "suffered economic harm" because the departure of illegal aliens from Hazleton has resulted in a "loss of clientele" and "loss of rental and business income." Appellees' Br. 19, 30, 35. The District Court below pointedly declined to characterize their injury-in-fact in this manner. 496 F.Supp. at 494.

Appellees cannot assert standing based on the loss of rental or other income derived from illegal aliens. Establishing standing requires injury to

a "*legally protected* interest." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)(emphasis added); *AFGE v. Styles*, 123 Fed. Appx. 51, 52 (3d. Cir. 2004).  Appellees' asserted "injury" is their loss of rental income from illegal alien tenants and their loss of business income from illegal alien customers.  Such income is *dependent upon the continuing violation of federal immigration laws*.  An illegal alien cannot occupy a rental unit or buy products in Hazleton without remaining unlawfully present in the United States.  Therefore, there is no legally protected interest in such income.  Just as a banker has no legally protected interest in profiting from the money laundering of a depositor in violation of federal criminal laws, Appellees have no legally protected interest in income derived from violations of federal immigration laws.  "[W]here the contract grows immediately out of, and is connected with, an illegal or immoral act, a Court of justice will not lend its aid to enforce it." *Armstrong v. Toler*, 24 U.S. 258, 278 (1826).

## C.  Appellees Cannot Base Standing on Actions of Independent Third Parties

Recognizing that their standing is dependent upon the decisions of third parties not before the court (e.g., prospective tenants, prospective customers), Appellees attempt to set aside controlling Supreme Court precedent by declaring that it is permissible to base standing on the

independent actions of third parties. Appellees' Br. 35-36. To do so, they take out of context the following sentence from *Warth v. Seldin*, 422 U.S. 490, 504-05 (1975): "The fact that the harm to petitioners may have resulted indirectly does not in itself preclude standing." Appellees fail to mention that two sentences later the Court finished its thought: "But it may make it substantially more difficult to meet the minimum requirement of Art. III: to establish that, in fact, the asserted injury was the consequence of the defendants' actions, or that prospective relief will remove the harm." *Id*. at 505. Accordingly, the Court held that the *Warth* plaintiffs did *not* possess standing.

In addition to mischaracterizing *Warth*, Appellees do not mention any of the subsequent Supreme Court decisions that narrowed *Warth* even further. A year after *Warth*, the Supreme Court clarified that standing *cannot be based on the independent actions of third parties*: "[A] federal court [can] act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (U.S. 1976). The Supreme Court would repeat these words in the landmark case of *Lujan* in 1992, stating that where an injury stems from an independent action of a third

party, "there is no causal connection between the injury and the conduct complained of." *Lujan*, 504 U.S. at 560. Five years later, in *Bennett v. Spear*, 520 U.S. 154, 167 (1997), the Court would again reiterate that injury for standing purposes cannot be "the result of the independent action of some third party not before the court." This rule has been recognized and applied by the Third Circuit. There is no standing where an injury-in-fact is "manifestly the product of the independent action of a third party." *Duquesne Light Co. v. United States EPA*, 166 F.3d 609, 613 (3d Cir. 1999).

Appellees misleadingly suggest that this Court departed from aforementioned line of Supreme Court case law in *Pitt News v. Fisher*, 215 F.3d 354 (3d Cir. 2000). Appellees' Br. 35-36. On the contrary, *Pitt News* reiterated that injury-in-fact cannot be dependent upon the "the independent acts of third parties." 215 F.3d at 360. Also, *Pitt News* was structurally different from the case at bar. There, the *third party was the entity regulated* by the government; and enforcement against that entity caused inevitable consequences for plaintiffs. Here, the *plaintiffs* are regulated; but they will only suffer injury if third parties make *entirely independent choices* that affect plaintiffs. In other words, in *Pitt News*, the third parties were not engaging in "independent actions." They were being punished by the state for violating a statute; and the only way they could avoid future punishment

was to act in a way that injured plaintiffs.  Thus, the state was coercing the actions of the third parties.  No such coercion occurs in the case at bar.

**D.  Non-Economic Compliance "Injury" Cannot Establish Standing**

Ultimately, Appellees are left with a single, unsupported basis on which to assert standing.  They assert that mere compliance with the ordinances imposes a "non-economic compliance injury" upon them.  Appellees' Br. 35.  Tellingly, they do not cite any case support for this novel concept.

No support exists, because if non-economic compliance "injuries" were sufficient to establish standing, then that would render meaningless the Supreme Court's requirement that an injury-in-fact must be "particularized." *Lujan*, 504 U.S. at 560.  "[T]he injury must affect the plaintiff in a personal and individual way."  *Id.* at 560, n.1.  The general obligation to comply with a law is not particularized enough to confer standing.  Even "a general threat of prosecution is not enough to confer standing."  *San Diego County Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1127 (9th Cir. 1996); *Arizona Contractors Ass'n v. Napolitano*, 526 F.Supp.2d 968, 978 (D. Ariz. 2007).  Stated differently, a person has an obligation to comply with every law; but such compliance does not give that person standing to challenge every law.

A second flaw in Appellees' argument is that the IIRA imposes no

greater compliance burden than that already imposed by federal law. Federal law already required business entities in Hazleton to refrain from knowingly employing unauthorized aliens, 8 U.S.C. § 1324a(a)(1), and prohibited landlords from harboring illegal aliens.  8 U.S.C. § 1324(a)(1)(A)(iii).  Thus, if Appellees were already complying with federal law, then they would not need to modify their behavior.  As the Eastern District of Virginia observed in a similar case involving a local ordinance relating to illegal immigration:  "Neither the Resolution nor the Orders … criminalize behavior that was not already punishable by local, state, or federal ordinance, and thus fear of such punishment does not create a cognizable injury."  *Roe 1 v. Prince William County*, 525 F.Supp.2d 799, 805 (E.D. Va. 2007).

## IV.  <u>THE PRESUMPTION AGAINST PREEMPTION APPLIES</u>

"In all preemption cases…we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was a clear and manifest purpose of Congress."  *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996).  *Colacicco v. Apotex*, Case No. 06-3107, slip op. at 18 (3rd Cir. 2008).  The District Court erroneously set aside this long-standing presumption, citing *United States v. Locke*, 529 U.S. 89,

108 (2000), for its contention that the presumption against preemption does not apply where there has been significant federal presence in the past. 496 F.Supp.2d at 518, n.41. Appellees ask this Court to repeat that error. Appellees' Br. 64.

The District Court failed to note that *Locke* has since been distinguished and narrowed by the Supreme Court. The *Locke* passage that the District Court cited is in a section of the opinion dissecting the earlier holding of *Ray v. Atlantic Richfield Co*., 435 U.S. 151 (1978). Two years later, the Supreme Court clarified, "As we explained in *United States v. Locke*, … the analysis in *Ray* was governed by field-pre-emption rules because the rules at issue were in a 'field reserved for federal regulation' and 'Congress had left no room for state regulation of these matters.'" *Sprietsma v. Mercury Marine*, 537 U.S. 51, 69 (2002); see *Colacicco*, at 20. Thus, *Locke* stands only for the principle that the presumption against preemption does not apply *if field preemption has already occurred in an area*.

In contrast, the case at bar concerns an area in which field preemption has not occurred. As the U.S. Supreme Court stated unequivocally in *De Canas v. Bica* the regulation of immigration by the federal government is *not* so comprehensive that it occupies the field and displaces state action. 424 U.S. 351, 357-358 (1976). Every federal court, other than the Court below,

continues to apply the presumption against preemption to state laws affecting immigration. See *Pacific Merchant Shipping Ass'n v. Aubry*, 918 F.2d 1409, 1415-16 (9th Cir. 1990); *Gray*, *24-*25; *Arizona Contractors*, *33-*34.

As this Court explained in April 2008, the correct question is whether the state's purpose is within the ambit of its police powers, such as "matters related to health and safety." *Colacicco*, at 19. In addition, "States possess broad authority under their police powers to regulate the employment relationship to protect workers with the State [against competition from illegal labor]." *De Canas*, 424 U.S. at 356. If the state purpose encompasses these legitimate police power objectives, then the presumption against preemption applies. *Colacicco*, at 19, 22. The IIRA serves all three objectives.

The District Court's misunderstanding apparently stems from its failure to correctly identify *what* is being regulated. The IIRA regulates two areas traditionally governed by the states: business licenses and rental housing. "[T]he ordinance is a regulation on business licenses, an area historically reserved to the states." *Gray*, at *25. Similarly, the regulation of rental accommodations is historically a state function. The IIRA regulates these areas in a way that is designed to reinforce federal

immigration law.  But, as the Supreme Court has explained, that does not transform the IIRA into a regulation of immigration:  "[T]he fact that aliens are the subject of a state statute does not render it a regulation of immigration, which is essentially a determination of who should or should not be *admitted* into the country, and the conditions under which a *legal* entrant may remain."  *De Canas*, 424 U.S. at 355.

## V.  <u>THE ORDINANCES ARE NOT EXPRESSLY PREEMPTED</u>

### A.  Appellees Misread a Committee Report to Invent a Requirement that the Federal Government Must First Find an Employer Guilty

8 U.S.C. § 1324a(h)(2) expressly permits states and cities to impose sanctions "through licensing and similar laws" upon businesses that knowingly employ unauthorized aliens.  As the District of Arizona observed regarding a similar statute, "The Act is a 'licensing law' because it sets out criteria and a process to suspend or revoke a permission to do business in the state.  It therefore falls within the plain meaning of IRCA's savings clause."  *Arizona Contractors*, at *20.  However, Appellees go to extraordinary lengths to twist this express permission into an express prohibition, resurrecting a far-fetched theory that they offered before the District Court below—one that the Court rightly rejected.  Appellees claim that 8 U.S.C. §

1324a(h)(2) allows a city to impose licensing sanctions only *after* the
employer has been tried in a federal criminal or civil proceeding and found
to violate an IRCA provision. Appellees' Br. 75.

Possessing no case law to support this theory—a theory that is at odds
with the text of 8 U.S.C. § 1324a(h)(2) itself—Appellees twist the meaning
of the Report of the House Judiciary Committee, which was discussed at
length in Appellant's Opening Brief. AOB. 42-47. The Committee Report
stated the following:

> The penalties contained in this legislation are intended to
> specifically preempt any state or local laws providing civil fines
> and/or criminal sanctions on the hiring, recruitment or referral
> of undocumented aliens. *They are not intended to preempt or
> prevent lawful state or local processes concerning the
> suspension, revocation or refusal to reissue a license* to any
> person who has been found to have violated the sanctions
> provisions in this legislation. Further, the Committee does not
> intend to preempt licensing or "fitness to do business laws,"
> such as state farm labor contractor laws or forestry laws, which
> specifically require such licensee or contractor to refrain from
> hiring, recruiting or referring undocumented aliens.

H.R. Rep. 99-682(I), 1986 U.S.C.C.A.N. 5649, 5662 (emphasis added).

From these words, Appellees manufacture a requirement that an employer
must be found guilty in a federal proceeding before a municipality can
suspend the employer's business license. Appellees' Br. 74-75.

There are four fatal flaws in Appellees' distortion of the Committee
Report. First, their reading ignores the first half of the second sentence,

which specifically refers to "state or local processes."  The actor who "finds" the person to have violated the law by employing an unauthorized alien is not a federal official, but the state or local official who makes the determination in the "state or local process."  The most reasonable interpretation of who the actor is that finds a person to have employed unauthorized aliens is derived by looking to the first half of the same sentence, which refers to state or local processes.  *The federal government is mentioned nowhere in the paragraph.*  Clearly, the only government actor in the paragraph is a state or local government.

Second, assuming *arguendo* that Appellees were correct that the federal government must first "find" that the employer is employing an unauthorized alien, the IIRA would still pass muster.  The ordinance specifically requires that the federal government must find that the alien in question is unauthorized to work in the United States *before* the City may reach the same conclusion or take any "further action on the complaint." IIRA § 7.E.  Only after a conclusive verification is received from the federal government can the City notify a business entity that the employee is believed to be an unauthorized alien, and that the business entity has three days to take one of several possible actions to correct the violation.  IIRA § 7.C.  In other words, even if the Committee Report could somehow be read

to require that the federal government must find a violation before a city takes action, the IIRA would meet that requirement, because the federal government's determination that an employee is an unauthorized alien through 8 U.S.C. § 1373(c) constitutes such a finding.  At that point, the employer has constructive knowledge that he is employing an unauthorized alien.  8 C.F.R. § 274a.1(l)(1)(situations in which employer may have "constructive knowledge that an employee is an unauthorized alien include, but are not limited to, situations where the employer: … (iii) Fails to take reasonable steps after receiving information indicating that the employee may be an alien who is not employment authorized…."); *Mester Mfg. Co. v. INS*, 879 F.2d 561, 567 (9th Cir. 1989); *New El Rey Sausage Co. v. INS*, 925 F.2d 1153, 1158 (9th Cir. 1991).

Third, Appellees misread the Committee Report as presenting an exclusive list of permissible state or local licensing sanctions.  As the District of Arizona explained:

> Plaintiffs rely on the second quoted sentence, which no doubt correctly states that state licensing processes are not preempted as to "any person who has been found to have violated the sanctions provisions of this legislation."  But Plaintiffs go further and assert that the example given in that sentence exhausts the entire meaning of the licensing sanction authorization.  The passage does not so state, *and the very next sentence gives further examples of permitted licensing and fitness to do business laws that are not tied to completed federal proceedings*.  One need look only to the sentence after the one

Plaintiffs rely upon to see that the House Report does not bear the meaning they would give it.

*Arizona Contractors*, at *25 (emphasis added). Appellees commit the same error.

Fourth, Appellees' reading of the Committee Report conflicts with the plain language of the statutory text. As the District of Arizona observed when rejecting precisely the same argument:

> IRCA's savings clause does not contain any language indicating that prior federal enforcement action is necessary before a state may sanction an employer's license. Plaintiffs' interpretation would reduce the express authorization of state "licensing and similar laws" almost to nothing, in contravention of the plain language of the statute.

*Arizona Contractors*, at *22-*23. The plain language of 8 U.S.C. § 1324a(h)(2) states that licensing sanctions may be imposed by localities "upon those who employ, or recruit or refer for a fee for employment, unauthorized aliens."

If Congress had shared Appellees' view, Congress would have enacted a statute containing the words "upon those who have been convicted by the federal government for employing unauthorized aliens." Of course, Congress did not choose that phrasing, or anything close to it. Rather, we have the statutory text as it is, which plainly indicates that localities may impose such sanctions upon those who employ unauthorized aliens. Nothing

in the statutory language requires any prior federal action against the employer before a locality may act.   "The legislative history does not substantiate Plaintiffs' interpretation, but even if it did, it could not change or add words to the statute." *Arizona Contractors*, at *22. (*citing Exxon Mobil Corp. v. Allapattah Services, Inc.* 545 U.S. 546, 568 (2005)(the "authoritative statement is the statutory text, not the legislative history")).

## VI.   THE ORDINANCES ARE NOT FIELD PREEMPTED

In the precedent that controls all immigration preemption cases, *De Canas v. Bica*, the Supreme Court stated unequivocally that field preemption had not occurred.  "Nor can such intent [to occupy the field] be derived from the scope and detail of the INA.  The central concern of the INA is with the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully within the country."  *De Canas*, 424 U.S. at 359. Moreover, *this Court has specifically held that field preemption has not occurred*:  "[T]he Supreme Court has held that in enacting the INA, Congress did not ordain pre-emption of state regulation of the employment of aliens illegally in the country."  *Rogers v. Larson*, 563 F.2d 617, 621 (3d Cir. 1977)(*citing De Canas*, 424 U.S. at 356).

Nevertheless, the District Court improperly swept aside *De Canas* to

conclude that the employment provisions of the IIRA were field preempted. See AOB 52-55. Appellees now invite this Court to commit the same error, asserting without support that the enactment of IRCA in 1986 rendered the controlling precedent of *De Canas* "out-dated." Appellees' Br. 52.

Appellees neglect to mention that *every other Court in the United States continues to apply the <u>De Canas</u> holding that field preemption has not occurred—even after IRCA*. "IRCA does not manifest an intent of Congress to occupy the entire field of immigration law." *Gray*, at *41. "In enacting IRCA … Congress passed employer sanctions provisions that expressly preempted *only some* state power and expressly preserve other state powers. It allowed complementary enforcement by states through 'licensing and similar laws.' 8 U.S.C. § 1324a(h)(2)." *Id*., at *34-*35. A court cannot logically infer field preemption from a statute that clearly invites states and localities into the field.

The Second Circuit reviewed an IRCA preemption challenge to a state labor law allowing injured workers to seek compensatory damages where the worker is an unauthorized alien, and concluded that IRCA did not result in field preemption. *Affordable Housing Foundation, Inc. v. Silva*, 469 F.3d 219, 240-41 (2d Cir. 2006). In an effort to distinguish *Affordable Housing*, the District Court stated that the labor law at issue "provides rights

to illegal aliens, which is inconsistent with [the City's] overall theme that such individuals have no rights."  496 F.2d Supp. 525.  The Court's simplistic argument has two flaws.  First, the City has never argued that illegal aliens "have no rights."  Second, the fact that the state law in *Affordable Housing* created rights for unauthorized aliens, while the IIRA discourages the employment of unauthorized aliens, is irrelevant.  What the Court failed to recognize is that field preemption sweeps *all* state laws from the field—regardless of whether the state law is more permissive or less permissive than federal law.

In addition to the Second Circuit, the Fifth and Ninth Circuits have continued to apply *De Canas*.  "The Supreme Court has acknowledged that 'there is no indication that Congress intended to preclude state law in the area of [alien] employment regulation.'  *De Canas*, 424 U.S. at 358, 362.  Thus, the field of alien employment tolerates harmonious state regulation."  *LeClerc v. Webb*, 419 F.3d 405, 424 (5th Cir. 2005).  "States, however, possess broad authority under their police powers to regulate the employment relationship to protect resident workers. *De Canas v. Bica*, 424 U.S. at 356."  *Pacific Merchant Shipping Ass'n*, 918 F.2d at 1415-16.  See also *Equal Access Educ. v. Merten*, 305 F.Supp.2d 585, 601-04 (E.D. Va. 2004).

In a last ditch attempt to resuscitate their field preemption claim, Appellees resort to suggesting that the use of the adjective "comprehensive" to describe IRCA in *Hoffman Plastic Compounds v. NLRB*, 535 U.S. 137, 147 (2002), should be taken as a code word indicating that field preemption has occurred. Appellees' Br. 52. What Appellees fail to mention is that *Hoffman* was *not a preemption case*. Appellees also do not mention that drawing such a conclusion from *Hoffman* has been rejected before. *Arizona Contractors*, at *31. Moreover, *De Canas* also referred to the INA as "comprehensive." 424 U.S. at 359.

## VII.  THE ORDINANCES ARE NOT CONFLICT PREEMPTED

### A.  Appellees' Seven Hypothetical "Conflicts" regarding the IIRA Employment Provisions do not Exist

Appellees suggest seven ways in which the employment provisions of the IIRA might conflict with federal law. Appellees' Br. 53. However, all seven hypothetical conflicts reflect either their misunderstanding of federal immigration law or their misreading of the IIRA.

#### 1.  The IIRA is Consistent with the Employment Verification System of IRCA

With regard to the first "conflict," Appellees argue without support that a city imposing licensing sanctions must precisely duplicate the

administrative hearing process that the federal government uses in imposing the civil fines under 8 U.S.C. § 1324a(e)(3)-(4). Appellees' Br. 53-54. Duplication of federal procedures is not necessary to avoid conflict preemption; a "mere difference between state and federal law is not conflict." *Arizona Contractors*, at *41 (*citing Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 141-46 (1963)). Any conflict must be "irreconcilable." *Rice v. Norman Williams Co*., 458 U.S. 654, 659 (1982). "[Conflict] pre-emption should be limited to state laws which impose prohibitions or obligations which are in *direct contradiction* to Congress' primary objectives, as conveyed with clarity in the federal legislation." *Gade v. Nat'l Solid Wastes Man. Ass'n*, 505 U.S. 88, 110 (1992)(Kennedy, J., concurring)(emphasis added). Accordingly, minor differences between the IIRA hearing procedures and the administrative hearing procedures used by the federal government do not establish conflict preemption.

Appellees then assert without support that a local government inquiry under 8 U.S.C. § 1373(c) can only inquire into an alien's lawful presence in the United States, not his employment authorization. Appellees' Br. 54. Appellees ignore the text of the federal statute. The text of 8 U.S.C. § 1373 requires the federal government to provide "verification *or* status information" to local entities, indicating that a city may request *either* an

alien's immigration status *or* verification of the alien's employment

authorization. What Appellees fail to recognize is that the term

"verification" is consistently used in federal immigration law with reference

to verification *of employment authorization*. 8 U.S.C. §§

1324a(b)("Employment verification system"), 1324a(b)(3)("Retention of

verification form"), 1324a(d)(1)(A)("employment verification system"),

1324a(d)(2)("verification system"), 1324a(d)(2)(e)("verification that an

employee… employee is eligible"). Moreover, Congress chose extremely

expansive language when drafting 8 U.S.C. § 1373(c). Cities may obtain

verification or status information "*for any purpose* authorized by law." 8

U.S.C. § 1373(c)(emphasis added). Congress did not restrict inquiries to

those with a purpose of determining lawful or unlawful presence. Inquiries

with the purpose of verifying employment authorization were also included.

### 2. The IIRA Does not Conflict with the I-9 Process

Appellees next assert that the IIRA somehow conflicts with the

process established by IRCA in 1986, whereby employers must scrutinize

employees' documents when I-9 forms are filled out. Appellees' Br. 55.

Under 8 U.S.C. § 1324a(a)(3), good faith compliance with those

requirements creates an affirmative defense if the federal government

prosecutes the employer. Appellees' contend, without any support, that the

IIRA is conflict preempted because it does not contain an identical affirmative defense provision. This argument contains two fatal flaws.

First, the IIRA actually provides employers something more valuable than an affirmative defense—it allows them to "correct" any failure to meet the conditions for possessing a business license. Once the federal government has conclusively verified that a business entity is employing an unauthorized alien, the business entity is allowed to rectify the situation before any suspension of its license can occur. IIRA §§ 4.B(4), 7.C. Far from operating in a "draconian" manner, as Appellees imagine, the IIRA allows every business entity a second chance— the opportunity to correct any violation while still retaining its business license. See Appellees' Br. 56. This approach is consistent with federal regulatory policies, which "offer a safe harbor for employers who [take] specific reasonable steps in response to no-match letters." 73 F.R. 15944, 15948 (2008), and federal law. "[I]f an employer unknowingly hires an unauthorized alien, …the employer is compelled to discharge the worker upon discovery of the worker's undocumented status. § 1324a(a)(2)." *Hoffman*, 535 U.S. at 148.

Second, Appellees' argument does not meet the requirement of all implied preemption claims that such preemption must be "unmistakably" intended by Congress. *De Canas*, 424 U.S. at 356. Implied preemption

occurs only when there is "unambiguous congressional mandate" that sweeps aside the state or local law. *Paul*, 373 U.S. at 147. If Congress had intended that local sanctions "through licensing… laws," which are expressly permitted by 8 U.S.C. § 1324a(h)(2), must include a particular affirmative defense to avoid preemption, Congress would have said so. This is especially true in light of the fact that licensing laws do not normally include "affirmative defenses." Speculation that Congress implicitly demanded such an unusual requirement is fallacious. Appellees' argument cannot be squared with the statutory text.

### 3. The IIRA Private Right of Action Mirrors Federal Law

Appellees next claim that the IIRA § 4.E conflicts with federal law because it allows a discharged worker a private right of action in the Municipal Court of Hazleton against his former employer if the employer was employing an unauthorized alien and not participating in E-Verify at the time of the discharge. Appellees' Br. 56. Appellees assert that such "strict liability" does not exist in federal law, and therefore a conflict exists. *Id.*

Appellees ignore changes to federal law enacted in 1996, when Congress amended the Racketeer Influenced and Corrupt Organizations (RICO) Act to make the employment of unauthorized aliens a RICO violation, and enable persons economically injured by such employment to

sue for treble damages in civil court. 18 U.S.C. § 1961(1)(F). See *Williams v. Mohawk Indus.*, 465 F.3d 1277, 1286 (11th Cir. 2006)(*cert. denied* 2007 U.S. LEXIS 2798 (Feb. 26, 2007)). Such suits seeking damages from employers have been litigated in numerous Circuits. See *Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602 (6th Cir. 2004); *Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163 (9th Cir. 2002); *Commer. Cleaning Servs. v. Colin Serv. Sys.*, 271 F.3d 374 (2d Cir. 2001). *IIRA § 4.E was drafted to precisely mirror this provision of federal law creating a nearly-identical private right of action* and reflects this congressional objective of allowing private suits to discourage the employment of unauthorized aliens.[1]

### 4. The IIRA Need not Redundantly Duplicate Federal Anti-Discrimination Laws

Appellants next insist that to avoid conflict preemption, the IIRA must include a provision prohibiting discrimination in hiring, duplicating the detailed procedures and bureaucracy created by 8 U.S.C. § 1324b. Appellees' Br. 57. Appellees echo the same argument made by the District Court. 496 F.Supp.2d at 528.

There was no need for the City to replicate the anti-discrimination provisions of 8 U.S.C. § 1324b, because every employee in Hazleton was

---

[1] Also, a private right of action is not a preempted "sanction." See AOB 48-52.

already protected by those federal provisions. Hazleton's workers are also protected by Pennsylvania's state workplace anti-discrimination laws, found at 43 P.S. §§ 953-955. The District of Arizona rejected *precisely the same argument*:

> Plaintiffs argue that because the Act does not contain an express prohibition on discrimination, it conflicts with federal law. Arizonans are protected by the prohibitions against discrimination in IRCA, other federal laws, and Arizona law. … The State did not have to duplicate those laws by inserting an independent discrimination provision into the Act.

*Arizona Contractors*, at *45-*46. No precedent supports Appellees' assertion that a city must include redundant provisions in its ordinances to avoid conflict preemption.

Also, no Appellee has even *alleged* that he has been the subject of employment-related discrimination. Consequently, none of the Appellees possess standing to raise this particular preemption claim.

### 5. The IIRA only Affects Employment Activity Covered by IRCA

Appellees next assert that the IIRA applies to a broader range of employment activity than IRCA. Appellees' Br. 57-58. Appellees speculate that the IIRA might apply to independent contractors or casual domestic workers; but they do not respond to the three pages of analysis in Appellant's Brief explaining why the IIRA cannot possibly apply to such

cases.  See AOB. 74-76.

Appellees also speculate that the IIRA might possibly apply to union membership activities.  Appellees' claim has obvious flaws.  Section 4.A of the IIRA delineates the proscribed activity:  "It is unlawful for any business entity to knowingly recruit, hire for employment, or continue to employ, or to permit, dispatch, or instruct any person who is an unlawful worker to perform work in whole or part within the city."  In engaging in union activities described in 8 C.F.R. § 274a.1(e), a union does not *recruit, hire or employ* its own members to perform work for the union (unless the member was serving as paid staff of the union—in which case both federal law and the IIRA would regard the union as an employer with respect to that individual).  The IIRA cannot be applied to cover the membership activity of any union.

The text of IIRA § 4.A was drafted to encompass precisely the same employment activities described in 8 U.S.C. §§ 1324a(a)(1)-(2).  Federal law proscribes the same employment activities in nearly identical terms:  "to hire, or to recruit," 8 U.S.C. § 1324a(a)(1)(A), and "to continue to employ … knowing the alien is (or has become) an unauthorized alien." 8 U.S.C. § 1324a(a)(2).  Mere phrasing differences do not result in conflict preemption.  Even a "dissimilarity of the standards" of federal and local law (which is not

present here) is insufficient; only "inevitable collision between the two schemes of regulation" can result in conflict preemption. *Paul*, 373 U.S. at 144. "We find preemption only in 'those situations where conflicts will necessarily arise.'" *Incalza v. Fendi*, 479 F.3d 1005, 1011 (9th Cir. 2007)(*quoting Goldstein v. California*, 412 U.S. 546, 554 (1973)). In any case, a "hypothetical conflict is not a sufficient basis for preemption." *Total TV v. Palmer Communications, Inc.*, 69 F.3d 298, 304 (9th Cir. 1995); *English v. General Elec. Co.*, 496 U.S. 72, 79-80 (1990).

Finally, even if there were any validity to Appellees' claim, none of Appellees would possess standing to raise it. No Appellee claims to be engaged in a business enterprise that is outside of the scope of IRCA, nor does any Appellee claim to be a union member.

### 6. The IIRA does not Mandate E-Verify, but Doing so Would not Conflict with Federal Objectives in Any Event

Appellees next restate the District Court's flawed argument that the IIRA mandates that all employers use E-Verify, and that this somehow conflicts with federal law. Appellees' Br. 59-60; 496 F.Supp.2d at 527. This argument is incorrect on both points. First, the IIRA does not impose a blanket requirement that all employers use E-Verify. Rather, the IIRA mirrors federal practice precisely—the government itself must use E-Verify when hiring, recipients of government contracts must use it, and employers

who have been found to knowingly employ unauthorized aliens in the past may be required to use it.  AOB 69-71.  Appellees offer no response.

On the second point, assuming *arguendo* that the IIRA did require E-Verify participation, Appellees offer no support for their assertion that a city cannot require E-Verify participation.  They simply refer to the statute that created the E-Verify program in 1996, which did not permit the *federal* government to require all employers in the United States to participate in it.  Appellees' Br. 59.  That is irrelevant to the question of whether state or local governments may require participation in E-Verify within their jurisdiction.  "Without more, [those provisions] do not raise an inference that Congress intended to prevent the states from mandating use of the system in their licensing laws."  *Arizona Contractors*, at *49.  "The Court does not see Congress's decision not to make the program mandatory as restricting state or local government's authority under the police powers."  *Gray*, at *58.  "Federal policy encourages the utmost use of E-Verify. …The Act's requirement that Arizona employers use E-Verify therefore does not actually conflict with Congress' objectives."  *Arizona Contractors*, at *53.  Appellees conspicuously ignore this case law.

Appellant's Brief also explains how current federal regulations and policies promote the maximum use of E-Verify, with reference to a formal

public statement by Secretary of Homeland Security Michael Chertoff on August 10, 2007. AOB 64 ("[W]e're going to be strengthening and expanding the system…. [W]e will want to encourage as many companies as possible to use E-Verify, and we're going to start with the federal government.").[2] In response, Appellees' oddly contend that this Court may not consider formal statements of U.S. policy by a Cabinet official unless they are part of the trial record. See Appellees' Br. 60, n.29. Formal, published statements of executive departments—just like statements of the executive branch published in the Federal Register, or statements of individual members of Congress—represent legal authority concerning federal objectives, not fact evidence that must be part of the record.[3]

No doubt, Appellees do not want the Court to read this more-recent statement by Secretary Chertoff either:

> Likewise, we're continuing to promote the use of E-Verify. The state of Arizona … in the last couple days had its new rule requiring E-Verify use sustained by the federal courts, and we are beginning to see that illegal workers are picking up and

---

[2] Secretary Chertoff's August 10, 2007, Statement is published on the U.S. Department of Homeland Security website at http://www.dhs.gov/xnews/releases/pr_1186781502047.shtm.

[3] Appellees themselves cite a stray statement of Congresswoman Jackson-Lee. Appellees' Br. 59 n.28. If this Court regards such published statements as fact evidence, not legal authority, then Appellant requests the Court to take judicial notice of them, which the Court may do on appeal. *Nantucket Investors II v. California Fed. Bank*, 61 F.3d 197, 205-206 (3rd Cir. 1995)(interpreting Fed.R.Evid. 201(b), 201(f)).

leaving, because they recognize this system is an impediment to their continued illegal activities and illegal employment in this country. …So this is not an easy task to undo a problem that's arisen over 30 years, but I think *we've really been making some substantial progress with the help of state and local governments.*[4]

This federal policy statement discredits Appellees' implausible theory that, by encouraging the use of E-Verify, the IIRA somehow conflicts with federal objectives. On the contrary, federal objectives are *advanced* through "the help of state and local governments" that encourage or require participation in E-Verify.[5] Such ordinances have enabled the federal government to make "substantial progress."

### 7. The IIRA Allows Federal Cure Procedures to Occur

Finally, Appellees hypothesize that the eight-day cure period of E-Verify might conflict with the IIRA. Appellees' Br. 61. Appellant's Brief explained how the IIRA was specifically drafted to accommodate this period, or any other period that the federal government might include in future verification protocols. This was confirmed by the testimony of the City official in charge of enforcing the IIRA. AOB 71-73. The IIRA's

---

[4] Statement of Secretary Chertoff, Joint Press Conference with Attorney General Mukasey, Feb. 22, 2008. Published on the U.S. Department of Homeland Security website at http://www.dhs.gov/xnews/releases/pr_1203722713615.shtm.

[5] As of February 22, 2008, over 53,000 employers were enrolled in E-Verify, and the number was growing by over 1,800 a week. Chertoff Statement at http://www.dhs.gov/xnews/releases/pr_1203722713615.shtm.

three-day period does not begin until any cure periods stipulated by federal regulations have expired and the federal government offers a *final* verification. IIRA § 7.E. "There is no conflict between these two provisions such that the employer cannot comply with both. Furthermore, the purpose of both laws is the same, namely to allow the alleged violator an opportunity to correct any error in the determination of an employee's status." *Gray*, at *53 (reviewing identical procedures)(*citing Incalza*, 479 F.3d at 1010). Rather than address Appellant's analysis, Appellees shift to a different argument. They now assert without support that the City cannot utilize E-Verify to verify the work authorization of a business entity's employee. Appellees' Br. 61-62.

Contrary to Appellees' assertion, the IIRA does not specify a particular verification system that the federal government must use in responding to the City's inquiries. IIRA §§ 4.A-B. The City simply requests a verification of employment authorization pursuant to 8 U.S.C. § 1373(c). IIRA § 4.B(3). The federal government may direct the City to use the E-Verify program, to use the SAVE program (which was specifically designed for state and local inquiries, and may be tailored to whatever purpose a city seeks to accomplish), or to simply verify employment authorizations through telephone communications with DHS officials

directly.  DHS officials have communicated to City counsel that DHS will likely direct the City to use the SAVE program.  However, the IIRA does not specify a particular program; it simply refers to federal "verification" under 8 U.S.C. 1373(c).

Moreover, the Verification Information System database that the federal government deploys in responding to 8 U.S.C. § 1373(c) inquiries is the same, regardless of whether the SAVE or E-Verify program is utilized.  The SAVE and E-Verify programs are simply different software portals into the same database.  Privacy Act:  Verification Information System Records Notice, 72 Fed. Reg. 17,569 (Apr. 9, 2007); *Arizona Contractors*, 534 F.Supp. 1036, at *13-*14.[6]

### B.  There are no Conflicts Between the IIRA Harboring Provisions and Federal Law

With respect to the harboring provisions of the IIRA, Appellees do not deny the well-established doctrine of "concurrent enforcement" which

---

[6] Appellees note that Appellant's Brief seems to suggest at one point that all IIRA inquiries will occur through the E-Verify program.  Appellees' Br. 55, n.25.  Appellant apologizes for this error.  "E-Verify program" should read "E-Verify program database" at AOB 6.  As is clear from the rest of Appellant's Brief, the IIRA does not specify which program must be used, although the SAVE program is most likely.  "The City will use the Systematic Alien Verification for Entitlements (SAVE) internet-based system, to obtain such verifications from the federal government, unless the federal government directs the City to utilize another method of verification."  AOB 7.  See also AOB 62-64, 72-73.

allows the City to prohibit the same harboring that is prohibited under 8 U.S.C. § 1324(a)(1)(A). See *Gonzales v. Peoria*, 722 F.2d 468, 474 (9th Cir. 1983); *Lynch v. Cannatella*, 810 F.2d 1363, 1367 (5th Cir. 1987); *Gray*, at *59.

### 1. The IIRA Harboring Provisions Mirror the Federal Crime of Harboring Precisely

Appellees mischaracterize the harboring provisions of the IIRA, stating that the IIRA prohibits any "rental of a dwelling unit" to an illegal alien. Appellees' Br. 47. Appellees conspicuously fail to mention that the IIRA only prevents such a rental if it is "knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law." IIRA § 5.A. This language is identical to that found in federal law. 8 U.S.C. § 1324(a)(1)(A).

Appellees then cite two cases which support Appellants' position. First, Appellees cite *United States v. You*, 382 F.3d 958, 966 (9th Cir. 2004), which stands for the proposition that a landlord must realize that his tenant is an illegal alien, to be guilty of the federal crime of harboring. The IIRA requires the same. IIRA § 5.A. Appellees then misquote the second case, *United States v. Varkonyi*, 645 F.2d 453, 456 (5th Cir. 1981), as follows: "'implicit in the wording [of the harboring statute] is the connotation that something is being hidden from detection.'" Appellees' Br. 47. The

smoking brackets reveal Appellees' misquotation. The Court was not referring to the wording "of the harboring statute," it was referring to wording of the charging document. 645 F.2d at 456. Furthermore, a year later the Fifth Circuit reiterated that the crime of harboring does *not* require sheltering an alien from detection. Harboring includes "any conduct tending to substantially facilitate an alien's remaining in the United States illegally." *United States v. Rubio-Gonzalez*, 674 F.2d 1067, 1073 (5th Cir. 1982).

It is well established that 8 U.S.C. § 1324(a)(1)(A)(iii) prohibits "a wide range of conduct… including providing unlawful aliens with housing," *United States v. Kim*, 193 F.3d 567, 574 (2d Cir. 1999), or "providing the aliens a place to live." *United States v. Tipton*, 518 F.3d 591, *5-*6 (8th Cir. 2008). Making an apartment available to an illegal alien has repeatedly been a basis for conviction under the federal statute. *Id.*; *United States v. Aguilar*, 883 F.2d 662, 669-70 (9th Cir. 1989); *United States v. Sanchez*, 963 F.2d 152, 155 (8th Cir. 1992). Charging rent does not erase the crime; renting an apartment to an illegal alien constitutes harboring. *United States v. Gomez-Moreno*, 479 F.3d 350, 354 (5th Cir. 2007). Indeed, harboring "for the purpose of commercial advantage or private financial gain" increases the severity of the crime. 8 U.S.C. § 1324(a)(1)(B)(i). See *United States v. Zheng*, 306 F.3d 1080 (11th Cir. 2002).

### 2. Appellees' Argument that "No Alien is Unlawfully Present Until an Immigration Judge Says So" Has Been Rejected by Every Circuit

Unable to show any conflict between the IIRA prohibition of harboring and the federal prohibition of harboring, Appellees resort to restating a preposterous theory adopted by the District Court—that an alien who has violated this country's immigration laws is not actually unlawfully present in the United States until an immigration judge renders a final order to that effect. 496 F.Supp.2d 532-533; Appellees' Br. 45.

This theory has been rejected by every Circuit that has considered it. In *United States v. Atandi*, 376 F.3d 1186 (10th Cir. 2004), the Tenth Circuit emphatically rejected this theory, holding that "an alien who is only permitted to remain in the United States for the duration of his or her status …becomes 'illegally or unlawfully in the United States' …*upon commission of a status violation*." *Id.* at 1188 (emphasis added). The Ninth Circuit agreed with the Tenth Circuit. *U.S. v. Bravo-Muzquiz*, 412 F.3d 1052, 1055 (9th Cir. 2005). The Fifth and Eighth Circuits had previously reached the same conclusion. *United States v. Igbatayo*, 764 F.2d 1039, 1040 (5th Cir. 1985); *United States v. Bazargan*, 992 F.2d 844, 847 (8th Cir. 1993).

Moreover, if Appellees' theory were correct, then much of federal law would be incomprehensible. Consider 8 U.S.C. § 1373(c), which states:

"The Immigration and Naturalization Service *shall respond* to an inquiry by a Federal, State, or local government agency, seeking *to verify or ascertain the citizenship or immigration status* of any individual …." (emphasis added). Congress expected states and localities to be making inquiries and expected that the INS or ICE (not an immigration judge) would be able to determine any alien's status. Similarly, 8 U.S.C. § 1621(a) requires states and localities to deny "public benefits" to aliens who are "not qualified." A "qualified alien" is defined essentially as any alien who is lawfully present in the United States. 8 U.S.C. § 1641(b). 8 U.S.C. § 1621(a) would also be incomprehensible if a definitive determination of an alien's legal status could not be rendered by DHS, absent an immigration hearing. Indeed Congress expressly created the SAVE system so that states and localities could ascertain the legal status of aliens in their jurisdiction. If the District Court's holding were correct, neither of these federal statutes would make any sense.

### 3. The Theory that Some Aliens are Unlawfully Present but Nonetheless Lawfully Residing in the United States is Erroneous

Appellees also restate the District Court's novel theory that certain categories of aliens are "not … technically lawfully present in the United States," but are nevertheless "permitted … implicitly to remain in the United

States." 496 F.Supp.2d at 531. Therefore, the Court supposed, the IIRA might wrongly deny housing to a particular alien. *Id*. The Court did not present any support for this proposition. The categories of aliens that the Court speculated might fall into this imaginary gray area were applicants for asylum, aliens paroled into the United States, aliens whose removal is deferred, and aliens in removal hearings who contest their removal by seeking to adjust status. *Id*.

The District Court's theory contradicts immigration law and applicable precedents. For example, the suggestion that an alien who is currently in a removal hearing is somehow "implicitly" permitted to remain in the United States has been rejected by every Circuit to consider the issue. *Atandi*, 376 F.3d at 1190; *Bravo-Muzquiz*, 412 F.3d at 1055. Nor does the existence of a pending application to adjust status change the fact that an alien is unlawfully present. *U.S. v. Lucio*, 428 F.3d 519, 525 (5th Cir. 2005)("[An application to adjust status] does not connote that the alien's immigration status has changed, as the very real possibility exists that the INS will deny the alien's application altogether.").

With regard to the other categories listed by the District Court, aliens in those categories *are lawfully present*. There is no conflict between federal law and the IIRA, because DHS would respond to an 8 U.S.C. § 1373(c)

inquiry by confirming that such an alien *is* lawfully present in the United States.  An alien paroled into the United States is lawfully present until his initial period of parole expires or DHS terminates his parole; 8 C.F.R. § 212.5(e).  "Cancellation of removal" recipients are permitted to "adjust to the status of an alien lawfully admitted for permanent residence."  8 U.S.C. § 1229b(b)(1).  Asylum applicants may obtain employment authorization (and lawful residence) in the United States until their applications are denied.  8 U.S.C. § 1158(d)(2).  An alien whose removal is withheld is also lawfully present during the withholding period.  See 8 U.S.C. § 1231(b)(3).  Accordingly, the federal government responds to an 8 U.S.C. § 1373(c) request by notifying the City that an alien in any such category is lawfully present.  As former INS special agent Michael Cutler testified at trial, an alien in any of these status categories is lawfully present and would be listed as such in the SAVE database.  Appx. A2588-89.  The federal government is always able to provide a definitive answer whenever a city inquires about any alien's immigration status.  Appx. A2591.

Here too, the District Court's theory renders specific federal statutes incomprehensible.  8 U.S.C. § 1373(c) and 8 U.S.C. § 1621 are based on the premise that every alien has an ascertainable legal status; and that the alien's status can be conveyed to any city requesting such information.  If the "gray

areas" imagined by the District Court existed, then these statutes would make no sense. Regardless, the City accepts whatever answer the federal government provides. IIRA §§ 5.B(3), 7.G. There can be no conflict if the City acts in accordance with federal determinations of status, as the IIRA requires.

Here too, none of Appellees claim to fit into any of these immigration categories. Therefore Appellees lack standing to raise this theoretical claim.

### 4. HUD Regulations do not Authorize Illegal Aliens to Remain in the United States

Finally, Appellees resort to making the absurd claim that "[t]he federal government routinely allows persons who currently lack lawfully immigration status to live in the United States." Appellees' Br. 45. In support of this assertion, they offer the HUD regulation 24 C.F.R. § 5.508, which actually *prevents* households from obtaining housing assistance for any illegal aliens living with them. Every member of the household must sign an affidavit stating he is either a US citizen or a lawfully present alien eligible for assistance, and must provide documentation. 24 C.F.R. § 5.508(b). 24 C.F.R. § 5.508(e) allows lawfully present members of a household to obtain assistance even if they have illegal aliens living with them, but only at a pro-rata rate *to prevent illegal aliens from gaining any federal housing assistance*.

On this slender regulatory reed Appellees balance their gargantuan claim that all illegal aliens residing in such households have been implicitly authorized to remain in the United States. Nowhere does this or any other HUD regulation state that such aliens are permitted to remain in the United States. On the contrary, 24 C.F.R. § 5.508(e) attempts to induce such illegal aliens to leave the United States, by denying them federal assistance. Congress's objective is spelled out in 8 U.S.C. § 1601(6): "It is a compelling government interest to remove the incentive for illegal immigration provided by the availability of public benefits."

## VIII. APPELLEES MISCHARACTERIZE THE IIRA TO MANUFACTURE A DUE PROCESS VIOLATION

Unable to point to a facial due process violation, Appellees mischaracterize how the IIRA would operate, if implemented. Their distortions are contrary to the express terms of the IIRA and the testimony of City officials, in at least four respects.

First, Appellees argue that the IIRA provides no predeprivation hearing. Appellees' Br. 77. This bald claim is contrary to the express terms of the IIRA. After a complaint is filed, an employer receives an administrative pre-deprivation hearing under IIRA § 4.B(3), at which he can present whatever "information" he wishes to the City. Evaluating *identical*

ordinance language, the *Gray* Court concluded, "The Court finds that … the Ordinance provides sufficient pre-deprivation notice and opportunity to be heard to satisfy the requirements of due process." *Gray*, at *93. The IIRA also provides employers and landlords the opportunity to seek a *judicial* pre-deprivation hearing at any time after a complaint is determined to be valid, in the Magisterial District Court of Hazleton. IIRA § 7.F.[7]

Second, Appellees claim that the administrative pre-deprivation hearing under IIRA § 4.B(3) would not allow an employer to present his side of the story. Appellees' Br. 78. This assertion is contrary to the testimony of the head of the Hazleton Code Enforcement Office, who explained that an employer would be allowed to present *any information he wished* during this administrative hearing. Appx. A1844-45.

Third, Appellees deceptively state the IIRA does not require employers to inform employees, or landlords to inform tenants, about any proceedings related to their immigration statuses. Appellees' Br. 15. Appellees pointedly fail to mention that *the City itself provides notice* to any

---

[7] Appellees attempt to twist the language of IIRA § 7.F: "Any business entity or rental unit owner subject to a complaint and subsequent enforcement under this ordinance… may challenge…." They claim that this means such a challenge can only occur after a license is suspended. Appellees' Br. at 79. This is an untenable reading of the word "enforcement." An IIRA § 7.F hearing may be triggered at any point after the City deems a complaint to be valid and begins the enforcement process under IIRA § 4.B(3) or 5.B(3).

employees or tenants involved.  Appx. A1843.

Fourth, Appellees mischaracterize the requirements of the Rental Registration Ordinance by claiming that alien tenants "are obliged to produce documentation that they do not possess;" and that inability to do so "will result in eviction."  Appellees' Br. 33.  This claim was directly contradicted by testimony of City officials.  Appellees conspicuously fail to offer any citation the record when making their assertion.  As was explained at trial, *no* occupancy permit will be denied to any tenant.  *Any* document from *any* source will be accepted for identity purposes.  Appx. A1852.

Appellees' gross mischaracterizations illustrate the purpose that underlies the *Salerno* standard.  The Supreme Court disfavors facial challenges precisely because such bizarre speculations by plaintiffs do not allow local officials or courts "to accord the law a limiting construction to avoid constitutional questions."  *Washington State Grange*, 128 S.Ct. at 1190.  Appellees have failed to meet the *Salerno* standard, which requires them to demonstrate that "no set of circumstances exist" under which it would be possible to implement the IIRA consistent with the requirements of due process.  *Salerno*, 481 U.S. at 745.

## CONCLUSION

For all of the aforementioned reasons, Appellant respectfully requests this Court to reverse the decisions below.

Respectfully submitted,

 /s/  Kris W. Kobach
Kris W. Kobach, Esquire

Harry G. Mahoney, Esquire
Carla P. Maresca, Esquire
Andrew B. Adair, Esquire
Michael M. Hethmon, Esquire

Attorneys for Appellant

## CERTIFICATE OF COMPLIANCE

I, Kris Kobach, Esquire, hereby certify that:

1.      This Brief complies with type-volume limitation of
Fed.R.App.P. 32(a)(7)(B), as modified by the Court's grant of leave to file
an over length brief not to exceed 10,000 words, because:

This Brief contains exactly 10,000 words, excluding the parts of
the Brief exempted by Fed.R.App.P. 32(a)(7)(B)(III).

2.      This Brief complies with the typeface requirements of
Fed.R.App.P. 32(a)(5) and the type style requirements of Fed.R.App.P. 32
(a)(6) because:

This Brief has been prepared in a proportionately spaced
typeface using MS Word, font size 14 point Times New Roman.

3.      The hard copy and the electronic copy of this brief are identical.

4.      The electronic copy of this brief has been virus scanned using
Symantec Mail Security virus software.


   _/s/  Kris W. Kobach_____
   Kris W. Kobach, Esquire
   Attorney for Appellant

# CERTIFICATE OF SERVICE

I, Kris Kobach, Esquire, hereby certify that this brief has been served, via U.S. Postal Service, on May 2, 2008, to the following individuals:

Thomas G. Wilkinson, Esq.
Thomas B. Fiddler, Esq.
Cozen & O'Connor
1900 Market St., 3rd Floor
Philadelphia, PA 19103

Lee Gelernt, Esq.
Omar Judwat, Esq.
ACLU
125 Broad St, 18th Floor
New York, NY 10004-2400

Foster Maer, Esq.
Ghita Schwartz, Esq.
Jackson Chin, Esq.
Puerto Rican Legal Defense Fund
99 Hudson St, 14th Floor
New York, NY 10013

Witold J. Walczak, Esq.
ACLU
313 Atwood St.
Pittsburgh, PA 15213

Lucas Guttentag, Esq.
ACLU
405 14th Street, Suite 300
Oakland, CA 94612

Jennifer Chang, Esq.
ACLU
39 Drumm St.
San Francisco, CA 94111

Shamaine A. Daniels, Esq.
Community Justice Project
118 Locust St
Harrisburg, PA 17101

/s/ Kris W. Kobach
Kris W. Kobach, Esquire
Attorney for Appellant